**United States District Court**
**Southern District Of New York**

| | |
|---|---|
| Elaine Aghaeepour, Elaine Barrett, Ashley Glasgow, Julie Higgins, Shane Moore, Michele Norris, Jesus Rivera, Ray Schilber, and Deborah Wilson, | } } } } |
| Plaintiffs | } } } |
| v. | } } |
| Northern Leasing Systems, Inc.; MBF Leasing, LLC; Lease Finance Group, LLC; Louis Cucinotta, Jennifer Nugent, Jay Cohen, Sara Krieger, Joseph I. Sussman, and Joseph I. Sussman, P.C., | } } } } } |
| Defendants | } } |

14 CV 5449

**COMPLAINT**

**JURY TRIAL DEMANDED**

## Nature of the Action

1.     This action arises out of Defendants' racketeering scheme to intimidate out-of-
state individuals into paying unwarranted sums of money by commencing (or
threatening) fraudulent lawsuits in New York City Civil Court for relatively small
sums of money, typically under $10,000.  Defendants were aware well before
bringing such actions that the documents underlying Defendants' claims against
Plaintiffs were forged and/or that Defendants never had a claim.  Nevertheless,
Defendants persisted in these small claims proceedings - and even obtained
fraudulent default judgments - in order to harass, intimidate, and thereby extort
money from Plaintiffs through threats of expensive long-distance litigation, of
damage to credit rating, and/or entry of default judgments.  Despite the fact that
as early as 2005, a City Civil Court judge (Cooper, J.C.C.) refused jurisdiction on
Defendants' boilerplate lawsuits premised on boilerplate forum selection clause
because such exercise of jurisdiction effectively deprived litigants from far-off

places (such as Plaintiffs) of their day in court, Defendants have continued to commence such proceedings and enter default judgments in that Court. Worse, they have continued to do so without even apprizing that Court of the adverse ruling of 2005 and/or several similar subsequent decisions.

2.  The racketeering scheme at issue also involves Defendants' wilful violations of the credit reporting statutes. Defendants impermissibly accessed Plaintiffs' credit report without even giving them the advance notice required under New York law. Thereafter, Defendants made an adverse entry on their credit reports, and wilfully refused to delete that entry even after being alerted to the falsity of their entry.

3.  On these and related grounds, Plaintiffs assert claims under the federal racketeering statute, 18 U.S.C. §1962, the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq*, ("FCRA"), under New York's Fair Credit Reporting Act, N.Y. Gen. Bus. L., §380 *et seq* ("NYFCRA"), and seeks compensatory, statutory, punitive and/or exemplary damages together with equitable and injunctive relief as well as attorneys' fees and expenses.

## Jurisdiction

4.  Jurisdiction is proper under the federal racketeering statute, 18 U.S.C. §1964(c), under the Fair Credit Reporting Act, 15 U.S.C. §§1681(p), and the principles of supplementary jurisdiction, 28 U.S.C. §1367. Defendants conducted a racketeering scheme in interstate commerce, through the use of the facilities of interstate coommerce.

## Parties

5.   Ms. Aghaeepour is a resident of California.

6.   Ms. Elaine Barrett is a resident of California.

7.   Ms. Ashley Glasgow is a resident of Florida.

8.   Ms. Julie Higgins is a resident of Indiana.

9.   Mr. Shane Moore is a resident of Tennessee.

10.  Ms. Michele Norris is a resident of Texas.

11.  Mr. Jesus Rivera is a resident of North Carolina.

12.  Mr. Ray Schilber is a resident of Murrietta, California.

13.  Ms. Deborah Wilson is a resident of Little Hocking, Ohio.

14.  Each of the abovenamed Plaintiffs is a "consumer" within the meaning of the FCRA, 15 U.S.C. §1681a(c), and NYFCRA, Gen. Bus. L., §380a- (b).

15.  Defendant Northern Leasing Systems, Inc., is a New York corporation with its principal place of business at 132 West 31st Street, New York, New York.  It is ostensibly in the business of originating and servicing micro-ticket leases through itself and through over 100 shell entities.  At all relevant times, it has managed and operated, and continues to manage and operate, itself and all these entities from the same offices in the same business using the same personnel with the same forms working with the same systems and employing the same *modus operandi*.  It exercised complete domination of Defendant MBF Leasing, LLC, and used such domination to commit the fraud and/or wrongs against Plaintiffs which resulted in Plaintiffs' injuries at issue.

16.     Defendant MBF Leasing LLC ("MBF") is a New York corporation, a wholly owned
        subsidiary and a "pass through" entity for Defendant Northern Leasing.  All leases
        procured in its name are routinely and promptly transferred to Defendant
        Northern Leasing for "servicing."

17.     Defendant Jay Cohen is one of the masterminds of the racketeering enterprise
        which is the subject of this action ("Enterprise").  At all relevant times, he was and
        continues to be the principal, an officer, and controlling person of the corporate
        Defendants, including, without limitation, President and Chief Executive Officer of
        Defendant Northern Leasing Systems, Inc.   At all relevant times, he received and
        continues to receive income directly and/or indirectly from the racketeering
        Enterprise.

18.     Defendant Sara Krieger is one of the masterminds of the Enterprise which is the
        subject of this action.  At all relevant times, she was and continues to be a
        principal, an officer, and controlling person of the corporate Defendants,
        including, without limitation, the Vice President for Operations of Northern
        Leasing and an officer of some of the shell entities through which the Enterprise is
        conducted.  For a substantial period of time, she verified all complaints filed by the
        Sussman Defendants in the New York City Civil Court on behalf of the Enterprise.
        At all relevant times, she received, and continues to receive, income directly
        and/or indirectly from the racketeering Enterprise at issue.

19.     Defendant Louis Cucinotta is one of the active, wilful participants in the
        Enterprise which is the subject of this action.  At all relevant times, he was and
        continues to be a principal, an officer, and controlling person of the corporate

Defendants, including, without limitation, the Legal Collections Manager for the Defendants.  He also purports to be, where convenient, an officer of the shell entities through which the Enterprise is conducted.  At all relevant times, he was one of the persons who verified complaints filed by the Sussman Defendants in the New York City Civil Court on behalf of the Enterprise.  At all relevant times, he received, and continues to receive, income directly and/or indirectly from the racketeering Enterprise at issue.

20.     Defendant Jennifer Nugent is one of the active, wilful participants in the Enterprise which is the subject of this action.  At all relevant times, she was and continues to be a principal, an officer, and controlling person of the corporate Defendants, including, without limitation, the Legal Administrative Manager for the Defendants.  She also purports to be, where convenient, an officer of some of the shell entities through which the Enterprise is conducted.  At all relevant times, she was one of the persons who verified complaints filed by the Sussman Defendants in the New York City Civil Court on behalf of the Enterprise.  At all relevant times, he received, and continues to receive, income directly and/or indirectly from the racketeering Enterprise at issue.

21.     Defendant Joseph I. Sussman is an attorney duly admitted to the Bar in New York.  At all relevant times, he commenced and conducted, and continues to commence and conduct, all of the litigation in the New York City Civil Court on behalf of the Enterprise.  At all relevant times, his offices were, and continue to be, part of the Defendants' offices, for the use of which offices he does not pay any rent.  In addition, he received, and continues to receive, a portion of the amounts collected

by the Enterprise.  He has, and continues to have, "all encompassing" access to the Enterprise's lease databases at all times.   He used, and continues to use, Defendants' computer system, CCS, as his own litigation management tool.  He is fully integrated with and a wilful, active participant in the Enterprise.  Whenever Defendant Sussman is made a party or subpoenaed as a witness in a lawsuit involving the Enterprise or its business practices, the Enterprise provides him with legal counsel and pay all attorneys' fees and expenses in his defense. Defendant Sussman has routinely disregarded the decision of Judge Cooper of the New York City Civil Court of 2005, *infra*.  Indeed, in subsequent proceedings that he commenced in the New York City Civil Court, in which proceedings he asserted jurisdiction over individuals from far-off places based solely on Defendants' boilerplate forum selection clause, he affirmatively concealed Judge Cooper's decision, and even obtained default judgments.  Further, he wilfully commenced or continued actions based on forged leases routinely, despite knowing of the forgery and/or having good reason to suspect the authenticity.

22.   Joseph I. Sussman, P.C., is a professional corporation under New York law with its principal offices at 132 West 31st Street, New York, New York 10001, the same offices as the other Defendants.  It is Defendant Joseph Sussman's law firm and as such, all pleadings and court filings in the New York City Civil Court are under its name and signature.  Defendants Joseph Sussman and Joseph I. Sussman, P.C., are cumulatively referred to herein as the "Sussman Defendants".

23.   Defendants Cohen, Krieger, Cucinotta, Nugent, and Sussman ("Individual Defendants") direct, control, and run the racketeering Enterprise as more fully

described below.   Defendants are ostensibly engaged in the business of leasing small business equipment, mostly credit card processing machines.  The Individual Defendants worked in concert to cause the racketeering Enterprise at issue to engage in the misconduct described in this complaint. In particular, the Individual Defendants each directed Northern Leasing, Lease Finance Group, MBF Leasing, and the shell entities to maintain continuous and systematic contacts with other members of the scheme and further directed the Enterprise to consummate the unlawful transactions described herein, and to attempt to enforce non-existent liabilities against Plaintiffs through a misuse of New York's judicial system.  Each of the Individual Defendants has personally profited personally from those activities.

24.   Each of Individual Defendants has been employed by the Enterprise, formally through Defendant Northern Leasing and/or its principals and affiliates for long periods of time at high levels in senior positions; as such, each is well aware of the fraudulent scheme that is the core of Defendants' ostensible "business."  Each is a wilful and active participant in the fraudulent scheme at issue.  Each was responsible at all relevant times for making the false entries in consumers' credit reports, for investigating disputes raised by consumers with respect to Defendants' adverse entries, and for Defendants' consistent refusal to retract these false statements despite conclusive evidence to the contrary.  The actions of each were beyond the scope of their employment.  Further, each committed these illegal acts, and participated in the fraudulent scheme, for his/her own personal purposes, motivated and incentivized by enhanced bonuses, profits, perks, and other

economic benefits and unmindful of the damage inflicted upon Plaintiffs and other innocent victims across the country.

25. Defendants are "furnishers of information" within the meaning of the FCRA, 15 U.S.C. §1681s-2, and "users" of consumer credit reports within the meaning of NYFCRA, Gen. Bus. L., §380a-(i).

## Factual Background

26. This case involves the systematic and repeated manner in which Defendants' Enterprise attempted to intimidate, and did intimidate, individuals located around the country in essentially a "shakedown" effort, in common parlance, to bully them into paying the Enterprise monies to which the Enterprise was never entitled. Based on forged documents, which Defendants knew were forged, the Enterprise sought to intimidate Plaintiffs with dunning letters and phone calls, telling them that it would be more expensive for them to dispute the Enterprise's claims in New York City Civil Court than it would be to pay tribute to the Enterprise. And when Plaintiffs did not succumb to such intimidation, the Enterprise brought lawsuits in the New York City Civil Court, New York County.

27. Obviously, once the Enterprise commenced these legal proceedings, Plaintiffs faced significant hurdles to having their day in court, including disproportionately high expenses and inconveniences of long-distance litigation, and multiple trips to New York. The relatively small amounts at issue would have, as Defendants and other participants in the Enterprise were well aware, prevented these Plaintiffs from obtaining counsel or from otherwise developing their defense. Further, Plaintiffs' potential witnesses were all in their respective local areas, quite far from

the New York City Civil Court.  Defendants' entire scheme was designed to ensure that Plaintiffs had no real opportunity to raise defenses to the Enterprise's bogus lawsuits, so that the entry of a default judgment was all but certain.  In fact, an overwhelming majority of the lawsuits brought by the Sussman Defendants on behalf of the Enterprise resulted in default judgments in the New York City Civil Court.

28.   As this Court is well aware, once a judgment is entered in the New York City Civil Court, it would be almost impossible for the judgment-debtor to challenge the Enterprise in subsequent judgment enforcement actions without incurring costs far in excess of the judgment itself.  Had the Enterprise filed the suits in Plaintiffs' respective home locations to enforce its alleged claims, Plaintiffs would have been able to present evidence of what really transpired, and establish the bogus nature of the Enterprise's claims in a local court, either through an attorney or by themselves.

29.   Further, the very entry of judgment in New York City Civil Court is automatically reported as an adverse entry in Plaintiffs' respective <u>personal</u> consumer credit reports.  This has significant impact on credit availability to Plaintiffs, including without limitation, denial of credit opportunities, increase in interest rates, and diverse other consequences.

30.   As shown below through the facts of each Plaintiff, the repeated nature of the manner in which Defendants acted and their wrongful behavior set the pattern and practice of a racketeering scheme unlawful under both federal and state law.

*Ms. Aghaeepour*

31.   In October of 2007, Defendants' representative came to Ms. Aghaeepour's offices and solicited her to sign up for check processing and guarantee service. Relying upon his representations[1] - which representations, unknown to Ms. Aghaeepour, were materially false and misleading - Ms. Aghaeepour provided her personal information such as bank account and social security number. The Enterprise and/or its representatives manufactured a fraudulent lease based on that information, with Defendant Northern Leasing as the alleged lessor. The Enterprise, under the name of Defendant Northern Leasing, commenced debiting Ms. Aghaeepour's account ostensibly towards payments under that lease. When Ms. Aghaeepour noticed that and attempted to reach the Enterprise's representative, he went incommunicado, and despite repeated requests from Ms. Aghaeepour, the Enterprise failed and refused to stop such debits.

32.   In March 2008, another of the Enterprise's representatives approached Ms. Aghaeepour offering to fix the problems created by the first representative. The same cycle followed, and unknown to Ms. Aghaeepour, the Enterprise's representatives manufactured another fraudulent lease, this time under the name of Defendant MBF Leasing as lessor. The Enterprise commenced debiting, under the name of Defendant MBF Leasing, Ms. Aghaeepour's account ostensibly for this second lease also.

---

[1]These misrepresentations included, without limitation, (a) that the machine and service would verify and guarantee checks so that Ms. Aghaeepour would avoid losses on bounced checks; (b) that the monthly fee was a flat $39, in addition to a transaction fee of 1% of face value of each check; and (c) that the arrangement was month-to-month, which Ms. Aghaeepour could terminate at will.

33. As before, Ms. Aghaeepour's continued attempts to rectify the situation were unsuccessful; this representative also went incommunicado, and the Enterprise once again failed and refused to stop the debits. In fact, as Ms. Aghaeepour found out later, the Enterprise's representations were materially false and misleading.

34. Ms. Aghaeepour then learnt about Defendant Northern Leasing and/or MBF Leasing, and its debits from her account. She informed Defendants that she had never signed any leases, contracts, or guarantees with either of them, and had no account or transactions with either of them. Accordingly, she requested Defendants to stop debiting her account and refund the amounts wrongfully taken from her bank account. Defendants refused, whereupon Ms. Aghaeepour was forced to close the bank account.

35. Defendants then started harassing telephone calls to Ms. Aghaeepour's home and business, claiming that she had signed two leases with them. Ms. Aghaeepour categorically informed Defendants that she had never signed any lease with them, and demanded that they stop the harassment. Nevertheless, Defendants' abusive calls continued with merciless frequency.

36. The Enterprise, under the name of Defendant Northern Leasing, also made adverse entries in Ms. Aghaeepour's personal consumer credit report, which caused her tremendous damage.

37. On or about February 26, 2013, Defendants, through Defendant Northern Leasing, accessed Ms. Aghaeepour's consumer credit report. Defendants never provide any advance or written notice to Ms. Aghaeepour that they intended to pull her consumer credit report. Such notice is mandatory under New York law.

38. Further, Defendants made an adverse entry in Ms. Aghaeepour's consumer credit report, stating "early termination/balance owing", and claiming that she had a "balance" of $1,365. On the "status" of the account, Defendants reported, "Account charged off. $1,373 written off."

39. In April, 2013, Ms. Aghaeepour disputed the said entry to Experian. Upon information and belief, Experian duly notified Defendants of Ms. Aghaeepour's dispute with a request to conduct the statutory reasonable investigation.

40. Defendants wilfully failed and refused to conduct any investigation. Although Ms. Aghaeepour had categorically asserted that her signatures had been forged in the alleged lease underlying Defendants' claim, Defendants did not even bother calling her by phone, or writing to her, or communicating with her in any manner in this connection. Instead, they summarily - and falsely - reported back to Experian that they had "verified" the alleged loan to Ms. Aghaeepour. Defendants' adverse entry is scheduled to continue on Ms. Aghaeepour's consumer credit report for at least seven years.

41. Defendants did not have any authority to access or make any entry in Ms. Aghaeepour's credit report.

42. Defendants knew or ought to have known that Ms. Aghaeepour had no account with them, and did not owe Defendants anything.

43. Meanwhile, unknown to Ms. Aghaeepour, the Enterprise, under the names of Defendants Northern Leasing and MBF Leasing, commenced two lawsuits against Ms. Aghaeepour in the New York City Civil Court, County of New York (032848 cv 09 and 032860 cv 09). They never served process upon her in either lawsuit, and

through false representations to that Court, obtained two default judgments against her for $3,198 and for $1,365.

44. As Defendants certainly knew and intended, both these judgments were reported as an adverse entry in Ms. Aghaeepour's consumer credit report.

45. Further, under the guise of enforcing these default judgments, Defendants, through the Sussman Defendants, wrongfully issued multiple restraining notices to Ms. Aghaeepour's bank accounts.  In other words, after levying an account, Defendants imposed duplicate levies on other accounts with different banks.  As a result, Ms. Aghaeepour's bank accounts were frozen, and she was deprived access to her own funds, in amounts several times the default judgments.

46. Finally, Ms. Aghaeepour had to retain lawyers in New York, and move the City Civil Court to get the default judgment set aside in order to gain access to her own money.  By order dated September 25, 2013, that Court granted Ms. Aghaeepour's motion and set aside the default judgments in both cases.

47. Nevertheless, Defendants failed and refused to delete the adverse entry in Ms. Aghaeepour's consumer credit report.

48. Defendant Cucinotta signed and verified the complaint in the New York City Civil Court on behalf of Defendants Northern Leasing and MBF Leasing.  Defendant Cucinotta stated, under penalties of perjury, that the contents of the two verified complaints were "true to my own knowledge" and were "based upon my personal knowledge" and Defendants' records.

49. In fact, Defendant Cucinotta never had any communication with Ms. Aghaeepour at any time.  He knew nothing about Ms. Aghaeepour's alleged execution of the

bogus lease.  He had no personal knowledge concerning Ms. Aghaeepour or the underlying alleged transaction, and his affirmation to the New York Court was wilfully false and perjurious.

50.     Worse, Defendant Cuccinota, as Defendants' Legal Collections Manager, persisted in those lawsuits, despite Ms. Aghaeepour's categorical assertions, under penalties of perjury, that the lease was forged, and despite Defendants' lack of any evidence to contravene the said assertions.  Further, Defendant Cucinotta was actually or constructively responsible for the impermissible access as well as wrongful refusal to remove the adverse credit entry from Ms. Aghaeepour's credit report.  These actions were beyond the scope of his employment.  Commission of fraud and wilfully violating the law as detailed in this Complaint was beyond the scope of Defendant Cucinotta's legitimate employment responsibilities.

51.     Defendant MBF wrongfully debited, in its own name, $3,279.60 while Defendant Northern Leasing debited, in its own name, $1,690.92 from Ms. Aghaeepour's account.

52.     In addition, the bad check losses due to the misrepresentations about the check guarantee system that the Enterprise's representative "leased" to Ms. Aghaeepour through false representations amounted to over $15,000 each for three years.

53.     Furthermore, Ms. Aghaeepour's credit was ruined.  She was unable to qualify for any type of loan or refinance of existing loans to take advantage of low interest rates.  She was turned down for a business bond and insurance, and her credit lines were closed.  As a result, she suffered significant economic damages.

54.   Moreover, Plaintiffs also suffered significant non-economic damages, including mental anguish, embarrassment, annoyance, and emotional distress, for which Defendants are liable jointly and severally.

Ms. Elaine Barrett

55.   At all relevant times, Ms. Barrrett is and has been a registered nurse in California. She never had any transaction with Defendants.

56.   Nevertheless, on July 25, 2012, the Enterprise, through Defendant Northern Leasing, accessed her consumer credit report.

57.   Defendants never had any authority to access Ms. Barrett's credit report. They never gave her any advance notice as required by New York law.

58.   Further, Defendants, under the name of Lease Financial Group, made an adverse entry in Ms. Barrett's consumer credit report that (a) she had opened an account with them on November 1, 2008; (b) that she owed them a balance of $11,868; and (c) that her account had been "charge[d]-off".

59.   On May 15, 2013, Defendants, under the name of Defendant Lease Finance Group, brought a lawsuit in the New York City Civil Court, New York County, against Ms. Barrett. That lawsuit was brought by the Sussman Defendants.

60.   Defendant Nugent verified that complaint on behalf of Defendant Lease Finance Group. Defendant Nugent stated, under penalties of perjury that the contents of the verified complaint were "true to my own knowledge" and were "based upon my personal knowledge" and Defendant Lease Finance Group's records.

61.   In fact, Defendant Nugent never had any communication with Ms. Barrett at any time. She knew nothing about Ms. Barrett's alleged execution of the bogus lease.

She had no personal knowledge concerning Ms. Barrett, and her affirmation to the New York Court was wilfully false and perjurious.

62.     The complaint sought recovery under an alleged lease between Defendant Lease Finance Group and one "VPLEX, Inc", based in Manhattan Beach, California. That alleged lease carried the forged signature of Ms. Barrett, reflecting her as "director".

63.     Ms. Barrett had nothing to do with VPLEX, Inc., and was not even aware of such a corporation.  She lived in Gilroy, California, which was over 300 miles from Manhattan Beach, California.  Defendants knew these facts from her consumer credit report which they had illegally accessed.

64.     Nevertheless, Defendants obtained a default judgment against Ms. Barrett for $16,712.36, in the City Civil Court.

65.     Upon coming to know of that judgment, Ms. Barrett had to retain attorneys in New York to get that judgment set aside.

66.     Ms. Barrett's attorneys then communicated with the Sussman Defendants pointing out the forgery, and requested that Defendants voluntarily vacate the default judgment and dismissal of the complaint.  The Sussman Defendants flatly refused, asserting that Ms. Barrett and "her son Ed" were "responsible parties."

67.     The alleged lease does not reflect any "Ed" or anyone else.  The Susman Defendants had no basis for refusing to vacate the default judgment or insisting that Ms. Barrett was "responsible" for the forged lease.

68. Ms. Barrett then had to commence motion practice in the New York City Civil Court to set aside the default judgment and to have the complaint dismissed.  That motion is pending.

69. Meanwhile, the Enterprise, through Defendant Northern Leasing, made an adverse entry in Ms. Barrett's credit report.

70. As a result of the Enterprise's actions, Ms. Barrett suffered significant economic and non-economic damages.  Thus, for example, when she attempted to replace her lost car, she had to pay much higher interest rates on the car loan.   Credit card companies refused her applications for credit.  So also, she ran into significant difficulties while trying to purchase a home.  Defendants are accountable for all these damages in such amount as may be determined by the Jury.

Ashley Glasgow

71. Ms. Glasgow never had any transactions with any of the Defendants.

72. On August 26, 2013, Defendants, under the name of Defendant Northern Leasing, brought a lawsuit in the New York City Civil Court, New York County, against Ms. Glasgow.  That lawsuit was brought by the Sussman Defendants.

73. Defendant Nugent verified that complaint on behalf of Defendant Northern Leasing.  Defendant Nugent stated, under penalties of perjury that the contents of the verified complaint were "true to my own knowledge" and were "based upon my personal knowledge" and Defendant Northern Leasing's records.

74. In fact, Defendant Nugent never had any communication with Ms. Glasgow at any time.  She knew nothing about Ms. Glasgow's alleged execution of the bogus lease.

She had no personal knowledge concerning Ms. Glasgow, and her affirmation to the New York Court was wilfully false and perjurious.

75. The complaint sought recovery under an alleged lease between Defendant Northern Leasing and one ""Fine Arts & Cigars of Tampa" based in Florida.  That alleged lease carried the forged signature of Ms. Glasgow, reflecting her as "owner."  Ms. Glasgow had nothing to do with that corporation or the alleged lease; indeed, she was not even aware of such a corporation.

76. Nevertheless, Defendants obtained a default judgment against Ms. Glasgow on December 5, 2013 for $5,404.42.

77. Ms. Glasgow learnt about the lawsuit for the first time in January 2014, when her bank account was frozen.  As a consequence, she was deprived access to her own funds abruptly, which turned her life upside down.

78. Upon coming to know of that judgment, Ms. Glasgow had to retain attorneys in New York to get that judgment set aside.

79. Ms. Glasgow's attorneys then communicated with the Sussman Defendants pointing out the forgery, and requested that Defendants voluntarily vacate the default judgment and dismissal of the complaint.  The Sussman Defendants flatly refused.

80. Ms. Glasgow then had to commence motion practice in the New York City Civil Court to set aside the default judgment and to have the complaint dismissed.  That motion was denied and is pending appeal.

81. Meanwhile, the Enterprise, through Defendant Northern Leasing, made an adverse entry in Ms. Glasgow's credit report.

82. As a result of the Enterprise's actions, Ms. Glasgow suffered significant economic and non-economic damages.

Julie Higgins

83. Sometime in 2005 Ms. Higgins bought a video store business in Denison, TX. Plaintiffs' representative came to her store and offered Ms. Higgins to sign up for credit card processing. Ms. Higgins was told that the equipment would be provided free of charge with the service.

84. Ms. Higgins provided all her banking info so that the funds could be deposited into her bank account. Shortly thereafter, Ms. Higgins' noticed charges on her bank account made by Defendant MBF.

85. Since she never heard of MBF before Ms. Higgins to call MBF a number of times. MBF representative over the phone told Ms. Higgins that she signed a lease with MBF.  Ms. Higgins said that she did not sign any lease, and this is the first time ever she learned about MBF.

86. For several months Ms. Higgins attempted to resolve the issue with Defendant MBF. She returned the machine back to MBF. Even after Ms. Higgins returned the machine MBF continued to charge her account, which she later closed.

87. The last time Ms. Higgins heard from Defendant MBF was sometime in 2006.  She assumed that the issue was resolved.

88. However, in 2014, Ms Higgins was shocked to find out that the judgment was entered in New York City Civil Court. Ms. Higgins was neither served with Summons and Complain nor aware of the proceedings in New York court.

89.  Defendants, under the name of Defendant Northern Leasing and MBF, also made adverse entries in her consumer credit report, which caused her tremendous damage.

90.  On or about July 24, 20132, July 24, 2013, October 30, 2013, and February 11, 2014, Defendants, through Defendant MBF, accessed Ms. Higgins' consumer credit report.  On or about July 25, 2012, and August 7, 2012, Defendants, through Defendant Northern Leasing, accessed Ms. Higgins' consumer credit report. Defendants never provide any advance or written notice to Ms. Higgins that they intended to pull her consumer credit report.

91.  Further, Defendants made two adverse entries in Ms. Higgins's consumer credit report. One entry by Defendant MBF claiming that she had a "balance" of $1,559. On the "status" of the account, Defendants reported, that account # "50XXXX" is "closed," and on the payment status – "charge-off."

92.  Another entry by Defendant MBF claiming that she had a "balance" of $2,719.  On the "status" of the account, Defendants reported, that account # "47XXXX" is "closed," and on the payment status – "charge-off."

Shane Moore

93.  Defendants, under the name of Defendant Northern Leasing, also made adverse entries in his consumer credit report, which caused him tremendous damage.

94.  Defendants never provide any advance or written notice to Mr. Moorethat they intended to pull his consumer credit report.

Michelle Norris

95. Defendants, under the name of Defendant Northern Leasing, also made adverse entries in her consumer credit report, which caused her tremendous damage.

96. Defendants never provide any advance or written notice to Ms. Norris that they intended to pull he consumer credit report.

Jesus Rivera

97. Defendants, under the name of Defendant Northern Leasing, also made adverse entries in his consumer credit report, which caused him tremendous damage.

98. Defendants never provide any advance or written notice to Mr. Rivera that they intended to pull his consumer credit report.

Ray D. Schilber

99. Mr. Jay Williams of Elite Pay Global came into Mr. Schilber's store and offered his company's services. Mr. Williams said that his could help to save substantial amounts on Visa and MasterCard processing rates.

100. Mr. Williams asked Mr. Schilber to sign certain documents, which he did. However, Mr. William refuse to leave any copies of the signed documents and stated that he will send copies later.  No copies were sent.

101. Subsequently Mr. Schilber requested a copy of an alleged lease to be sent to him. When he received a copy of the alleged lease Mr. Schilber noticed that his signature on it was forged. Mr. Schilber never signed any such document.

102. Defendants, under the name of Defendant Northern Leasing, made adverse entries in his consumer credit report, which caused him tremendous damage.

103. On or about October 18, 2013, and May 20, 2014, Defendants, through Defendant Northern Leasing, accessed Mr. Schilber's consumer credit report.  Defendants

never provide any advance or written notice to Mr. Schilber that they intended to pull his consumer credit report.

104. Further, Defendants made an adverse entry in Mr. Schilber's consumer credit report, claiming that he had a "balance" of $4,554. On the "status" of the account, Defendants reported, "Account closed," and on the payment status – "charged off."

Wilson

105. Defendants, under the name of Defendant Northern Leasing, also made adverse entries in her consumer credit report, which caused her tremendous damage.

106. On or about September 19, 2012, and May 20, 2013, Defendants, through Defendant Northern Leasing, accessed Ms. Wilson's consumer credit report. Defendants never provide any advance or written notice to Ms. Wilson that they intended to pull her consumer credit report.

107. Further, Defendants made an adverse entry in Ms. Wilson's consumer credit report, claiming that she had a "balance" of $4,500. On the "status" of the account, Defendants reported, "Account charged off."

Defendants' Wilfulness, Plaintiffs' Injuries

108. Defendants' accessing of Plaintiffs' credit records, and/or making a wrongful adverse report to credit reporting agencies, was wilful and malicious.

109. Plaintiffs suffered, and continues to suffer, actual and real monetary injury as a direct result of Defendants' aforesaid misconduct. These injuries were attributable to each of the Defendants, and to Defendant Northern Leasing's complete domination of Defendant MBF Leasing.

110.  As a result of Defendants' violations of the credit reporting statutes, Ms. Aghaeepour was unable to obtain a bond which she was required to post under State law.  Further, she was unable to open a bank account with Wells Fargo.

111.  Ms. Aghaeepour is entitled to compensatory and punitive damages therefor, together with attorneys' fees and expenses.

## Count I

### (Fair Credit Reporting Act, Section 1681b(f):

### Willfully Obtaining Consumer  Reports Without A Permissible Purpose)

112.  Plaintiffs realleges and incorporates the preceding paragraphs.

113.  Defendants willfully violated the FCRA by obtaining Plaintiffs's consumer credit report without her permission and without having a  permissible purpose therefor.

114.  Defendants Brown and Taylor conducted the business activities (on behalf of all Defendants) through repeated illegal accesses of Plaintiffs's consumer reports  and the information contained therein, as described above.

115.  These illegal acts affected Plaintiffs and a large number of unwitting consumers and persisted over at least a five year period, evidencing a pattern of Defendants' willfully violating the provisions of the FCRA.

116.  Defendants' acts in obtaining this information in willful  violation of the FCRA without a permissible purpose violate 15 U.S.C. §1681b(f).

117.  As a result of Defendants' aforesaid misconduct, Plaintiffs has sustained damages for which Defendants are liable, in addition to attorneys' fees and expenses, 15 U.S.C. §1681n(a).

## Count II

### ((Fair Credit Reporting Act, Section 1681b(f):

Negligently Obtaining Consumer Reports Without A Permissible Purpose)

118.   This count is asserted in the alternative to Count I above.

119.   Plaintiffs realleges and incorporates the preceding paragraphs.

120.   Defendants violated the FCRA by negligently obtaining Plaintiffs's consumer credit report without her permission and without having a permissible purpose therefor.

121.   Defendants Brown and Taylor conducted the business activities (on behalf of all Defendants) through repeated illegal accesses of Plaintiffs's consumer reports and the information contained therein, as described above.

122.   These illegal acts affected a large number of unwitting consumers and persisted over at least a five year period, evidencing a pattern of Defendants' negligently violating the provisions of the FCRA.

123.   As a result of Defendants' aforesaid misconduct, Plaintiffs has sustained damages for which Defendants are liable, in addition to attorneys' fees and expenses under 15 U.S.C. §1681o.

## Count III

### (Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b)(A) -

Wilful Refusal/Failure to Investigate and/or Rectify Error In Reporting)

124.   Plaintiffs realleges and incorporates the preceding paragraphs.

125.   Defendants were informed by the credit reporting agencies that Plaintiffs disputed the accuracy of the information Defendants had provided to credit reporting

agencies.  Defendants willfully failed to conduct a proper investigation of Plaintiffs's dispute that Plaintiffs was not liable for the account appearing on her credit report, as required by 15 U.S.C. §1681s-2(b)(A).

126.   Defendants willfully failed, neglected and/or refused to review all relevant information purportedly provided by such credit reporting agencies to Defendants in conducting their investigation, as required by 15 U.S.C. §1681s-2(b)(B).

127.   Defendants' failure/refusal to direct such consumer reporting agencies to delete inaccurate information about Plaintiffs pertaining to their respective accounts as required by 15 U.S.C. §1681s-2(b)(C) was wilful.

128.   Defendants Brown and Taylor conducted the business activities (on behalf of all Defendants), as described above.

129.   Defendants are liable to Plaintiffs for the actual damages sustained by reason of their violation of the FCRA, in an amount to be determined by the trier of fact, together with an award of punitive damages in an amount to be determined by the trier of fact, as well as reasonable attorney's fees and expenses pursuant to 15 U.S.C. § 1681n.

### Count IV

(Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b)(A):

Negligent Refusal/Failure to Investigate and/or Rectify Error In Reporting)

130.   This count is asserted in the alternative to Count III above.

131.   Plaintiffs realleges and incorporates the preceding paragraphs.

132. After being informed by the credit reporting agencies that Plaintiffs disputed the accuracy of the information that Defendants had provided to a credit reporting agency, Defendants negligently failed to conduct a proper investigation of their dispute, as required by 15 U.S.C. §1681s-2(b)(A).

133. Defendants negligently failed to review all relevant information adequately in conducting their investigation, as required by 15 U.S.C. §1681s-2(b)(B).

134. Defendants negligently failed to direct such consumer reporting agencies to delete inaccurate information about Plaintiffs, as required by 15 U.S.C. § 1681s-2(b)(C).

135. Defendants Brown and Taylor conducted the business activities (on behalf of all Defendants), as described above.

136. Defendants are liable to Plaintiffs for the actual damages sustained by reason of the aforesaid misconduct, together with reasonable attorney's fees and expenses, 15 U.S.C. §1681o.

### Count V

(New York Fair Credit Reporting Act, GBL, Section 380-b:

Willfully Obtaining Consumer Reports Without A Permissible Purpose

And/or Under False Pretenses)

137. Plaintiffs realleges and incorporates the preceding paragraphs.

138. Defendants willfully violated the NYFCRA by obtaining Plaintiffs's consumer credit reports without her permission and without having a permissible purpose therefor, and/or under false pretenses.

139. Further, Defendants wilfully failed and neglected to inform Plaintiffs in writing, before accessing her consumer report, that Defendants would request a consumer

report and/or that they would inform her of the name and address of the consumer reporting agency that furnished the report.

140.   Defendants Brown and Taylor conducted the business activities (on behalf of all Defendants), through repeated illegal accesses of consumer reports and the information contained therein, as described above.

141.   These illegal acts affected Plaintiffs and a large number of unwitting consumers and persisted over at least a five year period, evidencing a pattern of Defendants willfully violating the provisions of the NYFCRA.

142.   Defendants' acts in obtaining this information in willful violation of the NYFCRA without a permissible purpose violate N.Y. Gen. Bus. L., §380-b, which is actionable under Section 380-l thereof.

143.   As a result of Defendants' aforesaid misconduct, Plaintiffs has sustained damages for which Defendants are liable.

### Count VI

(New York Fair Credit Reporting Act, Section 380-b -

Negligently Obtaining Consumer Reports Without A Permissible Purpose)

144.   This count is asserted in the alternative to Count V above.

145.   Plaintiffs realleges and incorporates the preceding paragraphs.

146.   Defendants violated the NYFCRA by negligently obtaining Plaintiffs's consumer credit reports without her permission and without having a permissible purpose therefor.

147.   Further, Defendants failed and neglected to inform Plaintiffs in writing, before accessing her consumer report, that Defendants would request a consumer report

and/or that they would inform her of the name and address of the consumer reporting agency that furnished the report.

148.   Defendants Brown and Taylor conducted the business activities (on behalf of all Defendants), through repeated illegal accesses of consumer reports  and the information contained therein, as described above.

149.   These illegal acts affected Plaintiffs and a large number of unwitting consumers and persisted over at least a five year period, evidencing a pattern of Defendants' negligently violating the provisions of the NYFCRA.

150.   Defendants' actions were in violation of the NYFCRA, Gen. Bus. L., §380-b, which is actionable under Section 380-m.

151.   As a result of Defendants' aforesaid misconduct, Plaintiffs has sustained damages for which Defendants are liable.

**Count VII**

(New York Fair Credit Reporting Act, Gen. Bus. L., §380-l -

Wilful Reporting of False Information and/or Refusal/Failure to

Investigate and/or Rectify Error In Reporting)

152.   Plaintiffs realleges and incorporates the preceding paragraphs.

153.   Defendants knowingly and wilfully introduced or caused to be introduced false information concerning Plaintiffs into the files of consumer reporting agency or agencies in violation of Section 380-o, G.B.L.  Even after being informed by the credit reporting agencies that Plaintiffs disputed the accuracy of the information provided to credit reporting agencies, Defendants willfully refused to retract such

false information, or even investigate Plaintiffs's assertions that the information Defendants had provided to the credit reporting agency was false.

154.  Defendants are liable to Plaintiffs for the actual damages sustained by reason of their violation of the FCRA, together with an award of punitive damages in an amount to be determined by the jury, as well as her reasonable attorney's fees and expenses, pursuant to New York Fair Credit Reporting Act, Gen. Bus. L., §380-l.

### Count VIII

(New York Fair Credit Reporting Act, Gen. Bus. L., §380-m -

Negligent Refusal/Failure to Investigate and/or Rectify Error In Reporting)

155.  This count is asserted in the alternative to Count VII above.

156.  Plaintiffs realleges and incorporates the preceding paragraphs.

157.  Defendants introduced or caused to be introduced false information concerning Plaintiffs into the files of consumer reporting agency or agencies in violation of Section 380-o, G.B.L.  Even after being informed by the credit reporting agencies that Plaintiffs disputed the accuracy of the information provided to credit reporting agencies, Defendants failed and neglected to retract such false information, or even investigate Plaintiffs's assertions that the information Defendants had provided to the credit reporting agency was false.

158.  Defendants are liable to Plaintiffs for the actual damages sustained by reason of the aforesaid misconduct, together with her reasonable attorney's fees, N.Y. Gen. Bus. L., §380-m.

## Jury Trial Demanded

159.   Plaintiffs demands a jury trial on all issues so triable.

WHEREFORE,  Plaintiffs demands judgment against Defendants, jointly and severally, on each Count aforesaid:

a.   Awarding compensatory, punitive, statutory and/or treble damages to Plaintiffs in such amount as may be determined after discovery and trial;

b.   Awarding Plaintiffs the costs of this action, including reasonable attorneys' fees and expenses, experts' fees and other disbursements;

c.   Granting such further and other reliefs as may be just and proper.

Dated:   New York, New York      **Chittur & Associates, P.C.**
July 18, 2014

By:  Krishnan Chittur, Esq. (KC9258)
Central Westchester Business Park
500 Executive Boulevard Suite 305
Ossining, New York 10562

Attorneys for Plaintiffs

30