**United States District Court**
**Southern District Of New York**

| | | |
|---|---|---|
| Elaine Aghaeepour; Anne Barr; Bruce Drago; Julie Higgins; Shane Moore; Michele Norris; Jesus Rivera; and Hong Zhang, | } } } } | 14 CV 5449 (NSR) (LMS) |
| Plaintiffs | } } } | |
| v. | } } } | **SECOND AMENDED COMPLAINT** |
| Northern Leasing Systems, Inc.; MBF Leasing, LLC; Lease Finance Group, LLC; Louis Cucinotta, Jennifer Centeno a/k/a Jennifer Nugent, Jay Cohen, Sara Krieger, Joseph I. Sussman, and Joseph I. Sussman, P.C., | } } } } } } | |
| Defendants | } } | JURY TRIAL DEMANDED |

## Nature of the Action

1. This action arises out of Defendants' racketeering scheme to intimidate out-of-state individuals into paying unwarranted sums of money by commencing (or threatening) fraudulent lawsuits in New York City Civil Court for relatively small sums of money, typically under $10,000. Defendants were, or certainly ought to have been, aware well before bringing (or threatening) such actions that the documents underlying Defendants' claims against Plaintiffs were forged and/or that Defendants never had a claim. Nevertheless, Defendants persisted in these small claims proceedings - and even obtained fraudulent default judgments - in order to harass, intimidate, and thereby extort money from Plaintiffs through threats of expensive long-distance litigation, of damage to credit rating, and/or entry of default judgments. Despite several proceedings based on substantially similar allegations of fraud and forgery - including some by law enforcement agencies, such as the Lawsuit by the New York Attorney General and the Deputy

Chief Administrative Judge of the City Civil Court, *infra*, Defendants have continued to commence the same boiler boilerplate lawsuits premised on the same boilerplate forum selection clause to effectively deprive litigants from far-off places (such as Plaintiffs) of their day in court.

2.  The racketeering scheme at issue also involves Defendants' wilful violations of the credit reporting statutes.  Defendants impermissibly accessed Plaintiffs' credit report without a permissible purpose, without authority, and without giving Plaintiffs the advance notice required under New York law.  Thereafter, Defendants made an adverse entry on some Plaintiffs' credit reports, and wilfully refused to delete that entry even after being alerted to the falsity thereof.

3.  On these and related grounds, Plaintiffs assert claims under the federal racketeering statute, 18 U.S.C. §1962, the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq*, ("FCRA"), the New York Fair Credit Reporting Act, N.Y. Gen. Bus. L., §380 *et seq* ("NYFCRA"), the New York Deceptive Trade Practices Act, N.Y. Gen. Bus. L., §349, and New York's  common law, and seek compensatory, statutory, punitive and/or exemplary damages together with equitable and injunctive relief as well as attorneys' fees and expenses.

## Jurisdiction

4.  Jurisdiction is proper under the federal racketeering statute, 18 U.S.C. §1964(c), under the Fair Credit Reporting Act, 15 U.S.C. §§1681(p), and the principles of supplementary jurisdiction, 28 U.S.C. §1367.  Defendants conducted a racketeering scheme in interstate commerce, and/or violated the credit reporting statutes through the use of the facilities of interstate commerce.

## Parties

5.    Ms. Aghaeepour is a resident of California.

6.    Ms. Barr is a resident of Ohio.

7.    Mr. Drago is a resident of Pennsylvania.

8.    Ms. Julie Higgins is a resident of Indiana.

9.    Mr. Shane Moore is a resident of Tennessee.

10.   Ms. Michele Norris is a resident of Texas.

11.   Mr. Jesus Rivera is a resident of North Carolina.

12.   Mr. Hong Zhang is a resident of New Jersey.

13.   Each of the individual Plaintiffs abovenamed is a "consumer" within the meaning
      of the F.C.R.A., 15 U.S.C. §1681a(c), and N.Y.F.C.R.A., Gen. Bus. L., §380a- (b).

14.   Defendant Northern Leasing Systems, Inc., is a New York corporation.  It
      maintains offices within this judicial district, which offices were also its principal
      place of business until recently.  It is ostensibly in the business of originating and
      servicing micro-ticket leases through itself and through over 100 shell entities.  At
      all relevant times, it has managed and operated, and continues to manage and
      operate, itself and all these entities from the same offices in the same business
      using the same personnel with the same forms working with the same systems and
      employing the same *modus operandi*.  It exercised complete domination of the
      other corporate Defendants, and used such domination to commit the fraud
      and/or wrongs against Plaintiffs which resulted in Plaintiffs' injuries at issue.

15.   Defendant MBF Leasing LLC ("MBF") is a New York corporation, a wholly owned
      subsidiary of, and a "pass through" entity for Defendant Northern Leasing.  All

leases procured in its name are routinely and promptly transferred to Defendant Northern Leasing for "servicing."

16.    Defendant Lease Finance Group, LLC ("Lease Finance") is a New York corporation, a wholly owned subsidiary of, and a "pass through" entity for Defendant Northern Leasing.  All leases procured in its name are routinely and promptly transferred to Defendant Northern Leasing for "servicing."

17.    Defendant Jay Cohen is one of the masterminds of the racketeering enterprise which is the subject of this action ("Enterprise").  At all relevant times, he was and continues to be the principal, an officer, and controlling person of the corporate Defendants, including, without limitation, President and Chief Executive Officer of Defendant Northern Leasing.   At all relevant times, he received and continues to receive income directly and/or indirectly from the racketeering Enterprise.

18.    Defendant Sara Krieger is one of the masterminds of the Enterprise which is the subject of this action.  At all relevant times, she was and continues to be a principal, an officer, and controlling person of the corporate Defendants, including without limitation, the Vice President for Operations of Northern Leasing and an officer of some of the shell entities through which the Enterprise is conducted.  For a substantial period of time, she verified all complaints filed by the Sussman Defendants in the New York City Civil Court on behalf of the Enterprise. At all relevant times, she received, and continues to receive, income directly and/or indirectly from the racketeering Enterprise at issue.

19.    Defendant Louis Cucinotta is one of the active, wilful participants in the Enterprise which is the subject of this action.  At all relevant times, he was and

continues to be a principal, an officer, and controlling person of the corporate Defendants, including, without limitation, the Legal Collections Manager for the Defendants.  He also purports to be, where convenient, an officer of the shell entities through which the Enterprise is conducted.  At all relevant times, he was one of the persons who verified complaints filed by the Sussman Defendants in the New York City Civil Court on behalf of the Enterprise.  At all relevant times, he received, and continues to receive, income directly and/or indirectly from the racketeering Enterprise at issue.

20.     Defendant Jennifer Centeno a/k/a Jennifer Nugent is one of the active, wilful participants in the Enterprise which is the subject of this action.  At all relevant times, she was and continues to be a principal, an officer, and controlling person of the corporate Defendants, including, without limitation, the Legal Administrative Manager for the Defendants.  She also purports to be, where convenient, an officer of some of the shell entities through which the Enterprise is conducted.  At all relevant times, she was one of the persons who verified complaints filed by the Sussman Defendants in the New York City Civil Court on behalf of the Enterprise.  At all relevant times, she received, and continues to receive, income directly and/or indirectly from the racketeering Enterprise at issue.

21.     Defendant Joseph I. Sussman is an attorney duly admitted to the Bar in New York.  At all relevant times, he commenced and conducted, and continues to commence and conduct, all of the litigation in the New York City Civil Court on behalf of the Enterprise.  At all relevant times, his offices were part of the Defendants' offices,

for the use of which offices he did not pay any rent.  In addition, he received, and continues to receive, a portion of the amounts collected by the Enterprise.  He has, and continues to have, "all encompassing" access to the Enterprise's lease databases at all times.   He used, and continues to use, Defendants' computer system, CCS, as his own litigation management tool.  He is fully integrated with and a wilful, active participant in the Enterprise.  Whenever Defendant Sussman is made a party or subpoenaed as a witness in a lawsuit involving the Enterprise or its business practices, the Enterprise provides him with legal counsel and pay all attorneys' fees and expenses in his defense.

22.   Joseph I. Sussman, P.C., is a professional corporation under New York law whose principal offices at all relevant times were part of the same offices as the other Defendants.  It is Defendant Joseph Sussman's law firm and as such, all pleadings and court filings in the New York City Civil Court are under its name and signature.  Defendants Joseph Sussman and Joseph I. Sussman, P.C., are cumulatively referred to herein as the "Sussman Defendants".

23.   The Sussman Defendants' wilful misconduct and knowing participation in the racketeering scheme includes, without limitation, (a) commencing and/or continuing actions based on forged leases despite knowing of the forgery ; (b) refusing to vacate default judgments obtained on forged leases despite knowing of the forgery and/or having good reason to suspect the authenticity of the underlying documents; (c) concealing facts, including deposition transcripts, from the Court in order to mislead the Court into granting summary judgment for Defendant(s) herein and denying those lessees/guarantors their day in court; and

6

(d) making affirmative false representations to the Court, under penalties perjury, to mislead the Court.

24.     Defendants Cohen, Krieger, Cucinotta, Nugent, and Sussman ("Individual Defendants") direct, control, and run the racketeering Enterprise as more fully described below.   Defendants are ostensibly engaged in the business of leasing small business equipment, mostly credit card processing machines.  The Individual Defendants worked in concert to cause the racketeering Enterprise at issue to engage in the misconduct described in this complaint. In particular, the Individual Defendants each directed Northern Leasing, Lease Finance Group, MBF Leasing, and the shell entities to maintain continuous and systematic contacts with other members of the scheme and further directed the Enterprise to consummate the unlawful transactions described herein, and to attempt to enforce non-existent liabilities against Plaintiffs through a misuse of New York's judicial system.  Each of the Individual Defendants has personally profited personally from those activities.

25.     Each of Individual Defendants has been employed by the Enterprise, formally through Defendant Northern Leasing and/or its principals and affiliates for long periods of time at high levels in senior positions; as such, each is well aware of the fraudulent scheme that is the core of Defendants' ostensible "business."  Each is a wilful and active participant in the fraudulent scheme at issue.  Each was responsible, actually or constructively, at all relevant times for making the false entries in consumers' credit reports, for investigating disputes raised by consumers with respect to Defendants' adverse entries, and for Defendants'

consistent refusal to retract these false statements despite conclusive evidence to the contrary.  The actions of each were blatantly illegal and beyond the scope of their ostensible employment.  Further, each committed these illegal acts, and participated in the fraudulent scheme, for his/her own personal purposes, motivated and incentivized by enhanced bonuses, profits, perks, and other economic benefits and unmindful of the damage inflicted upon Plaintiffs and other innocent victims across the country.

26.  Defendants are "furnishers of information" within the meaning of the F.C.R.A., 15 U.S.C. §1681s-2, and "users" of consumer credit reports within the meaning of N.Y.F.C.R.A., Gen. Bus. L., §380a-(i).

## Factual Background

27.  This case involves the systematic and repeated manner in which the Enterprise, through Defendants, attempted to intimidate, and did intimidate, individuals located around the country in essentially a "shakedown" effort, in common parlance, to bully them into paying the Enterprise monies to which the Enterprise was never entitled.  Based on forged documents, <u>which Defendants knew or should have known were forged</u>, the Enterprise sought to intimidate Plaintiffs with dunning letters and phone calls, telling them that it would be more expensive for Plaintiffs to dispute the Enterprise's claims in New York City Civil Court than it would be to pay tribute to the Enterprise.  And when Plaintiffs did not succumb to such intimidation, the Enterprise brought lawsuits in the New York City Civil Court, New York County.  The Enterprise brought these lawsuits against Plaintiffs

personally, alleging Plaintiffs to be guarantors under the lease; most often, the Enterprise did not implead the alleged primary lessee at all.

28.  Obviously, once the Enterprise commenced these legal proceedings, Plaintiffs faced significant hurdles to having their day in court, including disproportionately high expenses and inconveniences of long-distance litigation, and multiple trips to New York.  The relatively small amounts at issue would have, as Defendants and other participants in the Enterprise were well aware, prevented these Plaintiffs from obtaining counsel or from otherwise developing their defense.  Further, Plaintiffs' potential witnesses were all in their respective local areas, quite far from the New York City Civil Court.  The Enterprise's entire scheme was designed to ensure that Plaintiffs had no real opportunity to raise defenses to the Enterprise's bogus lawsuits, so that the entry of a default judgment was all but certain.  In fact, an overwhelming majority of the lawsuits brought by the Sussman Defendants on behalf of the Enterprise resulted in default judgments in the New York City Civil Court.

29.  As this Court is well aware, once a judgment is entered in the New York City Civil Court, it would be almost impossible for the judgment-debtor to challenge the Enterprise in subsequent judgment enforcement actions without incurring costs far in excess of the judgment itself.  Had the Enterprise filed the suits in Plaintiffs' respective home locations to enforce its alleged claims, Plaintiffs would have been able to present evidence of what really transpired, and establish the bogus nature of the Enterprise's claims in a local court, either through an attorney or by themselves.

30.    Moreover, Defendants routinely pulled the personal credit report of small business persons without giving them advance notice.  Such notice is mandatory under New York law.

31.    Further, the very entry of judgment in New York City Civil Court is automatically reported as an adverse entry in Plaintiffs' respective <u>personal</u> consumer credit reports.  This has significant impact on credit availability to Plaintiffs, including without limitation, denial of credit opportunities, increase in interest rates, and diverse other consequences.

32.    As shown below, through the consistent pattern of misconduct evident from the facts concerning each Plaintiff, and through the repeated nature of such misconduct evidenced by the unprecedented lawsuit brought by the Deputy Chief Administrative Judge of the very Court abused by Defendants, Defendants employed, participated in, and were beneficiaries of a pattern and practice of a racketeering scheme unlawful under both federal and state law.

<u>The Lawsuit By the New York Attorney General and Deputy Chief Administrative of the New York City Civil Court</u>

33.    On April 11, 2016, the New York Attorney General and the Deputy Chief Administrative Judge, New York City Civil Court ("NYCCC"), commenced proceedings for dissolution of Northern Leasing and related entities, and for various civil penalties and restitution from Northern Leasing principals and attorneys.[1]  The Verified Petition ("VP") - based on affidavits of high ranking

---

[1]*People v. Northern Leasing Systems, Inc.*, No. 450460/2016 (N.Y. Sup., N.Y. Co.).

government and court officials reflecting several years of investigation and analysis of tens of thousands of court filings and other documents - evidences a staggering racketeering scheme, including (and much bigger than) the one at issue here.  The overwhelming evidence compelled the NYAG and the Deputy Chief Administrative Judge to conclude that Defendants were involved in  widespread "deceptive practices" and that Defendants "continue to flood New York courts with baseless filings," Fisher Aff., at 24 - the nub of the racketeering claims at issue here.[2]

34.   The Verified Petition summarizes the results of several years of investigation by NYAG, and New York Court officials from from 2010 - 2016.  Detailed below are those portions which buttress the claims here, and which demonstrate the well-orchestrated scheme.

35.   Marshaling evidence from tens of thousands of Defendants' victims, the NYAG and the Deputy Chief Administrative Judge summarized that, VP at 2-4.[3]

2.      . . Respondents . . ensnare individuals, many of whom are small, unsophisticated business owners, in void, invalid and/or never-ending equipment finance lease agreements . .  They do so by, *inter alia*, (a) misrepresenting the terms of the lease ,. . . and (c) <u>relying on leases that consumers deny signing or that they claim have been</u>

---

[2]The Court may take "judicial notice of filings in other courts"  *In re Neroni*, 2015 WL 9261287, at *3 (2d Cir. Dec. 18, 2015).  The empirical facts attested to by Judge Fisher, a sitting judge, in a public filing under penalties of perjury - such as the number and type of Defendants' filings in the NYCCC, the type and uniformity of defenses raised, the substantial similarity of the experiences sworn to by individuals across the country unknown to each other, the affidavit of JHO Cavallo, and the logical conclusions based thereon - cannot be seriously questioned.

[3]All emphasis in quotations are supplied unless otherwise specified.

<u>forged, or that contain one or more material terms that were altered after signing.</u>

\*\*\*\*\*\*\*\*\*\*        \*\*\*\*\*\*\*\*\*\*        \*\*\*\*\*\*\*\*\*\*

4. . . . <u>Although the typical credit card processing machine costs only a few hundred dollars, Respondents attempt to extract many times that amount, often thousands of dollars,</u> for equipment that the consumer has not used, that has paid for itself many times over and/or that the consumer has returned to Respondents.

5. The leases themselves are in <u>illegible print</u> and contain numerous one-sided and unconscionable provisions . .

6. If individuals stop paying the Northern Leasing Entities, the Northern Leasing Entities, along with Respondents Joseph I. Sussman, P.C., Joseph I. Sussman, and Eliyahu Babad, <u>harass and threaten individuals into paying hundreds to thousands of dollars based upon such void, invalid and/or never-ending agreements. Respondents persist in demanding payment even when they have evidence that the individuals have demonstrated defenses, including individuals who never did any business with them.</u>

- *Defendants' "Business Model," Reckless Indifference to Forgery Claims*

36. The VP details Defendants' fraudulent practices, many of which practices Plaintiffs complain about, as being an integral part of Defendants' "business model;" in other words, that's normally how Defendants do business.

37. For example, Defendants' "sales representatives <u>repeatedly</u> fail to disclose to consumers that they are entering into contracts with two different companies, let alone that they are entering into an equipment lease . ." VP¶42. Salespeople <u>routinely</u> misrepresent the terms of the transaction, and "are often unreachable shortly after speaking or meeting with a consumer, particularly where a consumer is seeking to have the salesperson deliver on the representations made during the sales pitch." VP¶64. The salespeople "receive substantial payments" for delivering a signed lease. VP¶65.

38.  Defendants profited considerably from the leases, but they <u>consistently</u> disclaimed responsibility for their salespeople's misrepresentations, despite the fact that, VP¶70.

> . . Respondent Jay Cohen, the Chief Executive Officer of Northern Leasing, testified that Northern Leasing trains the salespeople who present Northern Leasing's lease to consumers.

39.  As with Plaintiffs here, "[m]any consumers" are unaware of signing any lease with Defendants, and assert that their signature "was forged." VP¶73.  Defendants "often ignore or dismiss out of hand" forgery complaints, VP¶78.[4]  Even where Defendants do purport to address such complaints, Defendants subject such complainants "to an onerous process designed to prevent or dissuade them from disavowing the lease," VP¶80.  Even after complainants return completed affidavits of forgery or provide evidence of identity fraud, Defendants "continue to harass individuals for payment," threatening or bringing legal proceedings. VP¶82.  Defendants ignore complaints about post-signature alteration of material lease terms, *id*. ¶¶83-85.

40.  Defendants make it difficult and inconvenient for consumers to reject unwanted/defective equipment: they refuse to provide an address for return, and cite lease provisions that the equipment is leased "as is" when, in fact, many consumers receive the equipment much later.  VP¶¶86-91.

- *"Hounding" for Payment Even Where No Lease*

---

[4]As Defendants' corporate representative Kravic admitted in deposition testimony in another case, Defendants received forgery complaints on 175 to 200 leases *per month*. It cannot be seriously disputed that under the circumstances, that is an eye-popping number.

41.    Defendants "repeatedly hound" consumers for payments "even where they know or should know that the consumer does not owe the debt or never entered into a lease with them."  VP¶103.  Further, VP¶103,

> 103.    Respondents take the position that their equipment finance leases are valid and binding so long as some individual signs <u>or purports to sign it, regardless of whether that signature was forged</u> . . Respondents thus harass and threaten such individuals to pay hundreds of thousands of dollars based on such fraudulently obtained leases.

- *Routine Threats to Ruin Personal Credit Reports, "Cheaper to Pay Up" than Defend Lawsuit in New York*

42.    Defendants harass and threaten consumers for payment, including multiple telephone calls every day to persons who may not have signed a lease agreement at all.  VP¶109.  In these calls, Defendants' employees "threaten, *inter alia*, to ruin the individual's credit score, . ." and launch abusive litigation in New York City, VP¶110.  Further, Defendants regularly send threatening letters emphasizing the potential damage to victims' credit reports.  VP¶113.  Moreover, VP¶116,

> 116.    <u>The Northern Leasing Entities use the threat of litigation in New York to extract payment,</u> telling individuals who dispute owing any money, the vast majority of whom do not live in New York, that "it would be cheaper to pay up" than to defend against a lawsuit in New York.

43.    Defendants "relentlessly pursue" individuals who "signed <u>or purportedly signed</u>" the personal guaranty.  VP¶126.  They pursue individuals "for payment where the lease had been procured by fraud or misrepresentation," VP¶127.  Many persons "choose to pay off" Defendants to end the harassment.  VP¶128.

44.    Abusing the legal process, Defendants file lawsuits in venues that are inconvenient and costly for the individuals sued "to appear and defend and have no relationship

to the location where the lease was entered into." VP¶129.  Defendants typically

sue the personal guarantor, not the lessee.  VP¶130.

- *Staggering Number of Court Filings, Default Judgments*

45.   Since 2010, Defendants have filed over 30,000 actions in NYCCC, and obtained

over 19,000 default judgments. *Id.*., ¶9.  In 2014 and 2015 alone, Defendants filed

over 15,000, actions, VP¶132. which accounted for over 1/4 of the total general,

commercial, and consumer debt filings in that Court.  VP¶8.

46.   Between 2010 and 2015, Defendants obtained over 19,000 default judgments.

VP¶135.  In 2014, Defendants obtained 4,124 default judgments, or 41% of the

total default judgments entered in that Court. *Id.*, ¶10.  In 2015, Defendants

obtained 4,691 default judgments, nearly half of the 9,654 default judgments

entered in that Court. *Id*.

47.   Defendants had begun flooding courts in Nassau and Suffolk Counties, and Cook

County, Illinois, with such lawsuits.

- *Staggering Number of Complaints to NYAG*

48.   Defendants have generated 1,643 complaints to the NYAG from Jan. 1, 2010 to

December 31, 2015, the highest volume of complaints for any entity during that

period. *Id*.

- *Sussman Defendants' Role*

49. "The Sussman Firm is essentially an extension of the Northern Leasing Entities."

VP¶119.  Until recently, it was located in the same building as Northern Leasing,

paid no rent for the space, and had the same email as Northern Leasing entities. *Id.*[5]

50.   The Sussman Defendants "has participated in and has knowledge of the fraudulent, deceptive and illegal acts" at issue.  VP¶159.  Sussman "personally participates" in the scam by <u>sending deceptive collection letters, and filing debt collection actions, including based on time-barred debts</u>, VP¶160.  He has been representing Northern Leasing since 2002, and handles all matters "involving collection and delinquent leases," VP¶161.  Sussman knows that most individuals he sued defaulted, but nevertheless, continued to serve consumers by mailing process to the lease address and not by any of the authorized methods under CPLR 308.  VP¶167.  <u>Sussman is well aware of the widespread assertions of forgery and fraud, but continued persisting in such actions without conducting even the most basic of investigation.</u>  He also "drafted" some of the leases, and participated in "significant" litigation strategy decisions, such as suing individuals rather than business entities, VP¶¶170-71.

-   *Defendant Cohen's Role*

51.   Defendant Cohen <u>is "intimately involved in the operation</u> of the" Northern Leasing Entities.  VP¶145.  He has admitted responsibility for "overall management," that he "reviews lease applications submitted by salespeople and deals with leases 'all the time,'" and has "actual knowledge of the complaints about the Northern Leasing Entities' fraudulent and deceptive practices."  VP¶¶146-49.  He admits

---

[5]Sussman also had full access to Defendants' CCS computer system.

that Northern Leasing "trains the salespeople who present Northern Leasing's lease to consumers." VP¶150.  Further, his family "has a pecuniary interest in Northern Leasing." VP¶151.

- *Relief Sought*

52.   Based on N.Y. Executive Law §63(12) ("fraud"), G.B.L. §349 ("Deceptive Acts and Practices"), CPLR 5015(c), and other statutory provisions, the NYAG and the Deputy Chief Administrative Judge seek dissolution of the Northern Leasing entities, vacatur of all default judgments entered in the NYCCC in Defendants' lawsuits, and civil penalties, injunctive relief and restitution, *inter alia*.  That lawsuit is *sub judice*.

Deputy Chief Administrative Judge Fisher's and Other Court Officials' Findings

53.   Judge Fisher[6] noted the uniformity and regularity of defenses such as fraud/forgery in court filings, which she summarized as follows:

> 7.      In cases where the small business owners and employees have themselves moved to vacate these default judgments or answered Respondents' complaint, they uniformly assert the same defenses: that they did not sign the equipment lease financing agreements, that pages of the agreements were altered or added after signature, that the terms of the agreement differed starkly from those that the Northern Leasing Entities originally promised them, . . .  Moreover,

---

[6]Judge Fisher sought relief under CPLR 5015(c), which provides that an administrative judge may bring a proceeding to vacate default judgments when the default judgments "were obtained by fraud, misrepresentation, illegality, unconscionability, lack of due service, violations of law, or other illegalities or where such default judgments were obtained in cases in which those defendants would be uniformly entitled to interpose a defense predicated upon but not limited to the foregoing defenses."  A proceeding pursuant to CPLR 5015(c) may be brought when "such default judgments have been obtained in a number deemed sufficient by [the judge] to justify such action . . and upon appropriate notice to counsel for the respective parties, or to the parties themselves."

> based on a review of Respondents' court filings, Respondents have in almost all cases unreasonably applied the forum selection clause in these agreements, forcing individuals who live as far away as California to defend Respondents' actions in New York County Civil Court or be subject to a default judgment.  Many of these default judgments are for thousands of dollars, when the leased equipment appears to cost no more than a few hundred dollars.

54.   Judge Fisher annexed 55 "sample affidavits" from the tens of thousands of court filings and affidavits.  She also annexed affidavits from high ranking court officials attesting to the filings:

> (a) Ernest J. Cavallo, a JHO who assisted that Court in handling the deluge of Northern Leasing cases;

> (b) Eddy Valdez, Deputy Chief Clerk of the N.Y. City Civil Court;

> (c) Michael Boyle, Assistant Deputy Chief Clerk of the N.Y. City Civil Court;

> (d) Stephen M. Brandt, Director of Legal Research Division, Office of the Chief Judge, Circuit Court of Cook County, Illinois.

55.   Based upon these facts, and the evidence submitted by the NYAG, Judge Fisher affirmed, under penalties of perjury,

> I deem this evidence to be more than sufficient to justify the instant Petition.

Fisher Aff., at 5¶9.  Requesting grant of the Petition, she asserted, *id.,* 24:

> Respondents should not be allowed to profit from their deceptive practices and continue to flood the New York Courts with baseless filings.

JHO Cavallo's Findings

56.   Cavallo, a Judicial Hearing Officer, affirmed that given the deluge of Northern Leasing filings, in 2014, the Chief Administrative Judge of the N.Y. City Civil Court and he implemented a plan to schedule all Northern Leasing cases on a special

calendar to be managed by Mr. Cavallo every Thursday from June 5 to August 14, 2014. Cavallo aff., 2¶4. He conferenced a case every fifteen minutes on those days, and summarized his experience, *id.*:

4.    The vast majority of the defendants told the same basic story. A sales representative from a corporation, <u>allegedly unrelated to Northern Leasing</u>, appeared at defendants' place of business with credit card processing machines. The sales representative promised that the machine would save money. If the defendants expressed reluctance, the sales representative suggested a trial period or told the defendants that they could send the equipment back and cancel the contract. . . <u>Some denied signing anything or signing a one page document and declared that the salesperson or some unauthorized employee had signed the contract and personal guarantees, or that the sales representative had added pages.</u> . . [I]n most of these cases, Northern Leasing and their attorneys took the position that Northern Leasing was a separate legal entity from the vendors, and if there was any misrepresentation during the transaction, <u>Northern Leasing had no responsibility or concern</u> that the same sales representatives were involved in the execution of the contract which contained what ultimately became its finance agreement.

5.     . . <u>The sales representatives were of no help after they delivered the equipment. Many defendants sent the equipment back and were astounded to discover that Northern Leasing continued to debit their bank accounts, because they thought there was a trial period or that they could cancel as per the sales representative</u>. . .

6.    Every defendant who spoke to me objected strenuously to the New York forum . . Many expressed outrage that they had to spend at least a thousand dollars to come and stay in New York to defend a case that was seeking a few thousand dollars. . . <u>A few expressed the opinion that the New York Court System was in cahoots with Northern Leasing by allowing Northern Leasing to rely on the venue clause.</u>

7.    Although I presided for years in the Housing Court where landlords and tenants frequently engage in acrimonious litigation, <u>I was unprepared for the anger, frustration, humiliation and despair that I encountered when speaking with the defendants in the Northern Leasing cases.</u> Most had lost their businesses . . However, <u>at least once a day I spoke to a defendant who still had a successful business, and they stated that the deal with the sales representative and Northern Leasing was the worst experience of their business life</u>.

8.    When I finished my commitment on August 14, 2014, I refused to commit any more time or effort to resolve these cases.

57.   The empirical contents of the Fisher affidavit were verified by other court officials.

58.   On April 13, 2016, Justice Lucy Billings of the N.Y. Supreme Court entered emergency orders restraining Defendants from certain activities.

59.   The matter is now *sub judice* with respect to the dissolution, permanent injunction, disgorgement, and other reliefs sought by the NYAG and Judge Fisher.

Facts Concerning Ms. Aghaeepour

60.   In October of 2007, the Enterprise's representative came to Ms. Aghaeepour's offices marketing check processing and guarantee service.  Relying upon his representations[7] - which representations, unknown to Ms. Aghaeepour, were materially false and misleading - Ms. Aghaeepour provided her personal information such as bank account and social security number.  The Enterprise manufactured a fraudulent lease based on that information, with Defendant Northern Leasing as the alleged lessor.  The Enterprise, under the name of Defendant Northern Leasing, commenced debiting Ms. Aghaeepour's account ostensibly towards payments under that lease.  When Ms. Aghaeepour noticed that and attempted to reach the Enterprise's representative, he went incommunicado, and despite repeated requests from Ms. Aghaeepour, the Enterprise failed and refused to stop such debits based on the forged lease.

_____

[7]These misrepresentations included, without limitation, (a) that the machine and service would verify and guarantee checks so that Ms. Aghaeepour would avoid losses on bounced checks; (b) that the monthly fee was a flat $39, in addition to a transaction fee of 1% of face value of each check; and (c) that the arrangement was month-to-month, which Ms. Aghaeepour could terminate at will.

61.    In March 2008, another of the Enterprise's representatives approached Ms. Aghaeepour offering to fix the problems created by the first representative.  The same cycle followed, and unknown to Ms. Aghaeepour, the Enterprise manufactured another fraudulent lease, this time under the name of Defendant MBF Leasing as lessor.  Defendants commenced debiting, under the name of Defendant MBF Leasing, Ms. Aghaeepour's account ostensibly for this second lease also.

62.    As before, Ms. Aghaeepour's continued attempts to rectify the situation were unsuccessful.  This representative also went incommunicado, and Defendants once again failed and refused to stop the debits on the second forged lease.

63.    Defendants wrongfully debited, under the name of Defendant MBF Leasing, through monthly ACH deductions cumulatively, the sum of $3,279.60 from Ms. Aghaeepour's bank account.  In the same manner, Defendants wrongfully debited, under the name of Defendant Northern Leasing, $1,690.92 through monthly ACH deductions cumulatively, from Ms. Aghaeepour's bank account.

64.    Ms. Aghaeepour repeatedly informed Defendants that she had never signed any leases, contracts, or guarantees with either Defendant Northern Leasing or Defendant MBF Leasing.  Accordingly, she requested Defendants to stop debiting her account and refund the amounts wrongfully taken from her bank account.  Defendants refused, whereupon Ms. Aghaeepour was forced to close her  bank account.

65.    Defendants, under the name of Defendants Northern Leasing and/or MBF Leasing, then started harassing telephone calls to Ms. Aghaeepour's home and

business, demanding payment under the two forged leases.   Ms. Aghaeepour reiterated, repeatedly, to Defendants' representatives who called her that she had never signed any lease with them, and demanded that they stop the harassment. Nevertheless, Defendants' abusive calls continued with merciless frequency.

66.   Defendants, under the name of Defendant Northern Leasing, also made adverse entries in Ms. Aghaeepour's personal consumer credit report, which caused her tremendous damage.

67.   On or about February 26, 2013, Defendants, through Defendant Northern Leasing, accessed Ms. Aghaeepour's consumer credit report.  Such access was impermissible, unauthorized, and violative of federal and state law.  Defendant Northern Leasing never provided any advance or written notice to Ms. Aghaeepour that it intended to pull her consumer credit report.  Such notice is mandatory under New York law.

68.   Further, Defendants, under the name of Defendant Northern Leasing, made an adverse entry in Ms. Aghaeepour's consumer credit report, stating "early termination/balance owing", and claiming that she had a "balance" of $1,365.  On the "status" of the account, Defendants reported, "Account charged off. $1,373 written off."  Each of these statements in the said entry was false and misleading. The exact dates on which Defendants made such entry can be easily determined from Defendants' records.

69.   In April, 2013, Ms. Aghaeepour disputed the said entry to Experian.  Upon information and belief, Experian duly notified Defendants, through Defendant Northern Leasing, of Ms. Aghaeepour's dispute with a request to conduct a

reasonable investigation into that dispute.  Such investigation is mandatory under federal and State law.

70.    Defendants wilfully failed and refused to conduct any investigation.  Although Ms. Aghaeepour had categorically asserted that her signatures had been forged in the alleged leases, Defendants did not even bother calling her by phone, or writing to her, or communicating with her in any manner in this connection.  Instead, Defendants, through Defendant Northern Leasing, summarily - and falsely - reported back to Experian that they had "verified" the alleged loan to Ms. Aghaeepour.  That adverse entry is scheduled to continue on Ms. Aghaeepour's consumer credit report for at least seven years.

71.    Defendant Northern Leasing did not have any authority to access or make any entry in Ms. Aghaeepour's credit report.

72.    Defendants knew or ought to have known that Ms. Aghaeepour had no account with them, and did not owe Defendants anything.

73.    Meanwhile, unknown to Ms. Aghaeepour, Defendants, under the names of Defendants Northern Leasing and MBF Leasing, commenced two lawsuits through the Sussman Defendants against Ms. Aghaeepour in the New York City Civil Court, County of New York (032848 cv 09 and 032860 cv 09).  Defendants never served process upon her in either lawsuit, and through false representations to that Court, obtained two default judgments against her for $3,198 and for $1,365.

74.    As Defendants certainly knew and intended, both these judgments were reported as an adverse entry in Ms. Aghaeepour's consumer credit report.

75.  Further, under the guise of enforcing these default judgments, Defendants, through the Sussman Defendants, wrongfully issued multiple restraining notices to Ms. Aghaeepour's bank accounts.  In other words, after levying one account, Defendants imposed duplicate levies on other accounts with different banks.

76.  As Defendants knew and intended, banks served with such restraining notices routinely freeze the judgment debtor's funds on deposit with that bank in an amount twice the judgment.

77.  As a result, as Defendants knew and intended, Ms. Aghaeepour's bank accounts were frozen in amounts several times the default judgments, and she was deprived access to her own funds in amounts which were multiple time the amount of the wrongful default judgment.

78.  In addition, Ms. Aghaeepour was charged bank fees by each of her banks for "Legal order processing fees".  For example, on August 15, 2012, Wells Fargo charged Ms. Aghaeepour $100 on this ground.  Other banks charged her similar fees on account of Defendants' multiple accounting-freezing.

79.  Finally, Ms. Aghaeepour had to retain lawyers in New York, expend time and money therefor, and move the N.Y. City Civil Court to get the default judgment set aside in order to gain access to her own money.  By order dated September 25, 2013, that Court granted Ms. Aghaeepour's motion and set aside the default judgments in both cases.

80.  Nevertheless, Defendants failed and refused to delete the adverse entry in Ms. Aghaeepour's consumer credit report.

81.     Defendant Cucinotta signed and verified both the complaints in the New York City
        Civil Court, one each on behalf of Defendants Northern Leasing and MBF Leasing.
        Defendant Cucinotta stated, under penalties of perjury, that the contents of the
        two verified complaints were "true to my own knowledge" and were "based upon
        my personal knowledge" and Defendants' records.

82.     In fact, Defendant Cucinotta never had any communication with Ms. Aghaeepour
        at any time.  He knew nothing about Ms. Aghaeepour's alleged execution of the
        bogus leases.  He had no personal knowledge concerning Ms. Aghaeepour or the
        underlying alleged transactions, and his affirmation to the New York Court was
        wilfully false and perjurious.

83.     Defendant Cuccinota, as Defendants' Legal Collections Manager, persisted in
        those lawsuits, despite Ms. Aghaeepour's categorical assertions, under penalties
        of perjury, that the leases were forged, and despite Defendants' lack of any evidence
        to the contrary.  Further, Defendant Cucinotta was actually or constructively
        responsible for the impermissible access as well as wrongful refusal to conduct a
        reasonable investigation into Ms. Aghaeepour's dispute about the adverse entries
        in her consumer credit report raised through Experian and/or wrongful refusal to
        remove that entry.  Commission of fraud and wilfully violating the law as detailed
        in this Complaint was beyond the scope of Defendant Cucinotta's legitimate
        employment responsibilities.

84.     In addition, the bad check losses due to the misrepresentations about the check
        guarantee system that the Enterprise's representative "leased" to Ms. Aghaeepour
        through false representations amounted to over $15,000 each for three years.

26

85.     Furthermore, as a result of Defendants' actions, Ms. Aghaeepour's credit was

        ruined.  She was unable to qualify for any type of loan or refinance of existing

        loans to take advantage of low interest rates.  She was turned down for a business

        bond and insurance, and her credit lines were closed.  As a result, she suffered

        significant economic damages.

86.     Moreover, Ms. Aghaeepour also suffered significant non-economic damages,

        including without limitation mental anguish, embarrassment, annoyance, and

        emotional distress, for which Defendants are liable jointly and severally.  Ms.

        Aghaeepour suffered actual losses such as attorneys' fees and expenses of at least

        $2,500 in responding to Defendants New York City Civil Court litigation, together

        with costs of mailing, copying, and notarization.

Ms. Anne Barr

87.     Ms. Barr is a principal of Loren-Lynn, Inc., conducting business under the name

        and style of "SOS Technologies" in Dublin, Ohio.

88.     Ms. Barr's business had a credit card processing arrangement with Huntington

        Bank through an entity called First Data.

89.     In October 2014, the Enterprise's representative Hodge approached SOS

        Technologies, claiming to be representing First Data.  He told them that he would

        be switching their credit card machines; nothing would change except he was

        going to save them money with the new machine, which machine would have a

        chip reading cards in compliance with new legal requirements.  He made several

        false representations including without limitation, significant cost savings on

credit card transactions.  SOS provided banking and other personal information concerning SOS and Ms. Barr.

90.   Based upon that information, the Enterprise manufactured a forged lease in Ms. Barr's name, unknown to Ms. Barr, with Defendant Northern Leasing as lessor, and Ms. Barr as a personal guarantor.

91.   Ms. Barr subsequently came to know that Hodge had nothing to do with First Data or with Huntington Bank.  Her credit card transactions had not even been processed; she had been scammed.  Upon inquiry, Ms. Barr came to know that Mr. Hodge had multiple criminal records, and was then on probation in Arizona.

92.   Defendants, under the name of Defendant Northern Leasing, also started debiting SOS Technologies' bank account.  Upon coming to know of this, SOS Technologies promptly informed Defendants of the forgery, and took steps to stop the wrongful debits from SOS Technologies' bank account.

93.   On or about October 29, 2014; October 31, 2014; June 21, 2015; July 29, 2015; October 12, 2015; Defendants, through Defendant Northern Leasing, accessed Ms. Barr's personal consumer credit report.  Defendants never provided any advance or written notice to Ms. Barr that they intended to pull her consumer credit report on either occasion.

94.   Further, Defendants, under the name of Defendant Northern Leasing, made an adverse entry in Ms. Barr's personal consumer credit report with the credit reporting agency Experian.  Defendants, under the name of Defendant Northern Leasing, claimed that she had a "balance owing" of $3,150.  On the "status" of the account, Defendants reported, "charge off."

95.     On or about March 23, 2016, Ms. Barr disputed the said adverse entry with
        Experian.  Upon information and belief, Experian duly notified Defendant
        Northern Leasing of Ms. Barr's dispute with a request to conduct the statutory
        reasonable investigation.

96.     Defendants wilfully failed and refused to conduct any investigation.  Although Ms.
        Barr had categorically asserted that she did not sign the lease and had no
        transaction with Defendants, Defendants did not even bother calling her by phone,
        or writing to her, or communicating with her in any manner in this connection.
        Instead, Defendants, through Defendant Northern Leasing, summarily - and
        falsely - reported back to Experian that they had "verified" the alleged loan to Ms.
        Barr.

97.     That adverse entry is scheduled to continue on Ms. Barr's consumer credit report
        for at least seven years.

98.     Defendant Northern Leasing did not have any authority to access or make any
        entry in Ms. Barr's report.

99.     Defendants knew or ought to have known that Ms. Barr had no account with
        them, and did not owe Defendants anything.

100.    Defendants also harassed Ms. Barr with innumerable phone calls, repeatedly, to
        her business and her home demanding payment under the forged lease.

101.    Defendants have now filed their usual lawsuit in New York City Civil Court to
        extract tribute from Ms. Barr.  Defendant Nugent signed and verified the
        complaint in the New York City Civil Court on behalf of Defendant Northern
        Leasing.  Defendant Nugent stated, under penalties of perjury, that the contents of

the two verified complaints were "true to my own knowledge" and were "based upon my personal knowledge" and Defendants' records.

102.  In fact, Defendant Nugent never had any communication with Ms. Barr at any time.  She knew nothing about Ms. Barr's alleged execution of the bogus leases. She had no personal knowledge concerning Ms. Barr or the underlying alleged transactions, and her affirmation to the New York Court was wilfully false and perjurious.

103.  Defendant Nugent, as Defendants' Legal Administrative Manager, persisted in this lawsuit, despite Ms. Barr's categorical assertions, under penalties of perjury, that the leases were forged, and despite Defendants' lack of any evidence to the contrary.  Further, Defendant Nugent was actually or constructively responsible for the impermissible access as well as wrongful refusal to conduct a reasonable investigation into Ms. Barr's dispute about the adverse entries in her consumer credit report raised through Experian and/or wrongful refusal to remove that entry.  Commission of fraud and wilfully violating the law as detailed in this Complaint was beyond the scope of Defendant Nugent's legitimate employment responsibilities.

104.  As a result of the above, Ms. Barr sustained actual damages including without limitation incurring attorneys' fees and expenses, annoyance, embarrassment, mental anguish, emotional distress, loss of credit opportunities, loss of time and other consequences.  In addition, Ms. Barr suffered actual losses of at least $1,300 in attorneys' fees and expenses towards Defendants New York City Civil Court litigation, together with costs of mailing, copying and postage.

Mr. Bruce Drago

105.   Mr. Drago is the principal of Maxout Fitness, LLC, in West Reading, Pennsylvania.

106.   In June 2014, the Enterprise's representative Gosslin approached Maxout Fitness
       marketing credit card processing services.  He made several false representations
       including without limitation, significant cost savings on credit card transactions.
       Maxout provided banking and other personal information concerning Maxout and
       Mr. Drago, to have credit card processing through an entity called Securus.

107.   Gosslin's representations were materially false and misleading.  Upon discovery of
       the facts, Maxout annulled the transaction with Securus.

108.   Meanwhile, based upon that information, the Enterprise manufactured a forged
       lease in Mr. Drago's name, unknown to Mr. Drago, with Defendant Northern
       Leasing as lessor, and Mr. Drago as a personal guarantor.

109.   Defendants, under the name of Defendant Northern Leasing, also started debiting
       Maxout's bank account.  Upon coming to know of this, Maxout promptly informed
       Defendants of the forgery, and took steps to stop the wrongful debits from
       Maxout's bank account.

110.   On or about June 17, 2014; March 20, 2015; July 10, 2015; and October 29, 2015;
       Defendants, through Defendant Northern Leasing, accessed Mr. Drago's personal
       consumer credit report.  Defendants never provided any advance or written notice
       to Mr. Drago that they intended to pull his consumer credit report on either
       occasion.

111.   Further, Defendants, under the name of Defendant Northern Leasing, made an
       adverse entry in Mr. Drago's personal consumer credit report with the credit

reporting agency Experian.  Defendants, under the name of Defendant Northern Leasing, claimed that he had a "balance owing" of $3,520.  On the "payment status" of the account, Defendants reported, "charge off."

112.   On or about March 16, 2016, Mr. Drago disputed the said adverse entry with Experian.  Upon information and belief, Experian duly notified Defendant Northern Leasing of Mr. Drago's dispute with a request to conduct the statutory reasonable investigation.

113.   Defendants wilfully failed and refused to conduct any investigation.  Although Mr. Drago had categorically asserted that he did not sign the lease and had no transaction with Defendants, Defendants did not even bother calling him by phone, or writing to him, or communicating with him in any manner in this connection.  Instead, Defendants, through Defendant Northern Leasing, summarily - and falsely - reported back to Experian that they had "verified" the alleged loan to Mr. Drago.

114.   That adverse entry is scheduled to continue on Mr. Drago's consumer credit report for at least seven years.

115.   Defendant Northern Leasing did not have any authority to access or make any entry in Mr. Drago's report.

116.   Defendants knew or ought to have known that Mr. Drago had no account with them, and did not owe Defendants anything.

117.   Defendants also harassed Mr. Drago with innumerable phone calls, repeatedly, to his business and his home demanding payment under the forged lease.

118.   Defendants have now filed their usual lawsuit in New York City Civil Court to extract tribute from Mr. Drago.  Defendant Nugent signed and verified the complaint in the New York City Civil Court on behalf of Defendant Northern Leasing.  Defendant Nugent stated, under penalties of perjury, that the contents of the two verified complaints were "true to my own knowledge" and were "based upon my personal knowledge" and Defendants' records.

119.   In fact, Defendant Nugent never had any communication with Mr. Drago at any time.  She knew nothing about Mr. Drago's alleged execution of the bogus leases.  She had no personal knowledge concerning Mr. Drago or the underlying alleged transactions, and her affirmation to the New York Court was wilfully false and perjurious.

120.   Defendant Nugent, as Defendants' Legal Administrative Manager, persisted in this lawsuit, despite Mr. Drago's categorical assertions, under penalties of perjury, that the leases were forged, and despite Defendants' lack of any evidence to the contrary.  Further, Defendant Nugent was actually or constructively responsible for the impermissible access as well as wrongful refusal to conduct a reasonable investigation into Mr. Drago's dispute about the adverse entries in her consumer credit report raised through Experian and/or wrongful refusal to remove that entry.  Commission of fraud and wilfully violating the law as detailed in this Complaint was beyond the scope of Defendant Nugent's legitimate employment responsibilities.

121.   As a result of the above, Mr. Drago sustained actual damages including without limitation incurring attorneys' fees and expenses, annoyance, embarrassment,

mental anguish, emotional distress, loss of credit opportunities, loss of time and other consequences.  Mr. Drago also suffered actual losses of $1,800 in attorneys' fees and expenses for Defendants' litigation in New York City Civil Court, together with costs of mailing, copying, and postage.

Julie Higgins

122.   In 2005, the Enterprise's representative visited Ms. Higgins in her  video store business in Denison, Texas, marketing a credit card processing arrangement.  The Enterprise's representative told Ms. Higgins that a credit card swiping machine would be provided free of charge when she signed up for the service.

123.   For that purpose, Ms. Higgins provided her banking and other personal information so that the funds could be deposited into her bank account.   Based upon that information, the Enterprise manufactured a forged lease for that swiping machine in her name, unknown to Ms. Higgins, with Defendant MBF Leasing as lessor.

124.   Shortly thereafter, Ms. Higgins' noticed charges on her bank account made by Defendant MBF Leasing. Upon inquiry, she learnt about the forged lease.  Ms. Higgins promptly informed the Enterprise that she had not signed any lease, and had not, until then, even heard about Defendant MBF Leasing.

125.   Nevertheless, Defendants, under the name of Defendant MBF Leasing, continued debiting her bank account ostensibly towards payments under the forged lease. Ms. Higgins returned the swiping machine back to Defendants, but the debits continued until Ms. Higgins closed her account with her bank.

126. On November 12, 2013, Defendants, under the name of Defendant MBF Leasing, brought a lawsuit in the New York City Civil Court, New York County, against Ms. Higgins, seeking recovery under the forged lease.  That lawsuit was brought by the Sussman Defendants.

127. Defendant Nugent verified that complaint on behalf of Defendant MBF Leasing. Defendant Nugent stated, under penalties of perjury that the contents of the verified complaint were "true to my own knowledge" and were "based upon my personal knowledge" and Defendant Northern Leasing's records.

128. In fact, Defendant Nugent never had any communication with Ms. Higgins at any time.  She knew nothing about the underlying transaction and/or Ms. Higgins' alleged execution of the lease.  She had no personal knowledge concerning Ms. Higgins and her affirmation to the New York Court was wilfully false and perjurious.

129. The complaint sought recovery, under the name of Defendant MBF Leasing, under the personal guaranty for an alleged lease.  That alleged lease and guaranty carried the forged signature of Ms. Higgins, reflecting her as "owner."

130. Defendants, under the name of Defendant MBF Leasing, obtained a default judgment against Ms. Higgins in the New York City Civil Court, New York County, on March 28, 2014, for $4,320.98.

131. Ms. Higgins learnt about the lawsuit for the first time in April 2014, when her bank account was frozen in response to restraining notice issued by the Sussman Defendants.  As a consequence, she was deprived access to her own funds abruptly, which turned her life upside down.

132.  Ms. Higgins then had to retain attorneys in New York, incur attorneys' fees and expenses therefor, to set aside the default judgment in order to regain access to her own funds.  In addition, she also had to pay the bank's charges for complying with Defendants' restraining notice.

133.  Ms. Higgins, through her attorneys, has moved the New York City Civil Court to set aside the default judgment and dismiss the complaint.  That motion is pending.

134.  On or about July 24, 2012; July 24, 2013; October 30, 2013; and February 11, 2014,  Defendants, through Defendant MBF Leasing, accessed Ms. Higgins' consumer credit report.  On or about July 25, 2012; and August 7, 2012, Defendants, through Defendant Northern Leasing, accessed Ms. Higgins' consumer credit report.  Every such access was impermissible and unauthorized, and violative of federal and State law.  Defendants never provided any advance or written notice to Ms. Higgins that they intended to access her consumer credit report.

135.  Further, Defendants made two adverse entries in Ms. Higgins's consumer credit report.  One entry, under the name of Defendant MBF Leasing, stated that she had a "balance" of $1,559.  On the "status" of the account, Defendants reported, that account # "50XXXX" is "closed," and on the payment status – "charge-off."

136.  The other entry, also under the name of Defendant MBF Leasing, stated that she had a "balance" of $2,719.  On the "status" of the account, Defendants reported, that account # "47XXXX" is "closed," and on the payment status – "charge-off."

137.  As a result of the Defendants' actions, Ms. Higgins suffered significant economic and non-economic damages, including without limitation mental anguish,

embarrassment, annoyance, and emotional distress, for which Defendants are liable jointly and severally.  In addition, Ms. Higgins suffered actual losses of $1,500 in attorneys' fees and expenses incurred in connection with Defendants' New York litigation, apart from incidental expenses for mailing, copying and notarization.

Shane Moore

138.   In December 2008, the Enterprise's representative visited Mr. Moore at his restaurant in Tennessee marketing credit card processing services.  Relying upon representations made by that representative - which representations were, unknown to Mr. Moore, false and misleading - Mr. Moore provided his personal and banking information.  Based upon that information, the Enterprise manufactured two forged leases with Mr. Moore as a guarantor.

139.   As with other Plaintiffs, Mr. Moore learnt about these leases only when his bank statements reflected debits.  Eventually, he closed the bank accounts whereupon Defendants brought two lawsuits in New York City Civil Court through the Sussman Defendants and obtained default judgments based upon the forged leases.  That Court denied Mr. Moore's motion to set aside the default judgment.

140.   On or about December 19, 2008, Defendants accessed Mr. Moore's consumer credit report.  Such access was impermissible and unauthorized under federal and State law.  Defendants never provided any advance or written notice to Mr. Moore that they intended to pull his consumer credit report.  Such advance notice is mandatory under New York law.

141.    As a result of Defendants' wilful violations of the law, Mr. Moore suffered

significant economic and non-economic damages, including without limitation,

incurring attorneys' fees and expenses, waste of time and resources, annoyance,

embarrassment, mental anguish, emotional distress, loss of credit opportunities,

loss of time and other consequences.  Mr. Moore also suffered actual losses of at

least $1,900 in attorneys' fees and expenses towards responding to Defendants'

New York City Civil Court proceedings, together with costs of mailing, copying,

and notarization.

<u>Michele Norris</u>

142.    In 2005, the Enterprise's representative approached Ms. Norris marketing credit

card processing arrangement.  The Enterprise's representative made several false

representations to Ms. Norris, including without limitation, that there was no firm

commitment and Ms. Norris could simply return the swiping machines at any time

with no further obligations.  Ms. Norris provided her banking and other personal

information.  Based upon that information, the Enterprise manufactured a forged

lease in Ms. Norris' name, unknown to Ms. Norris, with Defendant MBF Leasing

as lessor.

143.    Ms. Norris closed her business in December 2006, and the bank account in

February 2007.  However, when she sought to return the swiping machine, the

Enterprise's representative informed her about a non-cancelable lease which she

had allegedly signed.   Ms. Norris promptly informed the Enterprise that she had

not signed any lease and her signature thereon was a forgery.

144. In June 2007, Ms. Norris returned the swiping machines to Defendant MBF Leasing by certified mail.  Defendant MBF Leasing accepted that returned machine without any objections or reservations.

145. On February 14, 2013, Defendants, under the name of Defendant MBF Leasing, brought a lawsuit in the New York City Civil Court, New York County, against Ms. Norris.  That lawsuit was brought by the Sussman Defendants.

146. Defendant Nugent verified that complaint on behalf of Defendant MBF Leasing. Defendant Nugent stated, under penalties of perjury that the contents of the verified complaint were "true to my own knowledge" and were "based upon my personal knowledge" and Defendant Northern Leasing's records.

147. In fact, Defendant Nugent never had any communication with Ms. Norris at any time.  She knew nothing about Ms. Norris' alleged execution of the lease.  She had no personal knowledge concerning Ms. Norris and her affirmation to the New York Court was wilfully false and perjurious.

148. The complaint sought recovery of $2,888.60 under an alleged lease between Defendant MBF Leasing and one "M&J Hair Designers" based in Texas.  That alleged lease carried the forged signature of Ms. Norris.

149. Nevertheless, Defendants obtained a default judgment against Ms. Norris in the New York City Civil Court, New York County, on July 30, 2013, for $2,645.80, with interest.

150. Ms. Norris came to know about this judgment for the first time only on October 16, 2013, when she received the judgment notice.

151.  Ms. Norris then had to retain attorneys in New York, incur attorneys' fees and expenses therefor in order to set aside the default judgment.  The N.Y. City Civil Court denied her motion to vacate, which order is under appeal.

152.  On or about February 1, 2013, August 14, 2013, and May 20, 2014, Defendants, through Defendant MBF, accessed Ms. Norris' consumer credit report. Defendants never provided any advance or written notice to Ms. Norris that they intended to pull her consumer credit report.

153.  On or about July 13, 2012, and July 25, 2012, Defendants, through Defendant Northern Leasing, accessed Ms. Norris' consumer credit report.   Defendants never provided any advance or written notice to Ms. Norris that they intended to pull her consumer credit report.

154.  As a result of Defendants' misconduct, Ms. Norris suffered significant damages, including without limitation annoyance, embarrassment, mental anguish, emotional distress, loss of credit opportunities, loss of time and other consequences.  Ms. Norris also suffered actual losses of at least $1,000 in attorneys' fees and expenses towards responding to Defendants' New York City Civil Court proceedings, together with costs of mailing, copying, and notarization.

Jesus Rivera

155.  Mr. Rivera is a Spanish-speaking first generation immigrant with a very limited working knowledge of English.  In June 27, 2006, the Enterprise's representative approached Mr. Rivera marketing prepaid cellular phones, prepaid calling cards, and similar services.  As part of that transaction, the representative informed Mr. Rivera, Mr. Rivera had to buy a credit card swiping machine.  Relying on those

representations, Mr. Rivera agreed to the transaction and provided his banking and other personal information.  Based upon that information, the Enterprise manufactured a forged lease in Mr. Rivera's name, unknown to Mr. Rivera, with Defendant Northern Leasing as lessor.

156.   None of the services promised to Mr. Rivera materialized, although Defendants debited his account on a monthly basis.  Mr. Rivera closed his account, and returned the swiping machines to Defendant Northern Leasing which Defendant Northern Leasing accepted without any objections.

157.   On August 30, 2009, Defendants, under the name of Defendant Northern Leasing, brought a lawsuit in the New York City Civil Court, New York County, against Mr. Rivera.  That lawsuit was brought by the Sussman Defendants.

158.   Defendant Krieger verified that complaint on behalf of Defendant Northern Leasing.  Defendant Krieger stated, under penalties of perjury that the contents of the verified complaint were "true to her own knowledge" and were "based upon her  personal knowledge" and Defendant Northern Leasing's records.

159.   In fact, Defendant Krieger never had any communication with Mr. Rivera at any time.  She knew nothing about Mr. Rivera's alleged execution of the lease.  She had no personal knowledge concerning Mr. Rivera and her affirmation to the New York Court was wilfully false and perjurious.

160.   The complaint sought recovery of $3,672 under an alleged lease between Defendant Northern Leasing and Azteca Mexican Store.  That alleged lease carried the forged signature of Mr. Rivera.

161.    Nevertheless, Defendants obtained a default judgment against Mr. Rivera in the New York City Civil Court, New York County, on April 11, 2008, for $3,551.71 with interest.

162.    Mr. Rivera then had to retain attorneys in New York, incur attorneys' fees and expenses therefor in order to set aside the default judgment.

163.    In July 2006, Defendants, through Defendant Northern Leasing, accessed Mr. Rivera's consumer credit report.  Defendants never provided any advance or written notice to Mr. Rivera that they intended to pull his consumer credit report.

164.    As a result of Defendants' misconduct, Mr. Rivera suffered significant damages, including without limitation annoyance, embarrassment, mental anguish, emotional distress, loss of credit opportunities, loss of time and other consequences.  He also thus suffered actual damages of at least $1,700 in attorneys' fees and expenses, in addition to copying, mailing and notarization costs.

<u>Mr. Hong Zhang</u>

165.    Mr. Hong Zhang is a relatively recent immigrant from China.  He has very limited knowledge of English.  He is part owner of a Chinese restaurant under the name and style "Grand Buffet" in New Jersey.

166.    In July 2014, the Enterprise's representative approached Grand Buffet marketing credit card processing arrangement.  The Enterprise's representative made several false representations to Grand Buffet, including without limitation, significant cost savings on credit card transactions.  Grand Buffet provided banking and other personal information concerning Grand Buffet and Mr. Zhang.  Based upon that

information, the Enterprise manufactured a forged lease in Mr. Zhang's name, unknown to Zhang, with Defendant Northern Leasing as lessor, and Mr. Zhang as a personal guarantor.

167.   Defendants, under the name of Defendant Northern Leasing, also started debiting Grand Buffet's bank account.  Upon coming to know of this, Grand Buffet promptly informed Defendants of the forgery, and took steps to stop the wrongful debits from Grand Buffet's bank account.

168.   On or about August 6, 2014, and February 22, 2016, Defendants, through Defendant Northern Leasing, accessed Mr. Zhang's personal consumer credit report.  Defendants never provided any advance or written notice to Mr. Zhang that they intended to pull his consumer credit report on either occasion.

169.   Further, Defendants, under the name of Defendant Northern Leasing, made an adverse entry in Mr. Zhang's personal consumer credit report with the credit reporting agency Experian.  Defendants, under the name of Defendant Northern Leasing, claimed that he had a "balance owing" of $7,425.  On the "status" of the account, Defendants reported, "charge off early termination/balance owing."

170.   On or about March 16, 2016, Mr. Zhang disputed the said adverse entry with Experian.  Upon information and belief, Experian duly notified Defendant Northern Leasing of Mr. Zhang's dispute with a request to conduct the statutory reasonable investigation.

171.   By letter dated March 23, 2016, Defendants cursorily informed Mr. Zhang that they had received notice of his dispute, that their "review of relevant

documentation reflect[ed] that [Mr. Zhang] executed a personal guaranty," and that the adverse entry in his credit report was correct.

172. Defendants wilfully failed and refused to conduct any investigation.  Although Mr. Zhang had categorically asserted that his signatures had been forged in the alleged leases, Defendants did not even bother calling him by phone, or writing to him, or communicating with him in any manner in this connection.  Instead, Defendants, through Defendant Northern Leasing, summarily - and falsely - reported back to Experian that they had "verified" the alleged loan to Mr. Zhang.

173. That adverse entry is scheduled to continue on Mr. Zhang's consumer credit report for at least seven years.

174. Defendant Northern Leasing did not have any authority to access or make any entry in Mr. Zhang's report.

175. Defendants knew or ought to have known that Mr. Zhang had no account with them, and did not owe Defendants anything.

176. Defendants also harassed Mr. Zhang with innumerable phone calls, repeatedly, to his business and his home demanding payment under the forged lease.

177. Defendants have now threatened their usual lawsuit in New York City Civil Court to extract tribute from Mr. Zhang.

178. As a result of the above, Mr. Zhang sustained actual damages including without limitation incurring attorneys' fees and expenses, annoyance, embarrassment, mental anguish, emotional distress, loss of credit opportunities, loss of time and other consequences.  Mr. Zhang also incurred actual losses of at least $1,500 in

attorneys' fees and expenses, together with costs of mailing, postage, and notarization.

Defendants' Wilfulness, Plaintiffs' Injuries

179.   Defendants' accessing of Plaintiffs' credit records, and/or making a  wrongful adverse report to credit reporting agencies, was wilful and malicious.  Defendants are liable for statutory damages for such wilful violation.

180.   Plaintiffs suffered, and continues to suffer, actual and real monetary injury as a direct result of Defendants' aforesaid misconduct.  These injuries were attributable to each of the Defendants.

181.   Plaintiffs are entitled to compensatory and punitive damages therefor, together with attorneys' fees and expenses.

## COUNT I

### (RICO, 18 U.S.C. §1962(c))

182.   The contents of the above paragraphs are incorporated herein by reference as if fully set forth herein.

183.   The association of Defendants and others whose identities are known only to Defendants at this time (cumulatively, the "Conspirators"), constituted an Enterprise within the meaning of 18 U.S.C. §1961(c), which Enterprise was engaged in, and whose activities affected, interstate and foreign commerce.  This Enterprise was continuous in that it lasted for more than two years, had an ascertainable structure, and was distinct from the predicate offenses alleged here.

184.   Each Defendant is a person within the meaning of 18 U.S.C. §1961(3) and separate from the Enterprise.

185.   Defendant Cohen, the President of the Defendant Northern Leasing and officer of some of the other related corporate enterprises, was in charge of all its day-to-day operations.  As such, he was one of the masterminds of the Enterprise who set up, orchestrated, and supervised the entire racketeering scheme at issue.  While he and the other Conspirators acted through various corporate entities, they functioned from the same business premises, with the same staff, in the same ostensible business, with the same standard form lease and the same *modus operandi.*

186.   Defendant Krieger, the Vice President for Operations of the Defendant Northern Leasing, and an officer of some of the other related corporate enterprises, was and remains one of the masterminds of the Enterprise.  She was responsible for several aspects of its day-to-day operations, lease originations, and sales.  In addition, until recently, she routinely verified most of the fraudulent complaints filed in the New York City Civil Court under penalties of perjury.

187.   Defendant Cucinotta, is one of the wilful, active participants in the Enterprise.  He is the Legal Collections Manager for the corporate Defendants, and an officer of some of the other related corporate enterprises, was responsible for collection aspects of the Enterprise.  He was one of the persons who routinely verified many fraudulent complaints filed in the New York City Civil Court under penalties of perjury.

188.   Defendant Nugent is a wilful, active participant in the Enterprise which is the subject of this action.  She is the Legal Administrative Manager for the Defendants, and an officer of some of the shell entities through which the

Enterprise is conducted.  She was one of the persons who verified many fraudulent complaints filed by the Sussman Defendants in the New York City Civil Court on behalf of the Enterprise**.**

189.    Defendant Joseph I. Sussman is an attorney duly admitted to the Bar in New York. Since late 2002, and continuing to date, he commences and conducts all of the litigation in the New York City Civil Court on behalf of the Enterprise.

190.    The remaining Defendants are corporate entities, through which the Enterprise functioned, and through which the underlying racketeering scheme was carried out.

191.    Defendants' *scienter* is established from their pattern and practices at issue and the centrality of these practices to their entire business.  As Deputy Chief Administrative Judge Fisher's affirmation shows, the fraud in this case was not an isolated incident, but rather a nationwide scheme that took place over a number of years.  Moreover, Defendants continued their misconduct nonchalantly.

192.    Defendants' *scienter* may also be inferred from the fact that the scheme at issue - which is immensely lucrative for Defendants - has continued despite several racketeering and class actions in various courts throughout the country impugning Defendants' deceptive business practices over the past several years, which actions are still pending as of today.[8]  In one such action, for example, the New York Court

---

[8]For example, the Attorney General of the State of New York had commenced another lawsuit in New York Supreme Court, New York County, on April 23, 2012, asserting that Defendant Northern Leasing and its affiliates had been engaged in a fraudulent scheme to collect over $10 million from lessees under long-expired leases under false representations.  People of the State of New York v. SKS Associates, et al, 400908/2012 (N.Y. Sup. N.Y. Co.) (Donna Mills, J.S.C.).

of Appeals, the highest court of the State of New York, held that Defendants'
systematic deception warranted an inference of fraud "against the corporate
officers in their individual capacity . . ." *Pludeman*, 10 N.Y.3d at 493.  Defendants
knew, or should have known, of that pronouncement and taken affirmative steps
to stop filing these fraudulent lawsuits in the New York City Civil Court.  But in
fact, even when confronted with evidence of forgery of the underlying documents,
Defendants refused to vacate the default judgments and insisted on tribute.

193.   Further, at least since 2005, in those rare cases where the small businesspersons
from far away places did raise challenges in the New York City Civil Court, judges
refused to enforce Defendants' consent to jurisdiction and/or forum selection
clauses whereunder Defendants have been dragging small businesspersons from
far off places to New York courts.  As one judge held:

> It is apparent that [Defendant Northern Leasing's] suit in New York,
> approximately 1600 miles away from where defendant lives and
> works, puts defendant at a significant disadvantage in defending
> herself. <u>From the numerous cases that it has presided over, this</u>
> <u>court is aware of the boiler-plate provision in [Defendant Northern</u>
> <u>Leasing's] lease agreement to justify proceeding against an</u>
> <u>out-of-state resident in New York</u>. "To allow [Defendant Northern
> Leasing] to do so is to effectively deprive litigants [such as
> defendant] of their day in court." *Northern Leasing Systems, Inc. v.*
> *Soumastre*, Civ Ct, N.Y. Cty, January 26, 2005, Cooper, J., Index No.
> 13566/03

*Northern Leasing Sys., Inc. v. Walton*, CV049136/02NY, 2012 WL 2466977 (N.Y.

Civ. Ct. June 25, 2012) (emphasis added).  It merits emphasis that the *Soumastre*

decision was of 2005, some seven years earlier, during which time Defendants

continued filing these boilerplate lawsuits.

194. The Sussman Defendants were Defendants' attorneys in each of those cases.  Thus, the Sussman Defendants knew at least since 2005 that judges in the New York City Civil Court had refused to exercise jurisdiction in New York over the lawsuits brought by the Enterprise, and that commencing such boilerplate lawsuits here were, according to New York courts, attempts to deprive Plaintiffs and others of their day in court, *i.e.*, violative of elementary Due Process.

195. Nevertheless, the Sussman Defendants have commenced and continued to commence these lawsuits in New York City Civil Court, presumably in the hopes of default judgments, without informing that Court in such subsequent lawsuits of these precedents refusing jurisdiction.  The Sussman Defendants, as attorneys duly admitted to the Bar in New York State, have a duty of candor to the Court, and are obligated to inform the Court of decisions such as those cited above. Instead, they have continued to file their boilerplate complaints with boilerplate verifications by Defendants as before.

196. Each Defendant knew, or should have known, of all these legal proceedings, and the decisions therein.  Nevertheless, they have continued their lucrative racketeering Enterprise.

197. Defendants participated, and conspired with others (including others whose identities are known only to Defendants at this time) to participate, in the affairs of the aforementioned Enterprise through a pattern of racketeering activity, as more fully set forth below, all in violation of 18 U.S.C. §§ 1962(c)).

Mail Fraud, Violations of 18 U.S.C. §1341

198.   Defendants and the other members of the enterprise, having devised or intending
to devise the scheme or artifice to defraud, and/or for obtaining money or
property by means of false or fraudulent pretenses, representations, or promises,
for the purpose of executing such scheme or artifice or attempting so to do, placed
in post office(s) or authorized depository for mail matter, several letters and/or
packages to be sent or delivered by the Postal Service, and/or took or received
therefrom, letters and/or packages, or knowingly caused to be delivered by mail or
such carrier according to the direction thereon, or at the place at which it was
directed to be delivered by the addressee such letters and/or packages.
Specifically,

    a.   On or about August 31, 2009, Defendants in New York caused the mailing,
through the use of interstate mails, of a summons and complaint to Ms.
Aghaeepour in California;

    b.   On or about August 24, 2009, Defendants in New York caused the mailing,
through the use of interstate mails, of a summons and complaint to Ms.
Aghaeepour in California;

    c.   On or about October 1, 2009, Defendants in New York caused the mailing,
through the use of interstate mails, of a summons and complaint to Ms.
Aghaeepour in California;

    d.   On or about March 11, 2010, Defendants in New York caused the mailing,
through the use of interstate mails, of a copy of the judgment entered in the

New York City Civil Court, New York County, to Ms. Aghaeepour in California;

e.    On or about March 24, 2010, Defendants in New York caused the mailing, through the use of interstate mails, of a copy of the judgment entered in the New York City Civil Court, New York County, to Ms. Aghaeepour in California;

f.    On or about August 13, 2012, Defendants in New York, through the Sussman Defendants, caused the mailing, through the use of interstate mails, of an "Information subpoena and restraining notice" to Wells Fargo Bank, N.S., in Philadelphia, Pennsylvania;

g.    On or about January 15, 2015, Defendants in New York, under the name of Defendant Northern Leasing, caused the mailing, through the use of interstate mails, an invoice to Ms. Barr in Ohio, falsely demanding payment of $135.19 on the forged lease;

h.    On or about January February 1, 2015, Defendants in New York, under the name of Defendant Northern Leasing, caused the mailing, through the use of interstate mails, an invoice to Ms. Barr in Ohio, falsely demanding payment of $130.19 on the forged lease;

i.    On or about February 11, 2015, Defendants in New York, under the name of Defendant Northern Leasing, caused the mailing, through the use of interstate mails, an "Important Notice" to Ms. Barr in Ohio, demanding personal and confidential documents from Ms. Barr, together with an

affidavit of forgery.  Defendants falsely represented that "an investigation will be conducted and a determination will be made on the forgery claim;

j.      On or about March 7, 2016, Defendants in New York, under the name of Defendant Northern Leasing, caused the mailing, through the use of interstate mails, a "Summons and Complaint" to Ms. Barr in Ohio, falsely demanding payment of $4,141.19 on the forged lease;

k.      On or about March 5, 2016, Defendants in New York, through the Sussman Defendants, caused the mailing, through the use of interstate mails, of a copy of the Summons and Complaint upon Ms. Barr in Ohio;

l.      On or about January 19, 2016, Defendants in New York caused the mailing, through the use of interstate mails, under the name of Defendant Northern Leasing, of a "Notice of Lawsuit" to Mr. Drago in Pennsylvania;

m.      On or about February 1, 2016, Defendants in New York, through the Sussman Defendants, caused the mailing, through the use of interstate mails, of a copy of the Summons and Complaint upon Mr. Drago in Pennsylvania;

n.      On or about January 28, 2014, Defendants in New York, through the Sussman Defendants, caused the mailing, through the use of interstate mails, of a copy of the Summons and Complaint upon Ms. Higgins in Texas;

o.      In April 2014, Defendants in New York, through the Sussman Defendants, caused the mailing, through the use of interstate mails, of a copy of an Information Subpoena and Restraining Notice upon Ms. Higgins' account with Bank of America in Indiana;

p.      On or about January 24, 2012, Defendants, through the Sussman Defendants in New York, caused the mailing, through the use of interstate mails, of a copy of the Summons and Complaint, upon Mr. Moore in Tennessee;

q.      On or about April 3, 2013, Defendants, through the Sussman Defendants in New York, caused the mailing, through the use of interstate mails, of a copy of the Summons and Complaint, upon Ms. Norris in Texas;

r.      On or about October 10, 2007, Defendants, through the Sussman Defendants in New York, caused the mailing, through the use of interstate mails, of a copy of the Summons and complaint, upon Mr. Rivera in North Carolina;

s.      On or about October 25, 2007, Defendants, through the Sussman Defendants in New York, caused the mailing, through the use of interstate mails, of a copy of the Summons and complaint, upon Mr. Rivera in North Carolina; and

t.      On or about March 1, 2016, Defendants, under the name of Northern Leasing, caused the mailing, through the use of interstate mails, of a letter to Mr. Hong Zhang falsely stating that Mr. Zhang had "executed a personal guaranty";

u.      On or about March 9, 2016, Defendants, under the name of Northern Leasing, caused the mailing, through the use of interstate mails, of a letter to Mr. Hong Zhang falsely stating that Mr. Zhang in New Jersey had "executed a personal guaranty";

v.      On or about March 23, 2016, Defendants, under the name of Northern Leasing, caused the mailing, through the use of interstate mails, of a letter to Mr. Hong Zhang falsely stating that Mr. Zhang had "executed a personal guaranty";

w.      On or about July 8, 2016, Defendants, under the name of Northern Leasing, caused the mailing, through the use of interstate mails, of a letter to Mr. Hong Zhang falsely stating that Mr. Zhang had "executed a personal guaranty"; and

x.      On or about March 9, 2016, Defendants, under the name of the Sussman Defendants, caused the mailing, through the use of interstate mails, of a letter to Mr. Hong Zhang falsely stating that Mr. Zhang had "executed a personal guaranty".

199.    Each participant knew, expected, reasonably foresaw, and intended that the facilities of interstate mail would be used in furtherance of the racketeering scheme, and that such use was an essential part of the scheme.

200.    The Conspirators, wilfully and with intent to mislead, concealed the material facts from the New York City Civil Court and from Plaintiffs as referred to above.

201.    The material misrepresentations were made by Conspirators to the New York City Civil Court concerning Plaintiffs, and to Plaintiffs.

202.    The New York City Civil Court, and Plaintiffs, relied upon Defendants' misrepresentations, and such reliance was reasonable.

203.    Defendants' perjurious misconduct was a fraud on the court and on Plaintiffs.

Wire Fraud, Violations of 18 U.S.C. §1343

204. Defendants and the other Members of the Enterprise, having devised or intending to devise the scheme or artifice to defraud, and/or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, for the purpose of executing such scheme or artifice or attempting so to do, made phone calls with the use of interstate wires, and/or transmitted by means of interstate wire directives to various Automated Clearing Houses to deduct monies from accounts of lessees that Defendants knew they were not entitled to, and/or electronically accessed and pulled the consumer credit report of each Plaintiff from credit reporting agencies. For example,

   a. On or about July 20, 2009, Defendants in New York, through the use of interstate wires, made a telephone call to Ms. Aghaeepour in California;

   b. On or about July 29, 2009, Defendants in New York, through the use of interstate wires, made a telephone call to Ms. Aghaeepour in California;

   c. On or about July 31, 2009, Defendants in New York, through the use of interstate wires, made a telephone call to Ms. Aghaeepour in California;

   d. On or about November 23, 2009, Defendants in New York, through the use of interstate wires, made a telephone call to Ms. Aghaeepour in California;

   e. On or about January 21, 2010, Defendants in New York, through the use of interstate wires, made a telephone call to Ms. Aghaeepour in California;

   f. On or about November 22, 2010, Defendants in New York, through the use of interstate wires, made a telephone call to Ms. Aghaeepour in California;

   g. On or about February 11, 2011, Defendants in New York, through the use of interstate wires, made a telephone call to Ms. Aghaeepour in California;

h.  On or about August 23, 2012, Defendants in New York, through the use of interstate wires, made a telephone call to Ms. Aghaeepour in California;

i.  On or about November 1, 2007, and on the first of every month thereafter until October 1, 2008, Defendants, under the name of Defendant Northern Leasing, debited Ms. Aghaeepour's bank account in California through the use of interstate communication and interstate banking facilities;

j.  On or about April 1, 2008, and on the first of every month thereafter until October 1, 2008, Defendants, under the name of Defendant MBF Leasing, debited Ms. Aghaeepour's bank account in California through the use of interstate communication and interstate banking facilities;

k.  On or about December 1, 2014, Defendants, under the name of Defendant MBF Leasing, debited Ms. Barr's business account in Ohio through the use of interstate communication and interstate banking facilities;

l.  On or about January 1, 2015, Defendants, under the name of Defendant MBF Leasing, debited Ms. Barr's business account in Ohio through the use of interstate communication and interstate banking facilities;

m.  On or about October 31, 2014, Defendants, through Defendant Northern Leasing, accessed Ms. Barr's personal consumer credit report from Experian, a credit reporting agency, through the use of interstate communication and wire facilities;

n.  On or about June 21, 2015, Defendants, through Defendant Northern Leasing, accessed Ms. Barr's personal consumer credit report from

Experian, a credit reporting agency, through the use of interstate communication and wire facilities;

o.    On or about July 29, 2015, Defendants, through Defendant Northern Leasing, made an adverse entry in Ms. Barr's personal consumer credit report with the credit reporting agency Experian, through the use of interstate communication and wire facilities;

p.    On or about June 17, 2014, Defendants, through Defendant Northern Leasing, accessed Mr. Drago's personal consumer credit report from Experian, a credit reporting agency, through the use of interstate communication and wire facilities;

q.    On or about March 20, 2015, Defendants, through Defendant Northern Leasing, accessed Mr. Drago's personal consumer credit report from Experian, a credit reporting agency, through the use of interstate communication and wire facilities;

r.    On or about July 10, 2015, Defendants, through Defendant Northern Leasing, accessed Mr. Drago's personal consumer credit report from Experian, a credit reporting agency, through the use of interstate communication and wire facilities;

s.    On or about October 29, 2015 Defendants, through Defendant Northern Leasing, accessed Mr. Drago's personal consumer credit report from Experian, a credit reporting agency, through the use of interstate communication and wire facilities;

t.     In March 2016, at a date and time known to Defendants alone, Defendants, under the name of Defendant Northern Leasing, made an adverse entry in Mr. Drago's personal consumer credit report with the credit reporting agency Experian, through the use of interstate communication and wire facilities.  Defendants, under the name of Defendant Northern Leasing, reported that Mr. Drago had a "balance owing" of $3,520.  On the "payment status" of the account, Defendants reported, "charge off;

u.     On or about July 24, 2012, Defendants, under the name of Defendant MBF, accessed Ms. Higgins' consumer credit report;

v.     On or about July 24, 2013, Defendants, under the name of Defendant MBF, accessed Ms. Higgins' consumer credit report;

w.     On or about October 30, 2013, Defendants, under the name of Defendant MBF, accessed Ms. Higgins' consumer credit report;

x.     On or about July 25, 2012, Defendants, under the name of Defendant Northern Leasing, accessed Ms. Higgins' consumer credit report;

y.     On or about and August 7, 2012, Defendants, under the name of Defendant Northern Leasing, accessed Ms. Higgins' consumer credit report;

z.     On or about December 19, 2008, Defendants, through the use of interstate wire facilities, accessed Mr. Moore's consumer credit report;

aa.     On or about February 1, 2013, August 14, 2013, and May 20, 2014, Defendants, through Defendant MBF, through the use of interstate wires, accessed Ms. Norris' consumer credit report from Experian;

bb.  On or about July 13, 2012, and July 25, 2012, Defendants, through Defendant Northern Leasing, accessed, through the use of interstate wire facilities, Ms. Norris' consumer credit report from Experian;

cc.  On or about August 6, 2014, Defendants, through Defendant Northern Leasing, accessed Mr. Zhang's personal consumer credit report with the credit reporting agency Experian, through the use of interstate communication and wire facilities;

dd.  On or about February 22, 2016, Defendants, through Defendant Northern Leasing, accessed Mr. Zhang's personal consumer credit report with the credit reporting agency Experian, through the use of interstate communication and wire facilities; and

ee.  In February 2016, Defendants, under the name of Defendant Northern Leasing, made an adverse entry in Mr. Zhang's personal consumer credit report with the credit reporting agency Experian through the use of interstate communication and wire facilities.  Defendants, under the name of Defendant Northern Leasing, claimed that he had a "balance owing" of $7,425.  On the "status" of the account, Defendants reported, "charge off early termination/balance owing.

205.  Defendants, in the same manner through the use of interstate wires, made dunning telephone calls to abuse, intimidate, and threaten Plaintiffs on numerous other occasions.  The details of each of these phone calls is readily available from Defendants' records and recordings.

206.   Defendants, in the same manner through the use of interstate wires, electronically accessed the consumer credit reports of each Plaintiff on numerous other occasions.  The details of each of these electronic accesses are readily available from Defendants' records and recordings.

207.   Defendants, in the same manner through the use of interstate wires, electronically deducted money from the bank accounts of businesses controlled by each Plaintiff on numerous other occasions.  The details of each of these electronic deductions is readily available from Defendants' records and recordings.

208.    Each participant knew, expected, reasonably foresaw, and intended that the facilities of the interstate wires affecting interstate commerce would be used in furtherance of the racketeering scheme, and that such use was an essential part of the scheme.

209.   The Conspirators wilfully and with intent to mislead concealed material facts, and made affirmative misrepresentations of material facts to Plaintiffs.

210.   Plaintiffs relied upon Defendants' misrepresentations, and such reliance was reasonable.

Extortion Under The Hobbs Act, 18 U.S.C. §1951

211.   Defendants had and implemented a practice and pattern of starting bogus legal proceedings based on false representations, and solely for the purpose of injuring Plaintiffs and recovering unwarranted sums through extortion.

212.   For this purpose, Defendants affirmatively misrepresented in filings with the New York City Civil Court in New York, under penalties of perjury, that

a.   Ms. Aghaeepour "unconditionally guaranteed all of the Lessee's obligations to" Defendant MBF Leasing;

b.   ABC Services "entered into an Equipment Finance Lease" with Defendant MBF Leasing and Ms. Aghaeepour "personally guaranteed" payments under the lease;

c.   Ms. Aghaeepour "consent[ed]" to litigation in New York;

d.   There was "presently due and owing" from Ms. Aghaeepour to Defendant MBF Leasing the sum of $3,198 interest thereon from November 1, 2008;

e.   There "is due and owing" from Ms. Aghaeepour to Defendant MBF Leasing attorneys' fees in the sum of $639.60;

f.   Ms. Aghaeepour "unconditionally guaranteed all of the Lessee's obligations to" Defendant Northern Leasing;

g.   Ms. Aghaeepour "entered into an Equipment Finance Lease" with Defendant Northern Leasing and "personally guaranteed" payments under the lease;

h.   Ms. Aghaeepour "consent[ed]" to litigation in New York;

i.   There was "presently due and owing" from Ms. Aghaeepour to Defendant Northern Leasing the sum of $1,365.00 with interest thereon from November 1, 2008;

j.   There "is due and owing" from Ms. Aghaeepour to Defendant MBF Leasing attorneys' fees in the sum of $273.

213.   Similarly, Defendants affirmatively misrepresented in filings with the New York City Civil Court in New York, under penalties of perjury, that

a.  Ms. Barr "personally guaranteed" payments under an alleged lease between Defendant Northern Leasing and "Fine Art And Cigars of Tampa;"

b.  Ms. Barr "unconditionally guaranteed all of the Lessee's obligations to" Defendant Northern Leasing;

c.  Ms. Barr "consent[ed]" to litigation in New York; and

d.  There was "presently due and owing" from Ms. Barr to Defendant Northern Leasing the sum of $4,141.19 with interest thereon from Oct 22, 2015.

214.  Similarly, Defendants affirmatively misrepresented in filings with the New York City Civil Court in New York, under penalties of perjury, that

a.  Mr. Drago  "personally guaranteed" payments under an alleged lease between Defendant Northern Leasing and Mr. Drago's business;

b.  Mr. Drago  "unconditionally guaranteed all of the Lessee's obligations to" Defendant Northern Leasing;

c.  Mr. Drago  "consent[ed]" to litigation in New York; and

d.  There was "presently due and owing" from Mr. Drago to Defendant Northern Leasing the sum of $4,768.28 with interest thereon from December 1, 2015.

215.  Similarly, Defendants affirmatively misrepresented in filings with the New York City Civil Court in New York, under penalties of perjury, that

a.  Ms. Higgins "personally guaranteed" payments under an alleged lease between Defendant Northern Leasing and "Hayes Video;"

b.  Ms. Higgins "unconditionally guaranteed all of the Lessee's obligations to" Defendant MBF Leasing;

    c.      Ms. Higgins "consent[ed]" to litigation in New York; and

    d.      There was "presently due and owing" from Ms. Higgins to Defendant Mbf Leasing the sum of $2,719.15 with interest thereon from February 1, 2008.

216.    Similarly, Defendants, through Defendant Nugent, affirmatively misrepresented in filings with the New York City Civil Court in New York, under penalties of perjury, that

    a.      Mr. Moore "personally guaranteed" payments under an alleged lease between Defendant Leasing Finance and "Mancino's Pizza & Grinders:"

    b.      Mr. Moore "unconditionally guaranteed all of the Lessee's obligations to" Defendant Leasing Finance;

    c.      Mr. Moore "consent[ed]" to litigation in New York; and

    d.      There was "presently due and owing" from Mr. Moore to Defendant Leasing Finance, the sum of $3,498.25 with interest thereon from January 23, 2011.

217.    Similarly, Defendants, through Defendant Nugent, affirmatively misrepresented in filings with the New York City Civil Court in New York, under penalties of perjury, that

    a.      Ms. Norris "personally guaranteed" payments under an alleged lease between Defendant MBF Leasing and "M & J Hair Designers;"

    b.      Ms. Norris "unconditionally guaranteed all of the Lessee's obligations to" Defendant MBF Leasing;

    c.      Ms. Norris "consent[ed]" to litigation in New York; and

    d.      There was "presently due and owing" from Ms. Norris to Defendant MBF Leasing the sum of $1,618.65 with interest thereon from March 1, 2007.

218.	Similarly, Defendants, through Defendant Krieger, affirmatively misrepresented in filings with the New York City Civil Court in New York, under penalties of perjury, that

a.	Mr. Rivera "personally guaranteed" payments under an alleged lease between Defendant Northern Leasing and Azteca Mexican Store;

b.	Mr. Rivera "unconditionally guaranteed all of the Lessee's obligations to" Defendant Northern Leasing;

c.	Mr. Rivera "consent[ed]" to litigation in New York; and

d.	There was "presently due and owing" from Mr. Rivera to Defendant Leasing Finance, the sum of $3,060 with interest thereon from November 1, 2006.

219.	Defendants affirmatively made substantially similar misrepresentations in filings with the New York City Civil Court in New York, under penalties of perjury, concerning Mr. Zhang.

220.	These representations were part of Defendants' standard form, boilerplate complaints filed in the New York City Civil Court.  These representations were verified by different Individual Defendants as detailed earlier, on behalf of the Enterprise, abundantly establishing concerted action and conspiracy.

221.	Defendants knew, and should have known, that the above representations were false when made.  Defendants' knowing fraud upon, and/or their intentional misrepresentations to, the New York City Civil Court deprived the litigation of its legitimacy.

222. Nevertheless, Defendants commenced actions in The New York City Civil Court with the aforesaid false statements.  Based upon such actions, they attempted to extort undeserved sums of money from Plaintiffs as identified above.

223. Thereby, Defendants used wrongful means for a wrongful objective, with an intent to obtain that which in justice and equity Defendants were not entitled to, and knew that they were not entitled to, receive.

224. Defendants affected interstate commerce by extortion and/or attempted or conspired so to do.

225. Defendants attempted to extort property from certain Plaintiffs identified above, with each identified Plaintiff's consent, induced by wrongful use of actual or threatened fear of economic loss and/or injury.  Such loss or injury included, without limitation, legal expenses in long-distance litigation, damage to credit rating, and/or entry of default judgments, and freezing of bank accounts.

Extortion Under New York Law

226. Plaintiffs incorporate the aforesaid allegations herein by reference.

227. Defendants intended to deprive Plaintiffs of property or to appropriate the same to themselves.  They wrongfully took or obtained, or attempted to take or obtain, such property from each Plaintiff.

228. Defendants wrongfully attempted to take such property by compelling or inducing Plaintiffs and other persons to deliver such property to Defendants.  They did so by attempting to induce a fear that, if the property is not so delivered, Defendants would cause damage to Plaintiffs' property, or engage in other conduct

constituting a crime, or testify or provide false information with respect to Defendants' legal claim.

229.    Thereby, Defendants committed the offense of extortion under New York's Extortion Act, N.Y. Penal Law, §155.05.

230.    Defendants' extortions are chargeable under New York law and punishable by imprisonment for more than one year.  As such, they constitute predicate racketeering acts under 18 U.S.C. §1961.

Pattern of Racketeering Activity

231.    The aforesaid acts had the same or similar purposes, results, participants, victims, and/or methods of commission, and were otherwise interrelated by distinguishing characteristics and were not isolated events.  The pattern of racketeering activity engaged in by Defendants consisted of a scheme executed by the aforementioned Conspirators from January 1998, and continuing to date, to extort and collect unwarranted sums through litigation based on perjurious averments or threats thereof.  That pattern included multiple predicate acts of extortion, mail fraud, and wire fraud.

232.    The racketeering acts identified hereinabove were related to one another and formed a pattern of racketeering activity in that they: (a) were in furtherance of a common goal, including the goal of profiting illegally by improperly commencing or threatening fraudulent litigation, by improperly threatening to ruin consumer credit scores, and by improperly making adverse entries in consumer credit reports; (b) used similar methods and standard form letters to intimidate; (c) had similar participants; and (d) had similar victims.

233. The acts of racketeering activity extended over a substantial period of time from January 1998, and continue to this day.  They were sufficiently continuous to form a pattern of racketeering activity.

234. Defendants participated in the scheme through themselves, and, in the case of the corporate Defendants, their representatives, salesmen, employees and officers, and others whose identities are known only to Defendants at this time.  Defendants benefitted enormously by the profits they made from the scheme, and the various amounts collected unlawfully.  The Conspirators knew, enabled, and actively participated in the racketeering scheme.

235. Defendants engaged in a pattern of racketeering activity consisting of extortion, mail fraud and wire fraud.  The predicate acts occurred over a period of well over 6 years.  Defendants received income from these patterns in the form of unwarranted payments.  Defendants disbursed these funds amongst themselves in a manner known only to them.

236. Each Defendant's participation was critical to the racketeering scheme.  Each Defendant enabled, conducted, maintained, aided, and abetted the racketeering scheme by:

    a. Drafting and preparing letters, "Important Notices," Verified Complaints, false affidavits, and other documents;

    b. Supervising, conducting, and monitoring the conduct of the fraudulent scheme;

    c. Concealing the scheme or, alternatively, consciously avoiding discovery of the scheme;

d.   encouraging third parties to participate in the racketeering scheme;

e.   wilfully violating, or being recklessly indifferent to, mandatory requirements of federal law and procedure concerning racketeering, and the misuse of the judicial system;

f.   Wilfully violating or being recklessly indifferent to their legal obligations to verify the validity of the alleged lease agreements;

g.   Wilfully violating or being recklessly indifferent to their legal obligations to conduct a reasonable investigation into allegations of forgery by Plaintiffs and other victims; and

h.   Wilfully violating or being recklessly indifferent to their legal obligations to conduct "due diligence" with respect to the accounts at issue.

237.   The precise role played by each Defendant is known only to Defendants at this time.  Such information, and evidence concerning their participation, is exclusively within the possession and knowledge of Defendants.

238.   Plaintiffs have been injured in their business or property by reason of Defendants' violation of 18 U.S.C. §1962(c).  As a direct and proximate result of these violations, Plaintiffs have been injured in that, inter alia, their business accounts were debited wrongfully, and they had to waste time and resources in responding to Defendants's dunning calls, threats, and lawsuit in New York; in retaining lawyers and incurring legal expenses therefor.  In addition, Plaintiffs' consumer credit rating has also been adversely affected, and they have suffered damages as detailed above.

239. By reason of this violation of 18 U.S.C. §1964(c), Plaintiffs are entitled to recover from Defendants three times their damages plus pre- and post- judgment interest, costs and attorneys' fees.

## COUNT II

### (Violation of 18 U.S.C. § 1962(d))

240. The contents of the above paragraphs are incorporated herein by reference as if fully set forth herein.

241. In violation of 18 U.S.C. § 1962(d), Defendants and others whose identities are known only to Defendants at this time conspired to violate the provisions of 18 U.S.C. §1962(c) in that, beginning no later than January 1998 and continuing through today, they knowingly agreed and conspired to conduct or participate, directly or indirectly, in the affairs of an enterprise through the pattern of racketeering activity described above.  The volume and frequency of the transactions, and the continuance of the scheme at issue for over 14 years, could not have occurred without the consent and knowing connivance of Defendants and other Conspirators.

242. As part of and in furtherance of their conspiracy, each Defendant agreed to and conspired in the commission of the many predicate acts described above, with the knowledge that they were in furtherance of that pattern of racketeering activity. As part of and in furtherance of their conspiracy, each Defendant agreed to and did commit at least two predicate acts of racketeering.  Further, each Defendant's actions are attributable to the other Defendants.

243. None of the Defendants have withdrawn, or otherwise dissociated themselves from the conspiracy at issue or the other Conspirators.  Defendants have also continued filing of perjurious affidavits under oath, showing the continuance of this conspiracy till today.

244. Plaintiffs have been injured in business or property by reason of Defendant's violations of 18 U.S.C. S 1962(d).

245. As a direct and proximate result of each Defendant's violations, Plaintiffs have been injured as aforesaid.

246. By reason of Defendants's violation of 18 U.S.C. §1964(d), Plaintiffs are entitled to three times their damages plus interest, costs and attorneys' fees.

### Count III

(Fair Credit Reporting Act, Section 1681b(f):

Willfully Obtaining Consumer  Reports Without A Permissible Purpose)

247. Plaintiffs realleges and incorporates the preceding paragraphs.

248. Defendants willfully violated the FCRA by obtaining each Plaintiff's consumer credit report without such Plaintiff's permission and without having a  permissible purpose therefor.

249. These illegal acts affected Plaintiffs and a large number of unwitting consumers and persisted over at least a five year period, evidencing a pattern of Defendants' willfully violating the provisions of the FCRA.

250. Defendants' acts in obtaining this information in willful  violation of the FCRA without a permissible purpose violate 15 U.S.C. §1681b(f).

251.   As a result of Defendants' aforesaid misconduct, Plaintiffs sustained damages for which Defendants are liable, in addition to attorneys' fees and expenses, 15 U.S.C. §1681n(a).

## Count IV

((Fair Credit Reporting Act, Section 1681b(f):

 Negligently Obtaining Consumer  Reports Without A Permissible Purpose, on behalf of all Plaintiffs except Moore and Rivera)

252.   This count is asserted in the alternative to Count III above.

253.   Plaintiffs reallege and incorporate the preceding paragraphs.

254.   Defendants violated the FCRA by negligently obtaining each Plaintiffs's consumer credit report without such Plaintiff's permission and without having a  permissible purpose therefor.

255.   These illegal acts affected a large number of unwitting consumers  and persisted over at least a five year period, evidencing a pattern of Defendants'  negligently violating the provisions of the FCRA.

256.   As a result of Defendants' aforesaid misconduct, Plaintiffs sustained damages for which Defendants are liable, in addition to attorneys' fees and expenses under 15 U.S.C. §1681o.

## Count V

(Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b)(A) -

 Wilful Refusal/Failure to Investigate and/or Rectify Error In Reporting, on behalf of all

Plaintiffs except Moore and Rivera)

257.  Plaintiffs realleges and incorporates the preceding paragraphs.

258.  As detailed above, certain Plaintiffs disputed the accuracy of adverse entries made

by Defendants.  Upon information and belief, Defendants were informed by the

credit reporting agencies that such Plaintiffs disputed the accuracy of the

information Defendants had provided to credit reporting agencies.  Defendants

willfully failed  to conduct a proper investigation of such Plaintiffs' dispute that

such Plaintiffs were not liable for the account appearing on her credit report, as

required by 15 U.S.C. §1681s-2(b)(A).

259.  Defendants willfully failed, neglected and/or refused to review all relevant

information purportedly provided by such credit reporting agencies to

Defendants in conducting their investigation, as required by 15 U.S.C.

§1681s-2(b)(B).

260.  Defendants' failure/refusal to direct such consumer reporting agencies to delete

inaccurate information about such Plaintiffs pertaining to their respective

accounts as required by 15 U.S.C. §1681s-2(b)(C) was wilful.

261.  Defendants are liable to such Plaintiffs for the actual damages sustained by reason

of their violation of the FCRA, in an amount to be determined  by the trier of fact,

together with an award of punitive damages in an amount to  be determined by the

trier of fact, as well as reasonable attorney's fees and expenses pursuant to 15

U.S.C. § 1681n.

**Count VI**

(Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b)(A):

Negligent Refusal/Failure to Investigate and/or Rectify Error In Reporting, on behalf of all Plaintiffs except Higgins, Moore, Norris and Rivera)

262.   This count is asserted in the alternative to Count V above.

263.   Plaintiffs reallege and incorporate the preceding paragraphs.

264.   After being informed by the credit reporting agencies that certain Plaintiffs disputed the accuracy of the information that Defendants had provided to a credit reporting agency, Defendants negligently failed to conduct a proper investigation of their dispute, as required by 15 U.S.C. §1681s-2(b)(A).

265.   Defendants negligently failed to review all relevant information adequately in conducting their investigation, as required by 15 U.S.C. §1681s-2(b)(B).

266.   Defendants negligently failed to direct such consumer reporting agencies to delete inaccurate information about such Plaintiffs, as  required by 15 U.S.C. § 1681s-2(b)(C).

267.   Defendants are liable to such Plaintiffs for the actual damages sustained by reason of the aforesaid misconduct, together with reasonable attorney's fees and expenses, 15 U.S.C. §1681o.

**Count VII**

(New York Fair Credit Reporting Act, GBL, Section 380-b:

Willfully Obtaining Consumer  Reports Without A Permissible Purpose

And/or Under False Pretenses And/or Without Providing Advance Notice, on behalf of

all Plaintiffs except Moore and Rivera)

268.  Plaintiffs realleges and incorporates the preceding paragraphs.

269.  Defendants willfully violated the NYFCRA by obtaining each Plaintiffs's consumer

credit reports without permission and without having a  permissible purpose

therefor, and/or under false pretenses.

270.  Further, Defendants wilfully failed and neglected to inform each Plaintiff in

writing, before accessing such Plaintiff's consumer report, that Defendants would

request a consumer report and/or that they would inform such Plaintiff of the

name and address of the consumer reporting agency that furnished the report.

271.  These illegal acts affected Plaintiffs and a large number of unwitting consumers

and persisted over at least a five year period, evidencing a pattern of Defendants

willfully violating the provisions of the NYFCRA.

272.  Defendants' acts in obtaining this information in willful  violation of the NYFCRA

without a permissible purpose violate N.Y. Gen. Bus. L., §380-b, which is

actionable under Section 380-l thereof.

273.  As a result of Defendants' aforesaid misconduct, Plaintiffs sustained damages for

which Defendants are liable.

## Count VIII

(New York Fair Credit Reporting Act, Section 380-b -

Negligently Obtaining Consumer  Reports Without A Permissible Purpose

And/or Without Providing Advance Notice, on behalf of all Plaintiffs except Moore and

Rivera)

274.    This count is asserted in the alternative to Count VII above.

275.    Plaintiffs reallege and incorporate the preceding paragraphs.

276.    Defendants violated the NYFCRA by negligently obtaining each Plaintiffs'
consumer credit reports without permission and without having a  permissible
purpose therefor.

277.    Further, Defendants failed and neglected to inform each Plaintiff in writing, before
accessing such Plaintiff's consumer report, that Defendants would request a
consumer report and/or that they would inform such Plaintiff of the name and
address of the consumer reporting agency that furnished the report.

278.    These illegal acts affected Plaintiffs and a large number of unwitting consumers
and persisted over at least a five year period, evidencing a pattern of Defendants'
negligently violating the provisions of the NYFCRA.

279.    Defendants' actions were in violation of the NYFCRA, Gen. Bus. L., §380-b, which
is actionable under Section 380-m.

280.    As a result of Defendants' aforesaid misconduct, Plaintiffs has sustained damages
for which Defendants are liable.

## Count IX

(New York Fair Credit Reporting Act, Gen. Bus. L., §380-l -

Wilful Reporting of False Information on behalf of all Plaintiffs except Moore and Rivera))

281.   Plaintiffs realleges and incorporates the preceding paragraphs.

282.   Defendants knowingly and wilfully introduced or caused to be introduced false information concerning certain Plaintiffs into the files of consumer reporting agency or agencies in violation of Section 380-o, G.B.L.  Even after becoming aware of the falsity of the information reported by Defendants to credit reporting agencies, Defendants willfully refused to retract such false information.

283.   Defendants are liable to such Plaintiffs for the actual damages sustained by reason of Defendants' violation of the FCRA, together with an award of punitive damages in an amount to  be determined by the jury, as well as reasonable attorney's fees and expenses, pursuant to New York Fair Credit Reporting Act, Gen. Bus. L., §380-l.

## Count X

(New York Fair Credit Reporting Act, Gen. Bus. L., §380-m -

 Negligent Reporting of False Information, on behalf of all Plaintiffs except Moore and Rivera)

284.   This count is asserted in the alternative to Count IX above.

285.   Plaintiffs reallege and incorporate the preceding paragraphs.

286.   Defendants introduced or caused to be introduced false information concerning certain Plaintiffs into the files of consumer reporting agency or

agencies in violation of Section 380-o, G.B.L.  Even after becoming aware of the falsity of the information provided to credit reporting agencies, Defendants failed and neglected to retract such false information.

287.   Defendants are liable to such Plaintiffs for the actual damages sustained by reason of the aforesaid misconduct, together with her reasonable attorney's fees, N.Y. Gen. Bus. L., §380-m.

## COUNT XI

### (N.Y. General Business Law Article 22-A)

288.   Plaintiffs incorporate the contents of the paragraphs hereinabove.

289.   None of the Plaintiffs had any commercial or other relationship with Defendants or any of them.  None of the Plaintiffs signed any lease with Defendants or any of them.  None of the Plaintiffs sought any of Defendants' alleged products or services for any purpose whatsoever. Plaintiffs were ordinary citizens and as such, "consumers" for purposes of consumer protection statutes.

290.   Defendants nonchalantly misused the court system of the State of New York and the City of New York, and routinely made false and baseless statements with reckless abandon, and even after knowing the falsity of such statements.  Even after the New York City Civil Court rejected jurisdiction because it would deprive Defendants' victims of their day in Court, Defendants nonchalantly continued commencing and prosecuting such lawsuits, obtaining default judgments, and enforcing such default judgments.  Litigants depend on the integrity of the conduct of participants

in civil proceedings through disputing the validity of their opponents'
claims to impose or resist civil liability.  For a litigant and its Conspirators
to concoct testimony or make false statements under oath even after they
know it is wholly fabricated and baseless is an unacceptable fraud on the
court.  Defendants' conduct at issue was thus, a deceptive and/or unfair
practice which affected, and continues to affect, the public at large.

291.  Defendants committed deceptive acts or practices in the conduct of
business in New York.  Their conduct was unlawful and of a recurring
nature, and strongly affected the public interest.  By their conduct
aforesaid, Defendants violated Article 22-A (Section 349) of New York's
General Business Law.

292.  Plaintiffs sustained damages due to Defendants' violation.  Accordingly,
under Section 349(h) of New York's General Business Law, Plaintiffs are
entitled to recover statutory, compensatory, and treble damages and
reasonable attorneys' fees and expenses.  In addition, Plaintiffs are also
entitled to an injunction against Defendants preventing them from
continuing the aforesaid deceptive practices.

## Count XII

### (Fraud)

293.  Plaintiffs incorporate the contents of the paragraphs hereinabove.

294.  Defendants conducted a fraudulent scheme to extract tribute from
Plaintiffs.  Defendants wilfully and knowingly made, or caused to be made,
affirmative misrepresentations of material facts in furtherance of this

**78**

scheme.  They also wilfully and knowingly concealed material facts from Plaintiffs.  Defendants knew the falsity of the misrepresentations at the time these misrepresentations were made.  Defendants also knew the material nature of the facts that they willfully concealed from Plaintiffs, and that Defendants ought to have disclosed these facts at that time to Plaintiffs.  Defendants had superior knowledge not available to Plaintiffs; as such, they had the duty to disclose the facts.  Plaintiffs relied upon Defendants's representations, and were unaware of the falsity or misleading nature of the representations.  Plaintiffs' reliance was reasonable under the circumstances.  As a result of such reliance, Plaintiffs sustained damages.

295.  By engaging in the conduct described above, Defendants committed a fraud upon Plaintiffs.

296.  Moreover, Defendants' wanton conduct was systematic, in reckless disregard of their statutory and other duties, tantamount to criminal indifference to civil obligations, and unconscionable.

297.  Defendants are therefore liable to pay Plaintiffs compensatory and punitive damages in such amount as may be proven at trial, together with attorneys' fees and expenses and such other amounts as may be appropriate.

## Jury Trial Demanded

298.  Plaintiffs demands a jury trial on all issues so triable.

WHEREFORE,  Plaintiffs demands judgment against Defendants, jointly and severally, on each Count aforesaid:

a.      Awarding compensatory, punitive, statutory and/or treble damages to Plaintiffs in such amount as may be determined after discovery and trial;

b.      Awarding Plaintiffs the costs of this action, including reasonable attorneys' fees and expenses, experts' fees and other disbursements;

c.      Granting such further and other reliefs as may be just and proper.

Dated:        New York, New York          **Chittur & Associates, P.C.**
              October 31, 2016
                                                    Sd/-

                                          _____
                                          By:  Krishnan Chittur, Esq. (KC9258)
                                          Central Westchester Business Park
                                          500 Executive Boulevard Suite 305
                                          Ossining, New York 10562

                                          Attorneys for Plaintiffs