SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------------x
PEOPLE OF THE STATE OF NEW YORK, by
ERIC T. SCHNEIDERMAN, Attorney General of the State
of New York; and
FERN A. FISHER, DEPUTY CHIEF ADMINISTRATIVE
JUDGE FOR NEW YORK CITY COURTS AND
ADMINISTRATIVE AUTHORITY OF THE CIVIL
COURT OF THE CITY OF NEW YORK,
                       Petitioners,

        -against-

NORTHERN LEASING SYSTEMS, INC.;
LEASE FINANCE GROUP LLC;
MBF LEASING LLC;
LEASE SOURCE-LSI, LLC, a/k/a LEASE SOURCE, INC.;
GOLDEN EAGLE LEASING LLC;
PUSHPIN HOLDINGS LLC;
JAY COHEN, a/k/a ARI JAY COHEN, individually, as
  a principal of NORTHERN LEASING SYSTEMS, INC.,
  as a member of LEASE FINANCE GROUP LLC, and as
  an officer of PUSHPIN HOLDINGS LLC;
NEIL HERTZMAN, individually and as an officer of
  NORTHERN LEASING SYSTEMS, INC.;
JOSEPH I. SUSSMAN, P.C.;
JOSEPH I. SUSSMAN, individually and as a principal of
  JOSEPH I. SUSSMAN, P.C.; and
ELIYAHU R. BABAD, individually and as a principal or
  associate of JOSEPH I. SUSSMAN, P.C.,
                       Respondents.
------------------------------------------------------------------------x

**VERIFIED PETITION**

Index No. _____

IAS Part _____

Assigned to Justice _____

      The People of the State of New York and the Honorable Fern A. Fisher, by their attorney,

Eric T. Schneiderman, Attorney General of the State of New York ("NYAG"), allege upon

information and belief:

## PRELIMINARY STATEMENT

    1.      NYAG brings this special proceeding on behalf of the People of the State of New

York (the "State") and Judge Fisher, Deputy Chief Administrative Judge for New York City

Courts and Administrative Authority of the Civil Court of the City of New York.

2.      Respondents Northern Leasing Systems, Inc. ("Northern Leasing Systems"), Lease Finance Group LLC ("Lease Finance Group"), MBF Leasing LLC ("MBF Leasing"), Lease Source-LSI, LLC, a/k/a Lease Source, Inc. ("Lease Source"), Golden Eagle Leasing LLC ("Golden Eagle"), and Pushpin Holdings LLC ("Pushpin") (collectively, the "Northern Leasing Entities") ensnare individuals, many of whom are small, unsophisticated business owners, in void, invalid and/or never-ending equipment finance lease agreements, primarily for credit card processing equipment.  They do so by, *inter alia*, (a) misrepresenting the terms of the lease such as savings that do not materialize; (b) packing their leases with numerous one-sided and onerous terms that are hidden in dense and difficult-to-read text; and (c) relying on leases that consumers deny signing or that they claim have been forged, or that contain one or more material terms that were altered after signing.  Many consumers allege that they were not given a copy of the lease or an opportunity to read it before signing.  Respondents routinely ignore complaints regarding such matters.

3.      Respondents also make it exceedingly difficult for individuals to cancel a lease and return equipment they do not want or request or that is defective from the outset. Respondents often require lessees to sign a form document that states they have received the equipment, that it "is in good working order" and that the lessee "unconditionally accept the Equipment for all purposes" when, in fact, the equipment has yet to be delivered.

4.      Respondents also make it difficult for individuals to return equipment at the end of the initial (typically four-year) lease period.  Thus, even after the initial lease period ends, the Northern Leasing Entities continue collecting or debiting monthly payments.  They do so even though the amounts paid well before the end of the initial term grossly exceed the value of the equipment and even where the consumer has returned the equipment.  Although the typical credit

2

card processing machine costs only a few hundred dollars, Respondents attempt to extract many times that amount, often thousands of dollars, for equipment that the consumer has not used, that has paid for itself many times over and/or that the consumer has returned to Respondents.

5.     The leases themselves are in illegible print and contain numerous one-sided and unconscionable provisions, including provisions that (a) authorize Respondents to sue individuals in New York City Civil Court (or sometimes court in Nassau or Suffolk Counties, or Cook County, Illinois) regardless of where the individual resides; (b) authorize Respondents to effectuate service by mail at the address in the lease regardless of whether that is the actual place of business or residence of the individual at the time of the lawsuit; (c) prevent canceling leases for any reason, including fraud or delivery of non-conforming or defective equipment, and (d) thwart a lessee's ability to terminate his or her lease *after the expiration of the initial lease term* and allow Respondents to continue bilking consumers for equipment that has been paid for or returned.  While some of these provisions may be permissible in standard commercial agreements negotiated at an arm's length, Respondents' leases are not standard commercial leases, and are instead used as a vehicle to commit fraud.

6.     If individuals stop paying the Northern Leasing Entities, the Northern Leasing Entities, along with Respondents Joseph I. Sussman, P.C., Joseph I. Sussman, and Eliyahu R. Babad, harass and threaten individuals into paying hundreds to thousands of dollars based upon such void, invalid and/or never-ending agreements.  Respondents persist in demanding payment even when they have evidence that the individuals have demonstrated defenses, including individuals who never did any business with them.

7.     When such efforts fail to yield payments, the Northern Leasing Entities file suit in New York State typically against the personal guarantor, who is an individual, instead of the

3

business entity that is the lessee.  Many of the sued individuals, the vast majority of whom do not

reside in New York State, cannot afford to physically appear in New York or to hire an attorney

to represent them.

8.     Over 95% of consumers sued by the Northern Leasing Entities reside outside of

New York.

9.     Since 2010, the Northern Leasing Entities have filed over 30,000 actions in New

York County Civil Court and obtained over 19,000 default judgments.  In 2014 and 2015, their

filings accounted for over one fourth of the total general, commercial, and consumer debt filings

in New York County Civil Court.

10.     In 2014, the Northern Leasing Entities held over *forty percent* of the total number

of default judgments entered in the New York County Civil Court in general, commercial, and

consumer credit cases, with their filings accounting over one fourth of the New York County

Civil Court's general, commercial and consumer credit filings that year.

11.     In 2015, the Northern leasing Entities obtained 4,691 default judgments, nearly

half of the 9,654 default judgments entered in New York County Civil Court for general,

commercial and consumer credit filings.

12.     The Northern Leasing Entities have generated 1,643 consumer complaints to the

NYAG for the period from January 1, 2010 to December 31, 2015.  This is the highest volume of

complaints against any entity during this six-year period.

13.     This proceeding is the State's second enforcement action against the Northern

Leasing Entities for engaging in fraudulent and deceptive practices harming consumers.

14.     In *People v. SKS Associates, et al.*, New York Supreme Court Index No.

400908/2012, the NYAG sued the Northern Leasing Entities (except Pushpin) for siphoning over

$3.6 million in unauthorized fees from the bank accounts of nearly 110,000 former customers whose leases had long expired or who had already fully paid Respondents.

15.     That proceeding resulted in a Consent Order and Judgment dated February 28, 2013 (the "Consent Order"), which permanently enjoined Respondents from engaging in any deceptive, fraudulent or illegal practices in violation of, *inter alia*, New York Executive Law § 63(12) and New York General Business Law ("GBL") § 349 in connection with "any collection or attempted collection of taxes and/or related administrative fees through any means from lessees or former lessees."

16.     Despite the Consent Order, the Northern Leasing Entities continue to engage in repeated and persistent fraud and illegality in violation of Executive Law § 63(12) and GBL § 349.  The Northern Leasing Entities' fraudulent and deceptive business practices have not only harmed tens of thousands of individuals, but have also sapped the time and resources of the NYAG and the New York County Civil Court system for years.

17.     The Northern Leasing Entities have been the subject of at least a dozen state or federal private class actions in the last eight years, most of which allege fraudulent and deceptive practices similar or identical to the practices at issue here.

18.     The Northern Leasing Entities have also been the subject of other government enforcement actions.  In 2007, the Missouri Attorney General sued Northern Leasing for "engaging in a scam in which it defrauds Missouri small businesses into entering into long-term, non-cancellable contracts which contain numerous unconscionable terms."  The Connecticut Attorney General is currently investigating a number of Northern Leasing Entities.

19.     Northern Leasing Systems, Inc. also has an "F" rating with the Better Business Bureau based upon, *inter alia*, 639 complaints filed against it and its related companies (*e.g.*,

5

MBF Leasing, Lease Source, Golden Eagle and Lease Finance Group). Similarly, Lease Finance Group had a separate "F" rating with the Better Business Bureau based upon, *inter alia*, 475 complaints filed against it in the last three years.

20.    The State brings this special proceeding pursuant to Executive Law § 63(12) and seeks to permanently enjoin Respondents from engaging in the deceptive, fraudulent and illegal business practices set forth herein and from extorting hundreds to thousands of dollars from such individuals based upon such purported agreements. The State also seeks an order and judgment (a) dissolving Northern Leasing Systems; (b) permanently enjoining Respondents from conducting any business or performing any act in and from the State of New York involving equipment finance leasing and/or debt collection or, in the alternative, if Respondents are permitted to engage in business in New York, to provide a performance bond in a sum sufficient to protect consumers from future misconduct; (c) declaring void and ordering the rescission of leases obtained by fraud or misrepresentation; and (d) directing Respondents to pay restitution, damages, disgorgement, civil penalties and costs and to provide an accounting.

21.    Judge Fern Fisher brings this proceeding pursuant to her authority under Section 5015(c) of the New York Civil Practice Law and Rules, which authorizes an administrative judge to seek an order vacating default judgments obtained by fraud, misrepresentation, illegality, unconscionability, lack of due service, violations of law, or other illegalities, or where the defendants in such cases would be uniformly entitled to interpose a defense predicated upon but not limited to the foregoing defenses. Pursuant to CPLR §§ 5015(c) and (d), Judge Fisher seeks (a) to vacate thousands of default judgments that Respondents have obtained in New York City Civil Court; (b) to stay all executions to collect on such judgments; and (c) to compel Respondents to pay restitution of all amounts collected based on such judgments.

## PARTIES AND JURISDICTION

22.     Petitioners are the People of the State of New York and the Honorable Fern A. Fisher.

23.     The State brings this special proceeding pursuant to (a) Executive Law § 63(12), which authorizes the Attorney General to seek injunctive relief, restitution, damages and costs when any person or entity has engaged in repeated fraudulent or illegal acts or has otherwise demonstrated persistent fraud or illegality in conducting its business; (b) GBL Article 22-A, which authorizes the Attorney General to seek injunctive relief, restitution and civil penalties against any person or business entity that has engaged in deceptive business practices; and (c) New York Business Corporation Law ("BCL") § 1102(a)(2), which authorizes the Attorney General to seek dissolution of a corporation that has "carried on, conducted or transacted its business in a persistently fraudulent or illegal manner."

24.     Petitioner Fern A. Fisher is the Deputy Chief Administrative Judge for New York City Courts and Administrative Authority of the Civil Court of the City of New York.  Judge Fisher brings her claims in this special proceeding against all Respondents except Cohen and Hertzman pursuant to Rule 5015(c) of the New York Civil Practice Law and Rules, which authorizes an administrative judge to bring a proceeding to vacate default judgments that "were obtained by fraud, misrepresentation, illegality, unconscionability, lack of due service, violations of law, or other illegalities," or where the defendants in such cases "would be uniformly entitled to interpose a defense predicated upon but not limited to the foregoing defenses."

25.     Respondent Northern Leasing Systems, Inc. ("Northern Leasing") is a New York corporation that owns, operates through, or purports to service the portfolios of, a variety of entities, including Lease Finance Group, MBF Leasing LLC, Lease Source-LSI, LLC, a/k/a

7

Lease Source, Inc., Golden Eagle Leasing LLC, and Pushpin Holdings LLC.  From at least 2003

until sometime in 2015, the principal place of business for the Northern Leasing Entities,

excluding Pushpin Holdings LLC, was 132 West 31st Street, New York, NY 10001 and for

Pushpin Holdings, LLC 1 Penn Plaza Box # 6255, New York, NY 10019.  Currently, all the

Northern Leasing Entities, including Pushpin Holdings LLC, are located at 419 East Main Street,

Middletown, NY 10940.

26.     Respondent Lease Finance Group LLC ("Lease Finance Group") is a Delaware

limited liability company.  Its principal place of business was 132 West 31st Street, New York,

NY 10001 until sometime in 2015, when it moved to 419 East Main Street, Middletown, New

York 10940.

27.     Respondent MBF Leasing LLC ("MBF Leasing") is a New York limited liability

company.  Its principal place of business was 132 West 31st Street, New York, NY 10001 until

sometime in 2015, when it moved to 419 East Main Street, Middletown, New York 10940.

28.     Respondent Lease Source-LSI, LLC, a/k/a Lease Source, Inc. ("Lease Source"), is

a New York limited liability company.  Its principal place of business was 132 West 31st Street,

New York, NY 10001 until sometime in 2015, when it moved to 419 East Main Street,

Middletown, New York 10940.

29.     Respondent Golden Eagle Leasing LLC ("Golden Eagle') is a New York limited

liability company.  Its principal place of business was 132 West 31st Street, New York, NY

10001 until sometime in 2015, when it moved to 419 East Main Street, Middletown, New York

10940.

30.     Respondent Pushpin Holdings LLC ("Pushpin") is a Delaware limited liability

company.  It purported to have its principal place of business at 1 Penn Plaza, Box # 6255, New

York, NY 10019 until sometime in 2015, when it moved to 419 East Main Street, Middletown, New York 10940.

31.     The Northern Leasing Entities are closely related.  Northern Leasing owns and manages MBF Leasing, Lease Finance Group and Golden Eagle.  Lease Source is a division of Northern Leasing.  Northern Leasing also operates through a number of entities other than the Northern Leasing Entities, including but not limited to Executech Lease Group, LLC and Global Leasing Company.   Consumers are repeatedly contacted by one or more of the Northern Leasing Entities or affiliates concerning the same lease and the Northern Leasing entities routinely assign leases among the various entities and affiliates.

32.     Respondent Jay Cohen, a/k/a Ari Jay Cohen, is the President and Chief Executive Officer of Northern Leasing, President of Pushpin Holdings, an officer of Lease Finance Group, and an officer of MBF Leasing.  Cohen operates the Northern Leasing Entities, and has formulated, directed, controlled or participated in the acts and practices of the Northern Leasing Entities.

33.     Respondent Neil Hertzman is Vice President of Customer Service and Collections at Northern Leasing and handles consumer complaints forwarded by NYAG.

34.     Respondent Joseph I. Sussman, P.C. is a law firm.  It was located at 132 West 31st Street, New York, NY 10001 until sometime in 2015, when it moved to 333 Pearsall Avenue, Suite 205, Cedarhurst, New York 11516.  Joseph I. Sussman, P.C. represents the Northern Leasing Entities in thousands of debt collection actions against consumers that they file in New York City, and commonly obtains default judgments in such actions. Since at least 2010, all of the filings in New York County Civil Court on behalf of the Northern Leasing Entities have been made by Joseph I. Sussman, P.C.

35.     Respondent Joseph I. Sussman is an attorney admitted to practice in New York in 2002, and is the name partner of Joseph I. Sussman, P.C.  He threatens to file, and does file, debt collection actions in New York City on behalf of the Northern Leasing Entities.

36.     Respondent Eliyahu R. Babad is an attorney admitted to practice in New York in 2010, and is a partner or an associate at Joseph I. Sussman, P.C.  He threatens to file, and does file, debt collection actions in New York City on behalf of the Northern Leasing Entities.

**FACTS**

I.     **THE NORTHERN LEASING ENTITIES' FRAUDULENT AND UNLAWFUL PRACTICES**

    A.     **The Northern Leasing Entities' Background**

        1.     <u>The Northern Leasing Entities' Business Model</u>

37.     The Northern Leasing Entities purport to provide equipment finance leases for relatively inexpensive business equipment, such as credit card processing equipment.[1]  They do not provide credit card processing services.

38.     The Northern Leasing equipment leases are typically for terms of forty-eight months (although sometimes thirty-six or sixty) and require the lessee to pay thousands of dollars for equipment worth only a few hundred dollars.

39.     In a typical equipment finance lease, such as the ones utilized by the Northern Leasing Entities, credit card transactions are processed through an interchange created by Visa and MasterCard.  Banks or payment processors, which are members of the interchange, provide credit card processing services.  They do not provide the credit card processing equipment.

---

[1]  In some instances, the leased equipment is a LED sign from Signtronix or an automated teller machine.

10

40.     The banks hire Independent Sales Organizations (often known as ISOs) such as Northern Leasing's affiliated sales representatives to market and sell their credit card processing services.

41.     The Northern Leasing Entities' sales representatives commonly offer the credit card processing services provided by the bank or other payment processor, along with credit card processing equipment leased by one of the Northern Leasing Entities or some other equipment finance company that subsequently assigns the lease to a Northern Leasing Entity.

42.     However, the sales representatives repeatedly fail to disclose to consumers that they are entering into contracts with two different companies, let alone that they are entering into an equipment lease, and many consumers thus do not understand the nature of the leases they sign.

43.     Some representatives never mention any lease and consumers unwittingly sign an equipment lease that is buried in paperwork for processing services.

44.     Many consumers believe that they are dealing with one company that provides credit card processing services (and perhaps accompanying equipment), but it turns out that they are actually entering into one contract for processing services and a separate contract that involves two additional companies, namely (a) the buyer and lessor of the equipment (the Northern Leasing Entities), and (b) the equipment supplier.

> 2.      The Northern Leasing Entities Target Unsophisticated, Vulnerable Individuals, Typically the Owners of Small Businesses

45.     The Northern Leasing Entities typically target small businesses, such as flower shops, hair salons, bodegas, and small restaurants or bars.

11

46.     The Northern Leasing Entities know that the individuals running these businesses "are often new business owners with little experience in debit and credit card transaction processing."

47.     The Northern Leasing Entities' salespeople typically approach individuals either in person at their place of business, which is sometimes also the individual's home, or by telephone.

48.     The individual who signs or allegedly signs a lease is typically, but not always, the owner of the business.  Sometimes the individual who signs or allegedly signs the lease is merely an employee.

49.     Generally, the individuals solicited are unsophisticated, vulnerable, and not represented by an attorney at the time of the transaction.

50.     Many are 65 years of age or older.

51.     Others are immigrants, and do not speak and/or read English well, if at all.

52.     Still others are veterans and/or disabled.

> 3.     <u>The Northern Leasing Entities, Directly and Through Their Sales Representatives, Engage in Deceptive Practices to Induce Consumers to Enter into Lease</u>

53.     Respondents engage in a variety of deceptive business practices to induce these unsophisticated and vulnerable individuals to enter into expensive financing agreements that greatly exceed the value of the equipment leased.

54.     The Northern Leasing Entities' salespeople repeatedly make false representations or fail to disclose material information about the credit card processing equipment and the terms of the lease.

12

55.     The Northern Leasing Entities' salespeople repeatedly falsely represent that the equipment is free.

56.     The Northern Leasing Entities' salespeople repeatedly falsely represent that consumers will save money by leasing equipment.

57.     The Northern Leasing Entities' salespeople repeatedly falsely represent that consumers can cancel the lease at any time or within a specific period.

58.     The Northern Leasing Entities' salespeople also repeatedly misrepresent that consumers will own the equipment at the end of the lease.

59.     The Northern Leasing Entities' salespeople make a variety of other false—and sometimes bizarre—representations to trick consumers.  Such consumers were told they were receiving the credit card terminal as part of a free government program.  Others were told that they were purchasing web design services or were receiving a grant or loan to help their business.

60.     Consumers are often given little or no opportunity to read the lease before signing.

61.     Indeed, many consumers are either not given any lease, are given or shown only one page out of multiple pages, or do not sign any lease.

62.     Additionally, in recent years, some consumers sign these leases electronically on the salesperson's iPad or other tablet device.  These consumers also do not receive a copy of the lease they sign.

63.     The Northern Leasing Entities require some lessees to sign an acknowledgment of receipt form the same date as the lease that states they have received the equipment, that it "is in

13

good working order" and that the lessee "unconditionally accepts the Equipment for all purposes" when, in fact, the equipment has yet to be delivered, let alone tested.

64.     The Northern Leasing Entities' salespeople are often unreachable shortly after speaking or meeting with a consumer, particularly where a consumer is seeking to have the salesperson deliver on the representations made during the sales pitch.

65.     The Northern Leasing Entities' salespeople receive substantial payments, directly or indirectly, for delivering a signed lease and such payments are based upon the stream of expected payments under the lease.

66.     Moreover, Northern Leasing employees make false representations directly to consumers, such as when they try to convince a current lessee to renew a lease or enter into a new lease.

67.     For example, to induce one consumer to renew her lease agreement, a supervisor at Northern Leasing falsely represented to her that it would be cheaper to lease rather than buy a new credit card processing machine.

68.     In another instance, a Northern Leasing employee telephoned a consumer to offer an upgraded credit card machine to replace one she was leasing from Northern Leasing and falsely represented that it would be compatible with her POS system.

69.     In yet another instance, a Northern Leasing employee falsely represented to a consumer that the company was affiliated with Cardworks, the consumer's credit card processor, and that the consumer needed to upgrade his terminal in order to process the new credit cards. When the consumer called Cardworks to initialize the new terminal, they were informed that no upgrade was needed and that they have no affiliation with Northern Leasing.

14

70.     Although the Northern Leasing Entities reap the benefits of these agreements, they disclaim responsibility for their salespeople by stating, in response to consumer complaints, that Northern Leasing "does not employ sales representatives to solicit merchants to induce any binding signature."  Yet Respondent Jay Cohen, the Chief Executive Officer of Northern Leasing, testified that Northern Leasing trains the salespeople who present Northern Leasing's lease to consumers.

71.     In some cases, the Northern Leasing Entities require individuals to submit an "affidavit of misrepresentation" even where they know that the individual is complaining that they were fraudulently induced to sign a lease by a Northern Leasing Entity sales representative, including where consumers had cancelled the lease immediately and before receiving any equipment.

72.     Even when individuals submit these affidavits, the Northern Leasing Entities continue to enforce the leases.

**B.     The Northern Leasing Entities Rely on Agreements That Many Consumers Allege They did not Sign or That may Have Been Materially Altered**

73.     Many consumers are in fact unaware of signing any lease with a Northern Leasing Entity and claim either that they never signed such a lease, or that the purported signature on the lease was forged.

74.     The Northern Leasing Entities have faced allegations of forgery in court – and lost.  On June 23, 2015, a jury in New York County Civil Court awarded counterclaim damages of over $1 million to a consumer who claimed that Northern Leasing had forged his signature on

15

a lease agreement.  *See* Reynolds Aff. Ex. U (jury verdict in *Northern Leasing Sys. Inc. v. LHC Car Wash LLC*, Index No. CV-041350-07/NY (N.Y. Cnty. Civ. Ct.)). [2]

75.     Some consumers assert under penalty of perjury that they are victims of identity theft and had no connection to any business that had ever leased credit card equipment.

76.     In some instances, the individual's name on the lease is misspelled, providing further evidence that the signature is not genuine.

77.     When individuals ask for a copy of the underlying agreement, the Northern Leasing Entities often refuse to provide one or ignore such requests.

78.     The Northern Leasing Entities often ignore or dismiss out of hand complaints that the individuals whose name is on the lease did not sign the lease or that their signatures were forged.

79.     Respondents take the position that such leases are valid and binding and that payments on the lease must continue.

80.     When not ignoring or dismissing such complaints, the Northern Leasing Entities subject individuals who assert that they did not sign the lease in question or that their signatures were forged to an onerous process designed to prevent or dissuade them from disavowing the lease.

81.     The Northern Leasing Entities typically require such individuals to complete and return an affidavit of forgery form, to provide a copy of a police report and three forms of identification – and suggests providing a cancelled check or "back of a major Credit Card."  This form asks for personal information that could be used for identity theft (not an unrealistic concern for consumers given the Northern Leasing Entities' fraudulent and deceptive practices).

_____

[2] The court reduced the jury verdict to $200,000 and the action is currently on appeal.

16

82.     Even when individuals return the completed affidavit of forgery forms, or provide evidence of identity fraud from their bank or a law enforcement authority, the Northern Leasing Entities ignore the consumers' claims and continue to harass individuals for payment, culminating in the Northern Leasing Entities threatening to bring, and often actually bringing, legal actions against individuals.

83.     In other instances, consumers find that the Northern Leasing Entities or their salespeople alter one or more material terms of the lease, such as the amount of the monthly payment or the length of the lease term, after an individual signs it.

84.     Other consumers are asked to sign a copy of the lease in which certain terms have been left blank, and the Northern Leasing Entities or their salespeople fill those terms in later, or, in some instances, leave them blank.

85.     The Northern Leasing Entities ignore complaints about such alterations.

**C.     The Northern Leasing Entities Make it Difficult and Inconvenient for Consumers to Reject Unwanted or Defective Equipment**

86.     Some individuals return or attempt to return the crediting card processing equipment shortly after receiving it because they never wanted or agreed to lease such equipment or because the equipment delivered does not conform to what was specified.

87.     Other consumers reject such equipment shortly after receiving it and attempt to return and/or cancel their leases because the equipment is not working.

88.     The Northern Leasing Entities do not permit consumers to return their equipment or cancel their leases.

89.     The Northern Leasing Entities repeatedly thwart consumers' attempts to return equipment that consumers did not want or request, or that was defective from the outset by

17

refusing to provide the address to which to return such equipment and insisting that the lease is non-cancelable despite the consumer's timely rejection of the equipment.

90.     In doing so, the Northern Leasing Entities rely on a provision in the leases which states that the consumer has received the equipment and accepts it "as is."  However, many consumers do not receive their equipment until many days after they sign their leases.

91.     Although the Uniform Commercial Code ("U.C.C."), which Respondents claim govern their finance leases, provides that a lessee must accept the equipment in order for the lease to become effective, and also permits a lessee to timely revoke acceptance of nonconforming equipment, the Northern Leasing Entities disregard these provisions.

**D.     The Northern Leasing Entities' Lease Termination Process Traps Consumers**

92.     The termination provisions in the Northern Leasing Entities' leases are yet another device to trap consumers in a never-ending agreement.

93.     Among other things, such provisions generally provide for automatic month-to-month renewal after the end of the lease term.  In order to stop the lease from renewing automatically, the lessee must either (a) return the equipment, freight prepaid, within ten days of the expiration of the lease term, or (b) notify the lessor in writing within thirty days prior to the end of the lease term that the lessee wishes to purchase the equipment "as is."

94.     Moreover, the termination provisions are buried in densely packed, difficult to read print in the Northern Leasing Entities' form agreements.  Two such provisions are set out herein:

18

14. **END OF LEASE TERM OPTIONS.** At the expiration of the Lease Term or monthly renewal period as described in this section, provided that you are not in default, you have the following options: (a) you may return the Equipment, freight prepaid, to us within ten days of the expiration of the Lease Term or monthly renewal period and pay us a $150 restocking fee; or (b) provided that you notify us in writing within thirty (30) days prior to the expiration of the Lease Term or monthly renewal period that you wish to exercise this option, you may purchase the Equipment on an AS-IS WHERE-IS basis for its Replacement Value which amount shall be due at the expiration of the Lease Term or monthly renewal period. If you do not provide us with thirty days' written notice of your intention to exercise option (b) above, or if you fail to return the Equipment to us within ten (10) days of the expiration of the Lease Term or monthly renewal period, this Lease shall thereupon be extended on a month-to-month basis at the same monthly lease payment and upon the same terms and conditions set forth herein, including your End of Lease Term Option set forth in this section. If you paid the last monthly lease payment at the time of the signing of this Lease, such payment shall be applied (without interest) to the last monthly lease payment upon your return of the Equipment to us provided that no other sums are owing by you to us under the Lease, in which event we may apply such payment to any such amount outstanding. By exercising option (a) or (b) above, your obligation to make monthly lease payments for the Equipment shall terminate. However, the exercise of any option in this section will not extinguish any other payment obligations arising under this Lease, including, but not limited to, the obligation to pay taxes and fees under Section 9 above. You acknowledge that the monies we collect for the restocking fee may provide us with a profit.

Reynolds Aff. Ex. F7 (Berg Aff. at 5) (Northern Leasing lease, shown actual size).

18. **END OF LEASE TERM OPTIONS:** At the expiration or termination of the Lease Term or monthly renewal period, provided that you are not in default, you have the following options: (a) You may return the Equipment, freight prepaid, to us in good repair, condition and working order, reasonable wear and tear alone excepted, in a manner and to a location we designate within ten days of the expiration or termination of the Lease Term or monthly renewal period and all your rights to use the Equipment shall terminate, or (b) provided that you notify us in writing within thirty (30) days prior to the expiration of the Lease Term or monthly renewal period that you wish to exercise this option, you may purchase the Equipment on an AS-IS WHERE-IS basis for its Replacement Value which amount shall be due at the expiration of the Lease Term. IF YOU DO NOT PROVIDE US WITH THIRTY DAYS' WRITTEN NOTICE OF YOUR INTENTION TO EXERCISE OPTION (B) ABOVE, OR FAIL TO RETURN THE EQUIPMENT TO US WITHIN TEN (10) DAYS OF THE EXPIRATION OR TERMINATION OF THE LEASE TERM OR MONTHLY RENEWAL PERIOD, THIS LEASE SHALL THEREUPON BE EXTENDED ON A MONTH-TO-MONTH BASIS AT THE SAME MONTHLY LEASE PAYMENT AND UPON THE SAME TERMS AND CONDITIONS SET FORTH HEREIN, INCLUDING YOUR END OF LEASE TERM OPTION SET FORTH IN THIS SECTION. If you paid the last monthly lease payment at the time of the signing of this Lease, such payment shall be applied (without interest) to the last monthly lease payment upon your return of the Equipment to us provided that no other sums are owing by you to us under the Lease, in which event we may apply such payment to any such amount outstanding.

Reynolds Aff. Ex. F51 (Townsley Aff. at 13) (MBF lease, shown actual size).

95.     As a result, many consumers do not know that the lease automatically renews or that they must return the equipment in order to terminate the lease.

96.     In some instances, particularly where the Northern Leasing Entities' salespeople tell consumers that they will own the leased equipment at the end of the lease, consumers have no reason to believe that they are required to take any action to terminate the lease.

19

97.     Moreover, the Northern Leasing Entities do not notify consumers that their lease term is ending or remind them of their options towards the end of the lease.  Instead, they remain silent and continue collecting the monthly payments, in many instances for years.

98.     Ostensibly based on these termination provisions, the Northern Leasing Entities often continue to deduct payments from consumers' bank accounts long after what should have been the end date for the lease.

99.     When consumers attempt to return the equipment at the end of the lease term and to terminate the automatic month-to-month renewal, the Northern Leasing Entities routinely make it difficult to do so, including by refusing to provide the address to which the equipment is to be returned.

100.     The Northern Leasing Entities commonly claim years after consumers return the equipment that they never received the equipment, that they received the wrong equipment, or that they received only some of the equipment.  They continue collecting or claim they are entitled to continue collecting money from consumers because, in their view, the lease remains "active."

101.     Because the leased credit card processing equipment, when new, costs only a few hundred dollars, through these tactics, the Northern Leasing Entities collect hundreds, or thousands, of dollars more than what the leased equipment is worth.

According to Northern Leasing, "typical" lease terms are $50 per month for 48 months, although many consumers are charged substantially more.  Under the "typical" terms, a lessee would pay $2,400 for the equipment, and the lessor would recoup the cost of the credit card processing equipment, assuming that it was new at the time, during the first six months of the lease.

20

102.    Ultimately, the total lease payments may be three or more times the cost of the equipment.

**E.      The Northern Leasing Entities' Fraudulent and Deceptive Debt Collection Practices**

  1.      Respondents Dun and Harass Consumers who they Know or Should Know Do Not Owe Them Money

103.    The Northern Leasing Entities repeatedly hound consumers for payments even where they know or should know that the consumer does not owe the debt or never even entered into a lease with them.

104.     Respondents take the position that their equipment finance leases are valid and binding so long as some individual signs or purports to sign it, regardless of whether that signature was forged, the individual's identity was stolen, the individual lacked the authority to sign such an agreement, or the individual who signed relied on deceptive statements made by the salesperson who procured the lease.  Respondents thus harass and threaten such individuals to pay hundreds to thousands of dollars based on such fraudulently obtained leases.

105.    Respondents also continue to demand payment from individuals who have terminated their leases at the end of the lease term, notified the Northern Leasing Entities in writing of the termination and returned the equipment, all in accordance with the onerous terms of the lease.

106.    Further, Respondents often wait several *years* following the end of the initial lease term before attempting to collect a purported debt from the consumer, despite the fact that the statute of limitations on the debt claim may have passed.

21

107. While the consumer may think the matter has been resolved, Respondents repeatedly continue to assess monthly charges and eventually seek to collect amounts in the thousands, or even tens of thousands of dollars.

        2.     <u>Respondents Engage In Deceptive and Harassing Debt Collection Tactics</u>

108. The Northern Leasing Entities harass and threaten consumers who they claim owe the Northern Leasing Entities money, including but not limited to those individuals who stop a Northern Leasing Entity from debiting their bank account.

109. This harassment includes placing multiple telephone calls per day or per week to any telephone number associated with the individual who may or may not have signed a lease agreement.

110. During such telephone calls, employees of the Northern Leasing Entities threaten, *inter alia*, to ruin the individual's credit score, to file a lawsuit, and to place liens on the individual's property.

111. Indeed, even where a Northern Leasing Entity acknowledges an error, it continues to try to collect.

112. The Northern Leasing Entities even demand payment from those who have previously settled with them.

113. The Northern Leasing Entities' harassment also includes multiple threatening letters to such individuals. Threats in those letters include statements such as "[b]y copy of this letter, we are directing our attorneys to **commence a civil action** against you to recover the monies due under the lease agreement and applicable law, including **default interest, courts costs and attorney's fees** as may be appropriate, unless you promptly pay the outstanding balance of $ . . . **within ten (10) days from the date of this letter**." and "[p]lease be advised that

22

**your delinquency has been reported to the credit bureaus as a chargeoff or collection**

**account** and will be reflected on your credit report."

114.    The Northern Leasing Entities' debt collection practices are calculated to harass

and intimidate their targets into paying hundreds to thousands of dollars for what appears to be

the lease's accelerated balance plus unspecified amounts of interest and attorneys' fees, even

where that agreement is void or invalid.

115.    Representatives of the Northern Leasing Entities do not provide their targets with

a breakdown of how they calculate the amounts that they seek to collect, such as the interest rate

applied to the accelerated balance or the attorneys' fees.

116.    The Northern Leasing Entities use the threat of litigation in New York to extract

payment, telling individuals who dispute owing any money, the vast majority of whom do not

live in New York, that "it would be cheaper to pay up" than to defend against a lawsuit in New

York.

117.    The Northern Leasing Entities threaten to file lawsuits even where they have not

communicated with the consumer in years or where they know or should know that such an

action is untimely under the applicable statute of limitations.

118.    When the Northern Leasing Entities' threats and harassment fail to extract

payment, they then step up their collection efforts by utilizing the law firm of Joseph I. Sussman,

P.C. (the "Sussman Firm") to provide additional threatening communications.

119.    The Sussman Firm is essentially an extension of the Northern Leasing Entities.

Until recently, it was located in the same building as the Northern Leasing Entities, its office was

"part of the space that Northern Leasing rent[ed] from the landlord" and the Firm paid no rent for

23

that space, and the firm's email was or is the same email as the Northern Leasing Entities.  When Sussman is sued, Northern Leasing pays for his representation.

120.     The Sussman Firm, through attorneys Joseph Sussman and Eliyahu Babad, mails letters to consumers in which it demands payment of amounts allegedly owed and threatens to file actions against them on behalf of one of the Northern Leasing Entities.  The letters enclose what the Sussman Firm describes as a fully executed summons and complaint.

121.     These debt collection letters are on the Sussman Firm's letterhead.  Sussman's and Babad's names appear on the left side of the letterhead and below the signature line of the letters.

> 3.     Respondents Rely on the "Personal Guaranty" Provision in Their Leases to Demand Individuals Pay Whatever Respondents Claim is Outstanding

122.     Integral to the Northern Leasing Entities' collection scheme is the personal guaranty provision in their lease forms.  That provision typically consists of, *inter alia*, (a) an individual's promise to pay all amounts due under the lease should the lessee, typically the business entity, fail to do so; (b) the individual's consent to the jurisdiction of the courts in the state and county of New York; (c) the individual's agreement to pay all reasonable attorneys' fees and other expenses of the Northern Leasing Entity; and (d) the individual's waiver of any rights to trial by jury, participation in any class action, and personal service for legal process.

123.     Like many of the other onerous terms in their form lease agreements, the personal guaranty is not negotiated by the parties but is presented on a "take it or leave it" basis.

124.     Also, like many of the other onerous terms in their form lease agreements, the personal guaranty is presented in dense, difficult-to-read print.

125.     For example, the following is a representative sample of a typical personal guaranty provision.

## PERSONAL GUARANTY

To induce Lessor to enter into this Lease and purchase the Equipment for Lessee and knowing that Lessor is relying on this guaranty as a precondition to entering into this Lease, I, the undersigned ("Guarantor"), individually, absolutely and unconditionally guaranty to Lessor the prompt payment when due of all of Lessee's obligations to Lessor under the Lease irrespective of any other circumstance which might otherwise constitute a defense to this guaranty. I Lessor shall not be required to proceed against Lessee or the Equipment or enforce any other remedy before proceeding against me. I agree to pay all reasonable attorneys' fees and other expenses Lessor incurs in enforcing this guaranty and Lease. I consent to any extension or modification granted to Lessee, and the release and/or compromise of any obligation of Lessee or any other obligors and guarantors shall not in any way release me from my obligations under this guaranty. This is a continuing guaranty and shall bind my heirs, successors and assigns, and may be enforced by or for the benefit of any assignee or successor of Lessor.  This guaranty and any and all matters in dispute between me and Lessor whether arising from or relating to the guaranty itself, or arising from alleged matters occurring prior to, during, or subsequent to the execution of the guaranty ("Dispute"), shall be governed by the laws of the State of New York. All Disputes relating to this guaranty shall be litigated exclusively in the federal or state courts located in the State and County of New York notwithstanding that other courts may have jurisdiction over the parties and the subject matter, and I freely consent to the jurisdiction of such courts, including without limitation, the Civil Court of the City of New York. Lessor may properly serve me with legal process via certified mail by mailing same to my address set forth herein or to my current or last known address at the time of suit. I WAIVE, INSOFAR AS PERMITTED BY LAW, TRIAL BY JURY IN ANY LITIGATION ARISING FROM OR IN ANY WAY RELATING TO THIS LEASE OR GUARANTY. I agree not to pursue a claim against Lessor or its assigns as part of a class action or other representative action, to the extent permitted by applicable law. I expressly authorize Lessor or its servicing agents or assigns continuing authority to obtain one or more investigative and other credit reports from a credit bureau or credit reporting agency and to conduct one or more credit checks concerning my credit history, and acknowledge that Lessor may furnish information relating to this Lease and guaranty to one or more credit reporting agencies. Disputes or inaccuracies regarding information Lessor furnishes to a credit reporting agency shall be sent to Lessor at its address listed above. I understand that upon my written request, Lessor will inform me whether or not a credit report was requested, and if such report was requested, of the name and address of the consumer reporting agency that furnished the report. BY SIGNING BELOW, I ACKNOWLEDGE THAT I HAVE READ ALL 2 PAGES OF THIS LEASE, THAT ALL BLANK TERMS ON PAGE 1 WERE FILLED IN AT THE TIME OF SIGNING, THAT I HAVE BEEN GIVEN A COPY OR AN OPPORTUNITY TO MAKE A COPY AND THAT I AGREE TO BE BOUND BY ALL THE TERMS OF THIS GUARANTY AND LEASE.

Mark Berg                                                                                                                        7880

| Guarantor's Signature | Print Name | | | Social Security No. |
|---|---|---|---|---|
| 213 HEMPSTEAD AVE | LYNBROOK | NY | 11563 | 516-599-0575 |
| Home Address | City | State | ZIP | Home Phone No. |

Reynolds Aff. Ex. F7 (Berg Aff. at 4).

126.    In their efforts to collect amounts claimed due, the Northern Leasing Entities

relentlessly pursue the individuals who signed or purportedly signed the personal guaranty, even

where that individual is not the owner of, or has no connection to, the small business entity that

is the lessee.

127.    The Northern Leasing Entities also pursue individuals for payment where the

lease had been procured by fraud or misrepresentations and/or where the equipment that is the

subject of the lease was not accepted and/or was timely revoked and returned to Northern

Leasing.

128.    Many individuals choose to pay off the Northern Leasing Entities to end the

harassment.

25

**F.      The Northern Leasing Entities' Abusive Use of Legal Process**

129.    When the Northern Leasing Entities' harassment and threats do not yield payment of the amounts demanded, they file lawsuits in venues that are inconvenient and costly for the individuals sued to appear and defend and that have no relationship to the location where the lease was allegedly entered into.

130.    The Northern Leasing Entities typically choose to sue the designated "personal guarantor," and not the business entity that is the lessee.

131.     The Northern Leasing Entities, through the Sussman Firm and Respondents Sussman and Babad, bring these lawsuits in New York City Civil Court even though the overwhelming majority of individuals sued do not live or work in New York City or even New York State.  Rather, they include residents of Alabama, Arizona, California, Colorado, Connecticut, Florida, Georgia, Idaho, Indiana, Kentucky, Louisiana, Maine, Maryland, Michigan, Minnesota, Nebraska, New Mexico, Nevada, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Washington, Wyoming, and Virginia.

132.    Through the Sussman Firm, the Northern Leasing Entities have filed thousands of collections actions in New York City Civil Court.  Respondents have filed over 30,000 actions between 2010 and 2015.  In 2014 and 2015 alone, Respondents filed 8,304 and 7,421 actions respectively —in sum, more than 15,000 actions in just two years.

133.    For many, the costs of physically appearing in court in New York and/or hiring an attorney are burdensome.

134.    As a result, as Respondents are well aware, many of these actions result in default judgments.

26

135.     Between 2010 and 2015, Respondents obtained more than 19,000 default judgments in general, commercial and consumer credit cases in New York County Civil Court. In 2014 alone, they obtained 4,124 default judgments, representing approximately 41% of the total of 9,933 default judgments entered in the New York County Civil Court in 2014 for consumer credit, commercial, and general cases.  In 2015, they obtained 4,691 default judgments, nearly half of the total default judgments entered in the New York County Civil Court in 2015 for consumer credit, commercial, and general cases.

136.     New York City Civil Court is not the only venue flooded by debt collection actions filed by the Northern Leasing Entities.  During 2015, Lease Finance Group and Pushpin Holdings LLC, through its Illinois attorney, Law Offices of Ari R. Madoff P.C., filed approximately 1,014 debt collection cases in Cook County, Illinois.

137.     More recently, Respondents have begun to file lawsuits in Nassau and Suffolk counties.  For example, Lease Source has filed approximately 826 cases in Nassau County since 2008 and approximately 686 cases in Suffolk County since 2009.

138.     After obtaining a default judgment, Respondents then use one or more information subpoenas and restraining notices to locate and garnish the bank account(s) of such individuals.

139.     Respondents file legal actions against individuals when they know or should know that the underlying leases were fraudulently obtained or otherwise invalid.  This includes individuals who never signed a lease or whose signature was forged (including individuals who returned a completed affidavit of forgery); and who complained about alterations to the leases made after the consumer signed the agreement.  It also includes individuals who did not receive the equipment ordered.

27

140.    Respondents also serve summons and complaints at addresses that they know or should know are outdated.  As a result, they obtain default judgments against individuals who were not aware that they had been sued.

141.    Respondents further file lawsuits that are untimely and where the alleged default occurred more than four or six years prior to the date on which the complaint was filed.

142.    As a result of their lawsuits, Respondents have sued for and/or obtained thousands of dollars in judgments for fraudulently induced equipment leases and for debts that are time-barred.

## II.    COHEN, HERTZMAN, SUSSMAN AND BABAD SHOULD BE HELD INDIVIDUALLY LIABLE

### A.    Respondent Cohen

143.    Respondent Cohen has participated in and has knowledge of the fraudulent, deceptive and illegal acts alleged in the Petition.

144.    Cohen is the Chairman of the Board of Northern Leasing as well as its Chief Executive Officer.  He has served as CEO of Northern Leasing since 1991.

145.    At least one court has considered evidence demonstrating that Cohen signed documents as President of Pushpin Holdings.

146.    Cohen is also an officer of Lease Finance Group and MBF Leasing, and in addition he is intimately involved in the operation of the Respondent entities.

147.    For example, Cohen has admitted that he is responsible for "overall management" of Northern Leasing.

148.    Cohen has also acknowledged that he reviews lease applications submitted by salespeople and deals with leases "all the time."

28

149.    Cohen has actual knowledge of the complaints about the Northern Leasing Entities' fraudulent and deceptive practices, including that consumers complain that they do not see all the pages of the leases and that the terms are not clearly presented.

150.    Cohen also admits that Northern Leasing trains the salespeople who present Northern Leasing's lease to consumers.

151.    Additionally, Cohen's family has a pecuniary interest in Northern Leasing. Northern Leasing is owned by two trusts, the beneficiaries of which are Cohen's five children and possibly his wife.

**B.      Respondent Hertzman**

152.    Respondent Hertzman has participated in and has knowledge of the fraudulent, deceptive and illegal acts alleged in the Petition.

153.    Hertzman is the Vice-President of Customer Service and Collections for the Northern Leasing Entities and, since at least 2013, has been responsible for handling complaints against the Northern Leasing Entities forwarded by NYAG.  Following entry of the Consent Order in *People v. SKS*, the Northern Leasing Entities designated Hertzman as the liaison for handling complaints and stated that he "ha[s] the authority to address and resolve any such complaints."

154.    Hertzman's name is on Northern Leasing's letters to NYAG in response to hundreds of complaints from lessees and other individuals, including but not limited to complaints that allege an individual's signature was forged on a lease, that one or more material terms were forged after an individual signed a lease, or that the Northern Leasing Entities' salespeople made misrepresentations to induce an individual to sign a lease.

155.   Hertzman's responses indicate that he is aware of the repeated complaints that Northern Leasing Entities' sales representatives misrepresented the terms of the leases.  In response to such complaints, Hertzman disavows any responsibility for the salesperson's representations.

156.   Other responses indicate that Hertzman knows that the Northern Leasing Entities continue to demand and collect payments even after consumers terminate their lease, including after returning their equipment, or after the Northern Leasing Entities have been advised that the lease was forged or the material terms altered.

157.   Regardless of the underlying facts, Hertzman's standard response to these complaints is to assert that the lease is non-cancelable and that the Northern Leasing Entities are not responsible for any misrepresentations because "NLSI is an entirely separate and independent company from the vendor, equipment manufacturer and/or credit card processor…"

158.   Hertzman is aware of and participates in the collection of debts for periods after the termination of the lease period and/or that are time-barred.

**C.     Respondent Sussman**

159.   Respondent Sussman has participated in and has knowledge of the fraudulent, deceptive and illegal acts alleged in the Petition.

160.   Sussman is the named partner in Joseph I. Sussman, P.C. and personally participates in furthering the Northern Leasing Entities' scam by (a) sending fraudulent and deceptive debt collection letters to consumers, and (b) filing debt collection actions against consumers, including debt collection actions that are time-barred by the applicable statute of limitations.

30

161.   Sussman has been providing legal work for Northern Leasing since 2002 and was formally retained by Northern Leasing in 2003.  He handles all matters for Northern Leasing involving collection and delinquent leases.

162.   Until recently, Sussman's offices were at the same location as the Northern Leasing Entities:  132 West 31st Street, New York, New York.  Along with the other lawyers at his firm, he has or had full access to Northern Leasing's computer database that is used to manage the Northern Leasing Entities' lease portfolios.

163.   As stated above, the Sussman Firm brings thousands of debt collection actions against consumers in New York City Civil Court on behalf of each of the Northern Leasing Entities.  Since at least 2003, all of the legal complaints filed by the Northern Leasing Entities in New York City go out under Respondent Sussman's name, and all legal documents, including the complaints and affirmations filed in debt collection actions, are signed by him and/or another attorney in his firm.

164.   Sussman is thus responsible for filing thousands of cases on behalf of the Northern Leasing Entities in the New York local civil courts each year.

165.   Sussman knows that many, if not most, of the individuals sued by the Northern Leasing Entities default.

166.   In fact, as far back as 2010, Sussman testified that as many as 90% of the cases filed resulted in defaults.

167.   Despite this knowledge, Sussman continues to serve consumers, or cause consumers to be served, by mailing the summons and complaint to an address on the lease or another address associated with that consumer, and not by any of the methods of personal service set forth in CPLR 308.

168.    As the attorney of record, Sussman also knows or should know that many of the individuals who appear and answer the Northern Leasing Entities' collection actions and/or move to vacate defaults have defenses that would result in dismissal of the collection actions, including that they did not sign a lease with any Northern Leasing Entity, that they had terminated or attempted to terminate the lease, that they never received the equipment promised, that the equipment received was defective and/or did not work, that they were not served with the summons and complaint and/or that the action was time-barred.

169.    Indeed, Sussman has acknowledged in sworn testimony that he is aware of the fact that the Northern Leasing Entities consumers have claimed (a) that their signatures are forged; (b) that the sales representative misrepresented terms of the leases; and (c) that Northern Leasing filed actions against consumers to collect debts that were time-barred under the statute of limitations.

170.    Sussman has also participated in significant decisions such as deciding to sue individuals who sign personal guaranties rather than the business entities that are the lessees.

171.    Sussman has also drafted certain of the Northern Leasing Entities leases.

**D.    Respondent Babad**

172.    Respondent Babad has participated in and has knowledge of the fraudulent, deceptive and illegal acts alleged in the Petition.

173.    Babad was admitted to practice law in New York in 2010 and is an attorney in the Sussman firm.

174.    Until recently, Babad worked at the same location as the Northern Leasing Entities:  132 West 31st Street, New York, New York.  Along with the other lawyers in the

32

Sussman Firm, he has full access to the Northern Leasing computer database that is used to manage the Northern Leasing Entities' lease portfolios.

175.    Along with Respondent Sussman, Babad personally sends debt collection letters to consumers and files debt collection actions against consumers in New York City Civil Court on behalf of the Northern Leasing Entities.

176.    Along with Respondent Sussman, Babad is the attorney of record for thousands of debt collection actions brought by the Northern Leasing Entities in New York City Civil Court and signs many of the summons and complaints and other legal documents in such actions.

177.    Babad knows or should know that the individuals sued by the Northern Leasing Entities are likely to default.  Despite this, he continues to serve consumers, or cause consumers to be served, by mailing the summons and complaint to an address on the lease or another address associated with that consumer, and not by any of the methods of personal service set forth in CPLR 308.

178.    As the attorney of record, Babad also knows or should know that many of the individuals consumers who appear and answer the Northern Leasing Entities' collection actions and/or move to vacate defaults have valid defenses that would result in dismissal of the collection actions, including that they did not sign a lease with any Northern Leasing Entity, that they had cancelled or attempted to cancel the lease, that they never received the equipment promised, that the equipment received was defective and/or did not work, that they were not served with the summons and complaint and/or that the action was time-barred.

## FIRST CAUSE OF ACTION
## BY THE STATE
## AGAINST ALL RESPONDENTS
## PURSUANT TO EXECUTIVE LAW § 63(12) (FRAUD)

179.   The State repeats and realleges paragraphs 1 through 178 as if fully set forth

herein.

180.   Executive Law § 63(12) defines "fraud" or "fraudulent" to include "any device,

scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression,

false pretense, false promise or unconscionable contractual provisions."

181.   As set forth above, Respondents repeatedly and persistently engage in fraud by,

*inter alia*:

- using fraud or misrepresentations to induce individuals to sign lease agreements;

- engaging in deceptive practices and high pressure sales to induce unsophisticated consumers to enter into leases, including misrepresenting the nature of the leases, targeting non-English speaking consumers, and hiding key provisions of the lease in fine print;

- enforcing leases that were forged or not signed by the consumer;

- failing to provide consumers with complete leases or with the opportunity to review the lease terms;

- unilaterally altering material terms of a lease;

- enforcing and collecting upon such agreements obtained by fraud or misrepresentation or forgery or that are otherwise invalid, including harassing and threatening to sue consumers;

- continuing to bill consumers after the expiration of their lease terms, including when consumers have returned the leased equipment;

- impeding or preventing consumers from returning equipment that was never requested or that was defective;

- threatening to sue and suing consumers after the expiration of the statute of limitations period;

- threatening to sue and suing individuals who do not reside in New York in New York City Civil Court; and

- incorporating one-sided, unconscionable contract provisions into lease agreements, including provisions that (i) set excessive prices for the leased equipment; (ii) require consumers to take equipment "as is" and bar cancellation for "any reason;" (iii) thwart consumers' ability to terminate their leases and avoid automatic renewal after the expiration of the stated lease term; (iv) provide for exclusive jurisdiction in the New York courts regardless of the residence of the party signing the lease; and (v) authorize Respondents to effectuate service by mail at the address in the lease regardless of whether that is the actual place of business or residence of the individual at the time of the lawsuit.

182.   Accordingly, Respondents engage in repeated and persistent fraud in violation of Executive Law § 63(12).

**SECOND CAUSE OF ACTION**
**BY THE STATE**
**AGAINST ALL RESPONDENTS**
**PURSUANT TO EXECUTIVE LAW § 63(12) (ILLEGALITY):**
**VIOLATION OF GBL § 349**
**(DECEPTIVE ACTS AND PRACTICES)**

183.   The State repeats and realleges paragraphs 1 through 178 as if fully set forth herein.

184.   GBL § 349 prohibits deceptive acts and practices in the conduct of any business, trade or commerce in the State of New York.

185.   As set forth above, Respondents repeatedly and persistently engage in deceptive acts and practices by, *inter alia*:

- using fraud or misrepresentations to induce individuals to sign lease agreements;

- engaging in deceptive practices and high pressure sales to induce unsophisticated consumers to enter into leases, including misrepresenting the nature of the leases, targeting non-English speaking consumers, and hiding key provisions of the lease in fine print;

- enforcing leases that were forged or not signed by the consumer;

35

- failing to provide consumers with complete leases or with the opportunity to review the lease terms;

- unilaterally altering material terms of a lease;

- enforcing and collecting upon such agreements obtained by fraud or misrepresentation or forgery or that are otherwise invalid, including harassing and threatening to sue consumers;

- continuing to bill consumers after the expiration of their initial lease term, including when consumers have returned the leased equipment;

- impeding or preventing consumers from returning equipment that was never requested or that was defective;

- threatening to sue and suing consumers after the expiration of the applicable statute of limitations period; and

- threatening to sue and suing individuals who do not reside in New York in New York City Civil Court.

186.   Respondents repeatedly engaged in deceptive practices involving elderly persons as defined in GBL § 349-c.

187.   Respondents' repeated deceptive acts and practices in violation of GBL § 349 constitute repeated and persistent illegal conduct in violation of Executive Law § 63(12).

**THIRD CAUSE OF ACTION
BY THE STATE AGAINST
RESPONDENT NORTHERN LEASING
PURSUANT TO BCL § 1101(A)(2)
(DISSOLUTION)**

188.   The State repeats and realleges paragraphs 1 through 178 as if fully set forth herein.

189.   BCL § 1101(a)(2) provides, in relevant part, that the Attorney General may bring an action for the dissolution of a corporation that has "carried on, conducted or transacted its business in a persistently fraudulent or illegal manner."

36

190.   BCL § 109(a)(5) provides that the Attorney General may maintain an action or special proceeding to dissolve a corporation under article 11, which includes BCL § 1101(a) actions.

191.   As set forth above, Respondent Northern Leasing, a New York corporation, has carried on, conducted and transacted its business in a persistently fraudulent and illegal manner, including but not limited to ensnaring individuals in void, invalid and/or never-ending leases and threatening and harassing individuals into paying hundreds to thousands of dollars based upon such purported leases.

192.   Accordingly, Northern Leasing should be dissolved pursuant to BCL § 1101(a)(2).

**FOURTH CAUSE OF ACTION
BY JUDGE FISHER AGAINST
RESPONDENTS NORTHERN LEASING,
LEASE FINANCE GROUP, MBF LEASING;
LEASE SOURCE,
GOLDEN EAGLE, JOSEPH I. SUSSMAN, P.C.,
JOSEPH I. SUSSMAN AND ELIYAHU R. BABAD
PURSUANT TO CPLR 5015(C)**

193.   Judge Fisher repeats and realleges paragraphs 1 through 142 and 159 through 178 as if fully set forth herein.

194.   CPLR 5015(c) provides that an administrative judge may bring a proceeding to vacate default judgments when the default judgments "were obtained by fraud, misrepresentation, illegality, unconscionability, lack of due service, violations of law, or other illegalities or where such default judgments were obtained in cases in which those defendants would be uniformly entitled to interpose a defense predicated upon but not limited to the foregoing defenses."

37

195.   As alleged above, Respondents have obtained thousands of default judgments from courts in the judicial districts of New York State by fraud, misrepresentation, illegality, unconscionability, lack of due service, violations of law or other illegalities or where such default judgments were obtained in cases in which those defendants or respondents would be uniformly entitled to interpose a defense predicated upon but not limited to the foregoing defenses.

## PRAYER FOR RELIEF

WHEREFORE, the State respectfully requests that the Court issue an order and judgment:

a.   dissolving Northern Leasing Systems pursuant to BCL § 1101(a)(2), within 60 days of its paying the amounts due for restitution, disgorgement, damages, civil penalties and costs due to its carrying on, conducting or transacting its business in a persistently fraudulent or illegal manner;

b.   permanently enjoining Respondents, their agents, trustees, employees, successors, heirs and assigns, or any other person under their direction or control, whether acting individually or in concert with others, or through any corporate or other entity or device through which one or more of them may now or hereafter act or conduct business from engaging in the fraudulent, deceptive and illegal practices alleged herein;

c.   permanently enjoining Respondents, their agents, trustees, employees, successors, heirs and assigns, or any other person under their direction or control, whether acting individually or in concert with others, or through any corporate or other entity or device through which one or more of them may now or hereafter act or conduct business from conducting any business or performing any act in and from the State of New York involving equipment finance

38

leasing and/or debt collection, including but not limited to enjoining Respondents from (a) purchasing or acquiring any equipment finance lease or purported equipment finance lease from any entity or individual, (b) selling, assigning or transferring any equipment finance lease or purported equipment finance lease to any entity or individual, and (c) enforcing or threatening to enforce any equipment finance lease or purported equipment finance lease against any entity or individual; or, in the alternative, to the extent that Respondents are permitted to engage in any business in New York, requiring Respondents to execute and file with the Attorney General a performance bond in an amount sufficient to protect the public and those with whom Respondents do business from Respondents' continuing fraudulent or illegal conduct;

d.        declaring void and ordering rescission of each lease that was obtained by fraud or misrepresentation, including leases for which a material term(s) was unilaterally altered after the consumer signed it or leases that were forged;

e.        directing Respondents to pay full restitution and damages to all affected consumers, including those not identified at the time of the order;

f.        directing Respondents to disgorge all profits arising from the fraudulent, deceptive and illegal practices alleged herein;

g.        directing Respondents, pursuant to GBL § 350-d, to pay a civil penalty to the State in the sum of $5,000.00 for each violation of GBL Article 22-A;

h.        directing Respondents to pay to the elderly victim fund, pursuant to GBL § 349-c, a supplemental civil penalty of $10,000.00 for their fraud against elderly persons;

i.        directing Respondents to provide an accounting to the Attorney General of the names and addresses of each consumer from whom Respondents collected monies in the last six years, and the amount of monies received from each such consumer;

j.      awarding the State, pursuant to New York Civil Practice Law and Rules ("CPLR") § 8303(a)(6), costs in the amount of $2,000.00 against each Respondent; and

k.      granting such other and further relief as this Court deems just and proper.

WHEREFORE, Judge Fisher respectfully requests that the Court issue an order and judgment granting the following relief with respect to all default judgments obtained by Respondents Northern Leasing, Lease Finance Group, MBF Leasing, Lease Source, Golden Eagle, Joseph I. Sussman, P.C., Joseph I. Sussman, and Eliyahu R. Babad (the "Fisher Respondents") in actions arising from alleged breaches of equipment finance leases and entered in the Civil Court:

a.      vacating and setting aside such default judgments;

b.      directing the Fisher Respondents to notify all three national credit reporting agencies, namely Experian, Equifax and Transunion, that the above-referenced default judgments have been vacated and should be removed from consumers' credit reports;

c.      staying all marshals and/or sheriffs who hold executions under such judgments from executing to collecting such judgments;

d.      directing restitution of all payments that have been collected on such judgments; and

e.      granting such other and further relief as this Court deems just and proper.

40

Dated:  April 11, 2016
        New York, New York

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York
*Attorney for Petitioner People of the State of*
*New York*


LYDIA KEANEY REYNOLDS
Assistant Attorney General
Consumer Frauds and Protection Bureau
120 Broadway, 3rd Floor
New York, NY 10271
Telephone:  (212) 416-8320

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York
*Attorney for Petitioner Honorable Fern A.*
*Fisher*


MARY ALESTRA
Special Counsel
Consumer Frauds and Protection Bureau
120 Broadway, 3rd Floor
New York, NY 10271
Telephone:  (212) 416-6698

41

## VERIFICATION

STATE OF NEW YORK       )
                                           ) ss.:
COUNTY OF NEW YORK   )

LYDIA KEANEY REYNOLDS, being duly sworn, deposes and says:

I am an Assistant Attorney General in the office of Eric T. Schneiderman, Attorney General of the State of New York, and I am duly authorized to make this verification.

I have read the foregoing petition and know the contents thereof, which are to my knowledge true, except as to matters therein stated to be alleged on information and belief, and as to those matters, I believe them to be true. The grounds for my beliefs as to all matters stated upon information and belief are investigatory materials contained in the files of the Bureau of Consumer Frauds and Protection in the New York State Office of the Attorney General.

The reason this verification is not made by the petitioner is that the petitioner is a body politic. The Attorney General is their duly authorized representative.

_____
LYDIA KEANEY REYNOLDS

Sworn to before me this

1ᵗʰ day of April 2016

_____
NOTARY PUBLIC

JOAN TAYLOR
Notary Public, State of New York
No. 4999162
Qualified in Bronx County
Commission Expires July 20, 2018

42