UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ELAINE AGHAEEPOUR, ANNE BARR, BRUCE
DRAGO, JULIE HIGGINS, SHANE MOORE,
MICHELE NORRIS, JESUS RIVERA, and HONG
ZHANG,

                Plaintiffs,

    -against-

NORTHERN LEASING SYSTEMS, INC., MBF
LEASING, LLC, LEASE FINANCE GROUP, LLC,
LOUIS CUCINOTTA, JENNIFER CENTENO a/k/a
JENNIFER NUGENT, JAY COHEN, SARA
KRIEGER, JOSEPH I. SUSSMAN, and JOSEPH I.
SUSSMAN, P.C.,

                Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5\8\19

14 cv 5449 (NSR)

OPINION & ORDER

---

NELSON S. ROMÁN, United States District Judge:

    Elaine Aghaeepour ("Aghaeepour"); Anne Barr ("Barr"); Bruce Drago ("Drago"); Julie

Higgins ("Higgins"); Shane Moore ("Moore"); Michele Norris ("Norris"); Jesus Rivera

("Rivera"); and Hong Zhang ("Zhang") (collectively, "Plaintiffs") filed the instant Complaint

against Jay Cohen ("Cohen"); Sara Krieger ("Krieger"); Jennifer Centeno a/k/a Jennifer Nugent

("Centeno" or "Nugent"); and Louis Cucinotta ("Cucinotta") (collectively, "Individual

Defendants"); Joseph I. Sussman ("Sussman"); Joseph I. Sussman, P.C. ("Sussman, P.C.")

(collectively, "Sussman Defendants"); Lease Finance Group, LLC ("LFG"); MBF Leasing, LLC

("MBF"); and Northern Leasing Systems, Inc. ("NLS") (collectively, "Corporate Defendants")

(Corporate Defendants with Individual Defendants and Sussman Defendants, collectively,

"Defendants"), alleging claims under the Federal Racketeer Influenced Corrupt Organizations Act

("RICO"), 18 U.S.C. §§ 1962, 1964; the Federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C.

§§ 1681b(f), 1681s-2(b)(A); New York's Anti–Deceptive Trade Practices Act ("NYFCRA"), N.Y. Gen. Bus. Law §§ 349, 380; and fraud. (Second Amended Complaint, ("SAC"), ECF No. 48.)

Before the Court is Defendants' Motion to Dismiss the SAC pursuant to Federal Rule of Civil Procedure 12(b)(6), federal preemption, and *res judicata*. (*See* Motion to Dismiss, ECF No. 54.) For the following reasons, Defendants' Motion is GRANTED in part and DENIED in part.

## BACKGROUND[1]

This is a case about greed, corruption, and impunity. Defendants purportedly operate a complex racketeering scheme through which they intimidate out-of-state individuals into paying unwarranted sums of money by commencing or threatening to commence fraudulent lawsuits in New York City Civil Court. The lawsuits involve efforts to collect relatively small sums of money, typically under $10,000, which Defendants claim is owed to them based on equipment lease agreements. Many of these agreements, however, contain forged signatures. Over the years, Defendants have persisted in small claims proceedings and even obtained fraudulent default judgments. They have used these judgments to harass, intimidate, and extort money from Plaintiffs, most of whom cannot afford expensive long-distance litigation in foreign venues. In furtherance of this scheme, Defendants have also improperly accessed and made inaccurate entries on Plaintiffs' credit reports.

Defendant NLS finances the equipment leases and manages and operates over 100 shell entities, including LFG and MBF, which are its subsidiaries. Individual Defendants are all principals and officers of the Corporate Defendants: Cohen is NLS's President and Chief Executive Officer; Krieger is NLS's Vice President for Operations; Cucinotta is NLS's Legal Collections Manager; and Centeno is NLS's Legal Administrative Manager.

---

[1] The following facts are drawn from Plaintiffs' SAC and are taken as true for resolving the instant Motion.

Defendant Joseph Sussman is an attorney duly admitted to the Bar in New York. Sussman, through his law firm, Joseph I. Sussman, P.C., commenced and conducted litigation on behalf of the Corporate Defendants. This litigation was based on forged leases, refusals to vacate default judgments, concealed facts from the Court (including deposition transcripts), and affirmative representations made to the Court to mislead it during litigation.

With each Plaintiff, Defendants engaged in largely the same racketeering scheme, consisting of "systematic and repeated" intimidation in attempts to collect money from Plaintiffs to which Defendants were not entitled. More specifically, Defendants "bullied" Plaintiffs with threats of litigation over documents that Defendants knew were forged. In each case, Defendants would create a fraudulent financing lease with Plaintiffs as guarantors. Where Defendants had access to Plaintiffs' bank accounts, Defendants would wrongfully debit amounts under the forged leases. Where Defendants did not have such access or when a plaintiff closed the bank account, Defendants harassed Plaintiffs—through phone calls and mailings—over "amounts due" and threatened Plaintiffs with litigation to collect the debt in default. In most cases, Defendants commenced lawsuits in the New York City courts. Since Plaintiffs are all out-of-state individuals, the lawsuits were designed to ensure that Plaintiffs had no real opportunity to raise defenses to the racketeering enterprise's bogus lawsuits, so that the entry of a default judgment was all but certain. When Defendants were granted default judgments, many Plaintiffs were forced to hire attorneys in New York to attempt to set the judgments aside.

In the course of this scheme, Defendants also wrongfully accessed Plaintiffs' credit reports and, in some cases, made adverse entries in the credit reports. Plaintiffs allege that these actions had "significant impact on credit availability to Plaintiffs, including without limitation, denial of credit opportunities, increase in interest rates, and diverse other consequences."

As a result, Plaintiffs suffered significant economic and non-economic damages, including mental anguish, embarrassment, annoyance, and emotional distress.

## PROCEDURAL HISTORY

Plaintiff filed the Complaint on July 18, 2014. (ECF No. 1.) Plaintiff filed the First Amended Complaint ("FAC") two months later on September 9, 2014. (ECF No. 6.) A few months later, Defendants moved to dismiss the FAC. (ECF No. 13.) This Court ruled on that motion on December 1, 2015, dismissing: (1) the RICO claims of plaintiffs Glasgow, Norris, and Moore; (2) all FCRA and NYFCRA claims of plaintiffs Moore and Rivera; (3) the FCRA and NYFCRA claims based on inaccurate reporting of plaintiffs Higgins and Norris; (4) the FCRA and NYFCRA claims based on negligence of plaintiffs Glasgow, Higgins, Schilber (no longer a defendant), and Schilco (no longer a defendant); and (5) the NYFCRA § 380-b claims based on impermissible access of credit reports of plaintiff Schilco. (*See* Opinion & Order, ("Order"), ECF No. 19.)

On January 17, 2017, Plaintiffs filed the SAC. On June 8, 2017, Defendants filed the instant Motion to Dismiss the SAC. (ECF No. 54.)

## LEGAL STANDARD

To survive a motion to dismiss, a complaint must supply "factual allegations sufficient 'to raise a right to relief above the speculative level.' "*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). In other words, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Starr v. Sony BMG Music Entm't,* 592 F.3d 314, 321 (2d Cir.2010) (quoting *Twombly,* 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). In applying this standard, a court should accept as

4

true all well-pleaded factual allegations, but should not credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Id.*

## DISCUSSION

### I. Federal Preemption

Defendants first argue that the NY FCRA claims are preempted and, therefore, fail to state a cause of action. (Defendant's Memorandum, ("Def. Mem."), ECF No. 56, at 2.) Specifically, Defendants contend that Plaintiffs' claim that Defendants failed to notify them prior to obtaining their credit reports fails because FCRA § 1681(m) addresses the same notice obligations set out in GBL § 380-b(b). (*Id.*)

Plaintiffs argue that the FCRA only limitedly preempts GBL § 380-b(b) because it is silent on a notice requirement imposed by state law. They claim that because state law is simply broader than federal law, there is no true conflict between the FCRA and GBL § 380-b(b). (Plaintiffs' Opposition, ("Pl. Opp."), ECF No. 58 at 4.) The Court agrees with the Plaintiffs.

### 1. Legal Standard

The Constitution's Supremacy Clause provides that "the Laws of the United States… shall be the supreme Law of the Land … anything in the Constitution or Laws of any State to the Contrary nowithstanding." U.S. Const. art. VI, cl. 2. Because U.S. laws are to be the supreme law of the land, "[i]t follows that Congress may preempt (or invalidate) a state law by means of a federal statute." *Galper v. JP Morgan Chase Bank, N.A.*, 802 F.3d 437, 443 (2d Cir. 2015). "It may preempt state law expressly or it may preempt state law implicitly." Further "[f]or any preemption inquiry, the ultimate touchstone … is the *intent* of Congress." *Id.* (emphasis added).

As this Court previously explained:

> The Supreme Court has recognized three typical settings in which courts will find that Congress intended to preempt state law. First, when Congress expressly provides that a federal statute overrides state law, courts will find state law preempted if, applying standard tools of statutory construction, the challenged state law falls within the scope of congressional intent to preempt. Second, when Congress legislates so comprehensively in one area as to "occupy the field," courts may infer from the federal legislation that Congress intended to preempt state law in that entire subject area. Third, when neither of the first two categories applies but state law directly conflicts with the structure and purpose of a federal statute, [courts] may conclude that Congress intended to preempt the state law.

*Segedie v. Hain Celestial Grp., Inc.*, No. 14-CV-5029 NSR, 2015 WL 2168374, at *2 (S.D.N.Y. May 7, 2015) (internal citations and quotation marks omitted).

    *2. New York Notice Requirements*

NY GBL § 380-b(b) imposes a notice requirement on persons who *request* consumer information, in connection with a credit application, prior to their attaining it. As such, it imposes a "pre-pull" notice requirement on credit information requests. § 380-b(b) provides:

> No person shall request a consumer report, other than an investigative consumer report, in connection with an application made after the effective date of this article, for credit, employment, insurance, or rental or lease of residences, *unless the applicant is first informed in writing or in the same manner* in which the application is made that (i) a consumer report may be requested in connection with such application, and (ii) the applicant upon request will be informed whether or not a consumer report was requested, and if such report was requested, informed of the name and address of the consumer reporting agency that furnished the report.

    *3. Federal Post-Pull Notice Requirements*

The FCRA imposes notice requirements on *users taking adverse actions* before taking such actions. In other words, the FCRA imposes "post-pull" notice requirements on credit users that are triggered when certain "adverse actions" are to ensue. Hence, § 1681m(a) first broadly outlines that a user of consumer credit information must give notice to a consumer if it takes "*any adverse action* with respect to any consumer that is based in whole or in part on any information contained

in a consumer report." 15 U.S.C. § 1681m(a) (emphasis added). Next, § 1681m(b) requires a "user of information" to provide notice to a consumer "whenever *credit* for personal, family, or household purposes involving a consumer is *denied or the charge for such credit is increased* either wholly or partly *because of* information obtained from a person other than a consumer reporting agency." 15 U.S.C. § 1681m(b). Similarly, §1681m(h), requires a user of consumer credit information to "provide oral, written, or electronic notice" to a consumer "in connection with an application for, or a grant, extension, or other provision of, credit on material *terms that are materially less favorable than the most favorable terms available to a substantial proportion of consumers* from or through that person, based in whole or in part of a consumer report." 15 U.S.C. Section 1681m(h) (emphasis added).

In sum, and as the Supreme Court has explained, the FCRA imposes a limited notice requirement on individuals who intend to take certain adverse actions against consumers "based in whole or in part on a consumer report." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 63, 127 S. Ct. 2201, 2212 (2007). The types of adverse actions contemplated are denying credit based on a credit report, increasing credit rates based on a credit report, and giving less favorable terms on a credit line based on a credit report. The FCRA, however, is silent as to whether seekers of credit reports who do not intend to take any adverse actions have pre-pull notice obligations. Nowhere does the statute say that its post-pull notice obligations on users of credit reports are the exclusive notice requirements imposed by the FCRA. Indeed, § 1681m does not even address third-party individuals who may not be authorized to view consumer reports. Rather, the statute articulates minimum requirements on legitimate *users* of consumer reports for a broad, but finite, set of adverse actions that are serious enough to impose uniform federal notice requirements. *Id*.

(reiterating that "not all 'adverse actions' require notice, only those 'based ... on' information in a credit report.")

### 4. Application

The instant issue does not fall squarely into any of the three categories through which preemption is typically analyzed. (*See supra*, Part I.1.) While Defendants are correct that there is explicit text related to preemption in the statute, the text does not address what happens when state law obligations exceed the FCRA. Hence, bearing in mind that the "ultimate touchstone" of the analysis is Congress's intent, the Court begins, but does not end, its analysis with the statute's text.

Beginning with the express language of the statute, § 1681t(b)(1) states that the FCRA preempts state laws "with respect to any subject matter regulated under" these sections. *See* 15 U.S.C. § 1681(t)(b)(1). The sections listed "under" specifically include subsections (a) and (b) of Section 1681(m), which are described as "relating to the duties of a person *who takes any adverse action* with respect to a consumer." *Id*. (emphasis added).

FCRA § 1681t(b)(1) also contains an express "savings clause," which provides:

> "except as provided in [the] subsections [below], *this subchapter does not annul, alter, affect, or exempt any person subject to the provisions of this chapter from complying with the laws of any State* with respect to the collection, distribution, or use of any information on consumers, or for the prevention or mitigation of identity theft, *except to the extent that those laws are inconsistent* with any provision of this subchapter, and then *only to the extent of the inconsistency*."

Section 1681t(b)(1)(a)(emphasis added.) Therefore, even though there is express language stating that § 1681(m) and its subsections preempt state law with respect to the "same subject matter," there is also express language stating that there is no preemption of state law "except to the extent that those laws are inconsistent" with § 1681t(b)(1), and even then, the preemption is "only to the extent of the inconsistency." *Id*. The preemption is narrow. By its own terms, it requires three things for the preemption to apply: 1) the state law provisions must relate to the "same subject

matter" as Section 1681(m)(a)-(b), 2) those provisions must be "inconsistent", and 3) the application of preemption cannot exclude more law than is necessary to alleviate the inconsistency.

We begin with the first requirement for preemption—that the statutes be dealing with the same subject matter. Defendants argue that based on Judge Forrest's reasoning in *Ritchie v. Northern Leasing Systems, Inc.*, 12-cv-4992, 2016 WL 1241531 (S.D.N.Y. Mar. 28, 2016), *aff'd sub nom.* 701 F. App'x 45 (2d Cir. 2017), the common subject matter between the two statute provisions is "when notice must be given to a consumer." (*See* Def. Reply Br., ECF No. 57, at 2.)

This description is overbroad. FCRA § 1681t describes the FCRA *subsections* that preempt state law (subsections (a) and (b) of section 1681m) as governing "duties of a person *who takes any adverse action* with respect to a consumer." § 1681t(b)(c). While Judge Forrest interpreted the preempted subject matter as "requirements on users of consumer reports," which is § 1681m's subtitle, the FCRA text specifically lists "subsections (a) and (b) of section 1681(m)" and describes them as "*relating to the duties of a person who takes an adverse action* with respect to a consumer." Not only does Judge Forrest's broader description contradict the statute's text, but it also nullifies the FCRA's savings clause, which states that "the [FCRA] does not annul, alter, affect, or exempt and person … from complying with the laws of any State…" and that it only preempts inconsistencies with state law and only to the extent of the inconsistency. FCRA § 1681t.

This brings us to the second reason why there is no preemption issue—there is no inconsistency with state law. As a matter of logic, there is no "inconsistency" with a state pre-pull notice requirement on *seekers* of credit information and federal a post-pull notice requirement on *users* taking adverse actions. Black's Law Dictionary defines "inconsistency" as: "A part of something that is *incompatible* with another part of the whole thing" or as "[a] *conflict* between two things…" *Black's Law Dictionary* (10th ed. 2014) (emphasis added).

The notice requirement under each statute applies at different times and may implicate different individuals. Even where a requester of credit information later takes an adverse action, and is therefore obliged to comply with both statutes, there is no incompatibility or conflict between the statutes. Rather, the individual would simply have successive obligations.

Defendants' reading the two separate obligations as somehow "inconsistent" makes no sense as neither obligation abrogates the other. Further, Judge Forrest's interpretation of *Safeco*, 551 U.S. 47, misstates what the Supreme Court held. It did not hold that the *only* notice requirements that could be legally imposed were those outlined in § 1681m. Rather, it held that the notice requirements articulated within § 1681m, the post-pull requirements imposed prior to a user taking an adverse action, are limited to "*only* when the adverse action is *based* in whole or in part on a consumer report." In other words, the Supreme Court left open the possibility that users of credit reports could still take certain adverse actions against consumers without giving them notice, so long as the credit report was not the *basis* for those adverse action. *See generally id*.

This reading aligns with the purpose of the statute. The Senate Report on the statute states that the Bill seeks to "prevent an undue invasion of the individual's right of privacy in the collection and dissemination of credit information." (S. Rep. No. 517, 91st Cong., 1st Sess. 8 (Nov. 5, 1969)). Indeed, the Report repeatedly emphasizes this consumer-protectionist purpose:

- "Whenever an individual is rejected for credit, insurance or employment because of an adverse credit report, the individual is given the right to be told the name of the agency making the report." (*Id*.);

- "Credit reporting agencies would be required to inform the consumer of all information in his credit file." (*Id*.);

- "Following disclosure, the consumer would be given an opportunity to correct inaccurate or misleading information in his credit file." (*Id*.);

- "In addition, the bill requires that the information in a person's file be kept confidential and only used for legitimate business transactions." (*Id*.).

The Report goes so far as to explain that the impetus for enacting the statute with minimum requirements was the lack of robust state law: "Until this year, there has been virtually no State legislation regulating credit reporting other than a 1916 Oklahoma statute with limited scope." (*Id*.) And again, the Report listed numerous specific problems that it sought to alleviate:

- "One problem which the hearings on S.823 identified is the inability at times of the consumer to know he is being damaged by an adverse credit report" (*Id*.);

- "Standard agreements between credit reporting agencies and the users of their reports prohibit the user from disclosing the contents of the report to the consumer." (*Id*.);

- "In some cases, the user is even precluded from mentioning the name of the credit reporting agency" (*Id*.)

- "Unless a person knows he is being rejected for credit or insurance employment because of a credit report, he has no opportunity to be confronted with the charges against him and tell his side of the story" (*Id*.)

- "A third problem is that even when individuals gain access to the information in their credit file, they sometimes have difficulty in correcting inaccurate information" (*Id*.)

- "In other cases, the consumer may have difficulty in getting his version of a legitimate dispute recorded in his credit file" (*Id*.)

- "A fourth problem is that information in a person's credit file is not always kept strictly confidential" (*Id*.)

The purpose of the FCRA was to increase, not decrease, the opportunities for consumers to be notified about their credit reports and to protect their interests in credit report accuracy. Hence, the Court finds that there is no inconsistency between the NY GBL and the FCRA, which impose separate notice requirements that both support the FCRA's protectionist purpose and do not contradict one another.

The Court then turns to the third requirement for preemption set in the FCRA's text, which is that the application of preemption cannot exclude more law than is necessary to alleviate the inconsistency. Again, the savings clause in the statute provides:

> except as provided in [the] subsections [below], *this subchapter does not annul, alter, affect, or exempt any person subject to the provisions of this chapter from complying with the laws of any State* with respect to the collection, distribution, or use of any information on consumers, or for the prevention or mitigation of identity theft, *except to the extent that those laws are inconsistent* with any provision of this subchapter, and then *only to the extent of the inconsistency*."

Section 1681t(b)(1)(a)(emphasis added.) The Senate Report directly explains how this savings clause functions, providing that the phrase "State laws which are inconsistent with Federal law are preempted to the extent to the inconsistency" means that "no State law would be preempted unless compliance would involve a violation of Federal law." (S. Rep. No. 517, 91st Cong., 1st Sess. 8 (Nov. 5, 1969)). The Court has already explained that complying with New York state law does impose violating federal law. The statutory history thus reiterates that when a state consumer protection law is merely broader than the federal law, the degree of inconsistency is zero.[2]

Accordingly, Defendants' Motion to Dismiss the NY FCRA/ GBL § 380-b(b) based on federal preemption is denied.

---

[2] This interpretation of the statute is also consistent with the Federal Trade Commission's commentary on the statute, which provides that the FCRA was not intended to usurp the entire field of consumer report law: "State law is preempted by the FCRA only when compliance with inconsistent State law would result in violation of the FCRA." 16 C.F.R. Pt. 600, App § 622 (listing examples of permissible state regulations similar to New York State's). It is also consistent with the holdings of district and circuit courts around the country. *See Davenport v. Farmers Ins. Grp.*, 378 F.3d 839 (8th Cir. 2004) (rejecting similar preemption challenge under Minnesota law for largely same reasoning as this Court's); *Credit Data of Arizona, Inc. v. State of Ariz.*, 602 F.2d 195 (9th Cir. 1979) (rejecting similar preemption challenge under Arizona law on grounds that Arizona's consumer protection act does not impede accomplishing FCRA's objectives); *Kasparian v. Transunion*, No. CV 15-13560-PBS, 2016 WL 4967688 (D. Mass. Sept. 16, 2016) (finding FCRA preemption narrow and "self-limiting") (listing cases); *Meyers v. Freedom Credit Union*, No. CIV.A. 05-3526, 2007 WL 2753172 (E.D. Pa. Sept. 21, 2007) (explaining that "FCRA does not occupy the field of regulating transactions between consumers and prospective creditors, and that only state causes of action inconsistent with it are preempted.") (listing cases).

## II. Failure to State a Claim due to Plaintiffs' Lack of Credit Applications

Defendants argue that even if Plaintiffs' GBL claims are not preempted, they should be dismissed because Plaintiffs never applied for credit, a requirement for triggering the notice requirements under GBL § 380-b(b). (Def. Rep. at 3, ECF No. 57.)

The Court agrees that the case law on GBL § 380-b(b) reflects that the New York pre-pull notice requirements pertain to a consumer applying for credit. *See Pietrafesa v. First Am. Real Estate Info. Servs., Inc.*, No. 1:05-CV-1450, 2007 WL 710197, at *6 (N.D.N.Y. Mar. 6, 2007) ("By its plain terms, § 380-b(b) applies to requests for a consumer report 'in connection with an application ... for credit.'"); *Ritchie*, 2016 WL 1241531, at *19 ("The NYFCRA also requires that an applicant for credit must be given notice if her consumer report may be requested.") While Defendants contend that the SAC does not reflect that Plaintiffs applied for credit, reading the SAC in the light most favorable to Plaintiffs, the Court finds that it does. For example, it states:

- Some consumers entered leases with Corporate Defendants but were unable to disavow them: "Defendants subject such complainants 'to an onerous process designed to prevent or dissuade them from disavowing the lease'" (SAC ¶ 39.)

- In October 2007, an Enterprise representative visited Plaintiff Elaine Aghaeepour, offered check processing, and attained her bank account and social security number, which it later used to create a fraudulent lease. (SAC ¶ 60.) Aghaeepour's acts in furnishing her personal information could be read as applying for credit, despite her claims that the lease Northern Leasing and MBF later created was fraudulent.

- In October 2014, an Enterprise representative visited Plaintiff Anne Barr, offering to switch her credit card machines to make them compliant with new laws, and eliciting her banking and other personal information. (SAC ¶¶ 89-90.) Barr's acts in furnishing her personal information could be read as applying for credit, despite her claims that the lease Northern Leasing and MBF later created was fraudulent.

- In June 2014, an Enterprise representative visited Plaintiff Bruce Drago, offering credit card processing services. Like other Plaintiffs, Drago provided his banking and other personal information, which was used to make fraudulent leases. (SAC ¶¶ 105-08.)

- The SAC outlines very similar incidents involving Experian representatives making false and misleading representations to Plaintiffs Julie Higgins, Shane Moore, Michele

Norris, Jesus Rivera, and Hong Zhang, thereby inducing them to provide Experian with their personal information and manipulating such information to later generate forged leases. (*See* SAC ¶¶ 122-23, 138, 142, 155.) Each plaintiffs' voluntary furnishing of personal information could be read as an application for credit.

At the same time, applications for credit can only plausibly be entered with the entities capable of giving credit—i.e. Defendants Northern Leasing, MBF, and LFG. (*See e.g.,* SAC ¶¶ 60-64) (describing how after Enterprise extracted Plaintiff Aghaeepour's personal information such as bank account and social security number, under the name "Northern Leasing" and later "MBF Leasing", it began wrongfully debiting money from her bank account.) (*See id*. ¶ 16) (explaining that "Defendant [LFG] is a New York corporation, a wholly owned subsidiary of, and a 'pass through' entity for Defendant Northern Leasing" whereby "[a]ll leases procured in its name are routinely and promptly transferred… for 'servicing'").

Accordingly, Plaintiffs' NY GBL § 380-b(b) claims (counts VII and VIII) against individual defendants Louis Cucinotta, Jennifer Contento, Jay Cohen, Sara Krieger, Joseph I. Sussman, and Joseph I. Sussman, P.C. are dismissed.

## III. Res Judicata

Defendants argue that Moore and Norris's NY GBL § 380-b(b) claims (Counts VII and VIII) are also barred by *res judicata* because they were litigated and disposed of by earlier courts, which reached final decisions on the merits. (Def. Mem. at 8.) Defendants add that this position is consistent with this Court's prior ruling on the FAC. (*Id*.)

Plaintiffs, however, argue that the New York City Civil Court (NYCCC) proceedings do not bar all of Moore's and Norris's claims. (Pl. Opp. at 7.)

For the following reasons, the Court agrees with Plaintiffs.

*1. Legal Standard*

Under the doctrine of *res judicata*, a "final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *EDP Med. Computer Sys., Inc. v. United States*, 480 F.3d 621, 624 (2d Cir. 2007) (internal quotations omitted). "Res judicata will bar subsequent litigation if the earlier decision was (1) a final judgment on the merits, (2) by a court of competent jurisdiction, (3) in a case involving the same parties or their privies, and (4) involving the same cause of action." *Overview Books, LLC v. United States*, 438 F. App'x 31, 33 (2d Cir. 2011) (internal citations and quotation marks omitted). *Res judicata*, or claim preclusion, is invoked when a party seeks to relitigate a claim, or cause of action, arising out of the same transaction or a series of transactions which were raised or could have been raised in a prior litigation. *In re Hunter*, 4 N.Y.3d 260, 269, 827 N.E.2d 269, 274 (2005).

A default judgment is typically considered a final judgment on the merits sufficient to invoke *res judicata*. *See Lazides v. P & G Enterprises*, 58 A.D.3d 607, 871 N.Y.S.2d 357 (2009) ("It is well settled that default judgments can have res judicata effect."); *U.S. Sec. & Futures Corp. v. Irvine,* No. 00 Civ. 2322(RMB)(THK), 2002 WL 34191506, at *4 (S.D.N.Y. May 13, 2002) ("A default judgment has the same preclusive effect for res judicata purposes as a judgment on the merits.") But in order for the default judgment to suffice, it must be valid, and the claims common to the instant case and underlying action must have "necessarily been decided." *Newin Corp. v. Hartford Acc. & Indem. Co.*, 37 N.Y.2d 211, 217 371 N.Y.S.2d 884 (1975).

In other words, *res judicata* exists to ensure that litigants to do not get two bites at the apple and waste judicial resources relitigating issues that have or could have already been decided. Restatement (Second) of Judgments § 24(2) (1982) ("a plaintiff cannot avoid the effects of res judicata by splitting his claim into various suits, based on different legal theories). Because the

main interest is preventing duplication, while "a party who has lost a case as a result of alleged fraud or false testimony cannot collaterally attack the judgment in a separate action," there is a long-standing exception to the rule which provides that "a separate lawsuit may be brought where the alleged perjury or fraud in the underlying action was 'merely a means to the accomplishment of a larger fraudulent scheme'… 'which was greater in scope that the issues determined in the prior proceeding.'" *Specialized Indus. Servs. Corp. v. Carter*, 68 A.D.3d 750 (2009) (citing *id.*)

Again, the crux of *res judicata* is that the "party to be precluded from relitigating the issue must have had a full and fair opportunity to contest the prior determination." *Kaufman v. Eli Lilly & Co.*, 65 N.Y.2d 449, 456, 482 N.E.2d 63 (1985).

### 2. Application

Defendants argue that Moore and Norris's NY GBL § 380-b(b) claims (Counts VII and VIII) are barred by *res judicata* because "the precise issues, parties, facts and documents were before earlier courts, which reached final decisions on the merits." (Def. Mem. at 8.)

Plaintiffs, on the other hand, contend that the New York City Civil Court ("NYCCC") does not bar all of Moore and Norris's claims on *res judicata* grounds because: 1) many of the NYCCC decisions were wrong and "contrary to well-settled law in multiple respects"; 2) under *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70 (2d Cir. 2015), there is a distinction between the underlying causes of action, regarding breach of contract, and the present ones, which regard use of default judgments to create a massive fraudulent enterprise, inviting violations of the Fair Debt Collection Practices Act ("FDCPA") and Racketeer Influenced and Corrupt Organizations Act ("RICO"); and 3) in any event, this case involves a "greater" and "different" fraudulent scheme than what was contemplated in any of the underlying state actions or the FAC. (Pl. Opp. at 7-17.)

For all three reasons, and particularly the third, the Court finds that Plaintiffs' arguments carry the weight of the day. It addresses each in turn.

Turning first to the argument that many of the NYCCC judgments were wrong, the Court notes that while this may seem to be Plaintiffs' weakest argument because federal district courts generally do not question the final judgments of state courts, *see Rooker v. Fidelity Trust Co.,* 263 U.S. 413 (1923); *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462 (1983), here there is a unique circumstance that gives merit to the argument.

In April 2016, The New York Attorney General and the Honorable Fern A. Fisher, Deputy Chief Administrative Judge for New York City Courts and Administrative Authority of NYCCC, marshalled evidence from tens of thousands of similar Defendants' victims and court filings and initiated a lawsuit pursuant to CPLR Section 5015(c).[3] *See People v. Northern Leasing Systems, Inc.*, No. 450460/2016 (N.Y. Sup., N.Y. Co.) (ECF No. 59-1.) The case was brought pursuant to Executive Law § 63(12) and Judge Fisher's authority as an administrative judge, seeking to: 1) dissolve Northern Leasing Systems, 2) permanently enjoin several of the instant Defendants from conducting any business or performing any act in New York State involving equipment lending or debt collection, 3) declare void and order the rescission of leases obtained by fraud or misrepresentation, and 4) direct several of the instant Defendants from paying restitution, damages, disgorgement, civil penalties, and costs and to provide an accounting. (*Id*. at 6.) The action specifically sought to "vacate thousands of default judgments that Respondents have obtained in

---

[3] This provision allows "[a]n administrative judge, upon a showing that default judgments were obtained by fraud, misrepresentation, illegality, unconscionability, lack of service, violations of law, or other illegalities or where such default judgments were obtained in cases in which those defendants would be uniformly entitled to interpose a defense predicated upon but not limited to the foregoing defenses, and where such default judgments have been obtained in a number deemed sufficient by him to justify such action as set forth herein, and upon appropriate notice to counsel for the respective parties, or to the parties themselves, may bring a proceeding to relieve a party or parties from them upon such terms as may be just." CPLR Section 5015(c).

New York City Civil Court", "stay all executions to collect on such judgments", and "compel Respondents to pay restitution of all amounts collected based on such judgments." (*Id.*)

Though the action is ongoing, on February 19, 2019, the New York State Appellate Division, First Department affirmed denying Defendants' motion to dismiss the action, finding that "[i]nsofar as it is based on unconscionable contract terms, the Executive Law § 63(12) claim states a cause of action" and that "procedural unconscionability is sufficiently alleged given the assertions that the ISO sales representatives targeted vulnerable individuals – the elderly, disabled, and immigrants with limited fluency in English – and employed deceptive tactics to deceive them to execute the leases." *Matter of People v. Northern Leasing Sys., Inc*. 2019 NY Slip Op. 01179 (N.Y. App. Div., February 19, 2019). It added that "[a]lthough the challenged contract provisions are ordinarily enforceable, the element of substantive unconscionability is sufficiently stated by the allegations that the contract provisions are 'unreasonably favorable' to the Northern Respondents." *Id*. Regarding the Susman Defendants, it held that they "continually engaged in a large-scale practice of bringing debt actions against numerous lessees and guarantors across a span of years, despite being aware of the same defenses raised by the lessees against the Northern Respondents, including fraud and misrepresentations." *Id*. Hence, Susman Defendants "knew that their litigation-related conduct was objectively baseless."[4]

Accordingly, the Court finds that the AG's complaint, along with its underlying evidence, reflecting astronomical numbers and nuanced methods through which Defendants ensnared small unsophisticated business owners to create vehicles of fraud, and Appellate Divisions' recent ruling,

---

[4] The Court may appropriately consider the decision by the First Department, as it may take "judicial notice of filings in other courts" so long as it does assume the allegations to be true. *In re Neroni*, 639 F. App'x 9, 11 (2d Cir. 2015).

is a sufficient basis for the Court to question the validity of all the state default judgments, none of which dealt with the merits of any federal claims, and none of which were raised by Plaintiffs.

The Court next turns to Plaintiffs' argument that there is a distinction between the underlying causes of action, which regard individual breach of contract claims based on the phony leases, and the present action, which regards Defendants' creation of a massive default judgment machine in order to deceive consumers and the courts, in violation of the FDCPA and RICO.

Plaintiffs argue that Second Circuit authority reflects that this court may consider the actions substantively distinct. This Court agrees. In *Sykes*, a RICO case involving a similar fraudulent scheme that created a purported "default judgment mill," the Second Circuit upheld the District Court's finding that the claims raised in the federal lawsuit were distinct from the breach of contract claims that led to the default judgments in state court:

> The district court concluded, at the motion to dismiss stage, that "plaintiffs assert claims independent of the state-court judgments and do not seek to overturn them." We agree. As explained previously, claims sounding under the FDCPA, RICO, and state law speak not to the propriety of the state law judgments, but to the fraudulent course of conduct that defendants pursued in obtaining such judgments.

*Sykes*, 780 F.3d at 94-95 (internal citation omitted). Similarly, in *Specialized Indus. Servs.*, 68 A.D.3d, 750, the New York State Appellate Division, Second Department held that the plaintiff sufficiently alleged that there was a larger fraudulent scheme related to the defendant's scheme of intentional deceit that fell into the exception to the rule against res judicata/collateral attack.

The Court finds the instant situation analogous to the cases above. Plaintiffs, through this action, do not seek to overturn the underlying default judgments. Whether those are overturned will depend on the merits of the AG's aggregated action. Further, while the underling actions refer to the fraudulent leases, there is no elaboration nor adjudication regarding the alleged *scheme* Defendants orchestrated that mechanistically produced default judgments. In other words, just

because Moore and Norris attempted to defensively raise claims of fraud does not mean that the lower court reached an actual decision on the merits regarding Defendants' massive systematic enterprise to exploit vulnerable and unsophisticated consumers. Reviewing the lower court's decisions makes it crystal clear that the lower court never even considered this argument. (*See* Moore and Norris's complaints and the decisions issued by the Civil Court of the City of New York, ECF No. 55, Exs. A, B, E, F.) Nor would it have made sense for individual Plaintiff's to raise such an argument below—as they were simply contesting their individual leases and had no way of knowing about the full scope of Defendants' enterprise.[5] Lastly, while this Court previously held that the instant claims did not implicate the fraud exception invoked in *Specialized Indus.*

---

[5] Indeed, the SAC explains how Judge Fisher only realized the scope of the operation was because he had to allocate full days to conference these cases every week for about three months, scheduling each 15 minutes apart. He noted:

> The vast majority of defendants told the same basic story. A sales representative from a corporation, allegedly unrelated to Northern Leasing, appeared at defendants' place of business with credit card processing machines. The sales representative promised that the machine would save money. If the defendants expressed reluctance, the sales representative suggested a trial period or told the defendants they could send the equipment back and cancel the contract…Some denied signing anything or signing a one page document and declared that the salesperson or some unauthorized employee had signed the contract and person guarantees, or that the sales representative had added pages…In most of these cases, Northern Leasing and their attorneys took the position that Northern Leasing was a separate entity from the vendors, and if there was any misrepresentation during the transaction, Northern Leasing had no responsibility or concern that the same sales representatives were involved in the execution of the contract which contained what ultimately became its finance agreement.

> The sales representatives were of no help after they delivered the equipment. Many defendants sent the equipment back and were astounded to discover that Northern Leasing continued to debit their bank accounts, because they thought there was a trial period or that they could cancel as per the sales representative…

> Every defendant who spoke to me objected strenuously to the New York forum…Many expressed outrage that they had to spend at least a thousand dollar to come and stay in New York to defend a case that was seeking a few thousand dollars. A few expressed the opinion that the New York Court System was in cahoots with Northern Leasing by allowing Northern Leasing to rely on the venue clause.

> Although I presided for years in the Housing Court where landlords and tenants frequently engage in acrimonious litigation, I was unprepared for the anger, frustration, humiliation and despair that I encountered when speaking with the defendants in the Northern Leasing cases. Most had lost their businesses… However, at least once a day I spoke to a defendant who still had a successful business, and they stated that the deal with the sales representative and Northern Leasing was the worst experience of their business life.

> When I finished my commitment on August 14, 2014, I refused to commit any more time or effort to resolve these cases.

*Servs. Corp.*, the Court's decision was based on: 1) the finality of default judgments that are now being contested and 2) Plaintiffs' then inability to show that the current scheme was "much greater in scope" than the issues determined in state court. (Opinion, at 17.)

This brings the Court to the last reason why *res judicata* does not bar Moore and Norris's GBL § 380-b(b) claims. In the SAC, Plaintiffs have shown that Defendants' scheme was astronomically "greater" than and "different" from their previous understanding. Indeed, the SAC is the first place where Judge Fisher and the AG's findings and investigation are described in this litigation. (*See* SAC ¶¶ 32-59.) This makes sense, as the AG complaint was not even filed until April 2016, two years after the FAC was filed. (*See* FAC, ECF No. 6.)

Moreover, the following facts show how much greater and different the scheme was:

- Deputy Chief Administrative Judge and NYAC concluded that Defendants were involved in "widespread deceptive practices" which flood[ed] New York courts with baseless filings. (SAC ¶ 33.)

- Uncovering the scope of the scheme took government and court officials "several years of investigation and analysis of tens of thousands of court filings and other documents – evidenc[ing] a staggering racketeering scheme" (SAC ¶ 33.)

- The Verified Petition summarizes the results of several years of investigation by NYAG, and New York Court officials from 2010 – 2016 and aggregates evidence from **tens of thousands** of Defendants' victims. (SAC ¶¶ 34-35.)

- In essence, Judge Fisher and the NYAG found that the scheme involved Defendants' ensnaring mostly small, unsophisticated business owners in void, invalid, or never-ending equipment lease agreements that contained misleading terms or alterations unilaterally made by Defendants later in time. (SAC ¶ 35.)

- The scheme also revealed that sales representatives repeatedly failed to disclose to consumers that they were entering equipment leases and would subsequently be unreachable; they would also profit handsomely from such leases. (SAC ¶ 37.)

- Many consumers were unaware that they even entered a lease and claimed that their signatures were forged. (SAC ¶ 39.)

- Even where there was no lease, Defendants would heavily hound Plaintiffs, including by calling Plaintiffs multiple times each day and threatening to ruin their credit reports. (SAC ¶¶ 40-42.)

- These "hounding" efforts were often successful as Plaintiffs would then pay Defendants to get rid of them despite not owing them anything. (SAC ¶ 43.)

- Defendants would also exploit legal processes by instituting proceedings in inconvenient, far away venues, knowing it would be more expensive for them to arrive there than to pay off the phony leases. (SAC ¶ 44.)

- Since 2010, Defendants have filed **over 30,000** actions in NYCCC, and obtained **over 19,000 default judgments**. In 2014 and 2015 alone, Defendants filed over **15,000, actions**, which accounted for **over 1/4 of the total general, commercial, and consumer debt filings in that Court**. (SAC ¶ 45.)

- Between 2010 and 2015, Defendants obtained **over 19,000 default judgments**. In 2014, Defendants **obtained 4,124 default judgments**, or **41% of the total default judgments** entered in that Court. In 2015, Defendants obtained **4,691 default judgments**, nearly **half of the 9,654 default judgments** entered in that Court. (SAC ¶ 46.)

- Defendants have generated **1,643 complaints to the NYAG** from Jan. 1, 2010 to December 31, 2015, the **highest volume of complaints for any entity** during that period. (SAC ¶ 48.)

Due to Defendants' staggeringly larger and complicated scheme, about which the Court now sees well-pleaded allegations, the Court finds that *res judicata* does not bar Moore and Norris's GBL § 380-b(b) claims.

## IV.    GBL § 349 Claims on Inaccurate Reporting

Defendants next argue that Plaintiffs' GBL § 349 claims that are premised on Defendants' allegations of false reporting to credit reporting agencies are preempted by 15 U.S.C. § 1681t(b)(1)(F), which provides: "No requirement or prohibition may be imposed under the laws of any State … with respect to any subject matter regulated under … section 1681s-2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies."

(Def. Mem. at 15.) They argue that where a state law claim is based on conduct that is regulated by 15 U.S.C. § 1681s-2, the state law claim cannot proceed. (*Id.*)

Plaintiffs contend that, as this Court held in its previous decision, Plaintiffs' GBL § 349 claims are much broader than the limited scope of preemption under the FCRA, which narrows preemption to "laws that regulate the responsibilities of persons who furnish information to consumer reporting agencies." (*See* Order, at 32-33.)

The Court agrees with Plaintiffs. As previously discussed, while some of Plaintiffs' state common law claims are preempted by § 1681s-2, namely those related to *furnishing information* to consumer reporting agencies, Plaintiffs claims under § 349 are broader than only asserting that Defendants violated their obligations to furnish information to consumer reporting agencies. Rather, Plaintiffs claim that there is a scheme of forging leases and filing fraudulent lawsuits to recover on such leases. (*See* SAC ¶¶ 288-292.) The § 349 claims are thus broader than the scope of federal preemption under the FCRA and are not dismissed.

## V.     Plaintiffs' Re-Pleaded Claims

Defendants lastly argue that this Court should dismiss all of Plaintiffs' re-pleaded claims. This, they argue, include all Moore and Norris's RICO claims and a host of their FCRA and NYFCRA claims. (Def. Mem. at 15-16.) Plaintiffs argue that because those claims were "dismissed without prejudice" and because the decision "was silent on whether the other claims were dismissed with prejudice," they were presumably dismissed without prejudice. (Pl. Opp. at 24-25.) In any event, Plaintiffs argue, the unearthing of newly discovered evidence calls for reconsideration under Fed. R. Civ. P. Rule 60(b). (*Id.*)

The Court agrees with Plaintiffs. Plaintiffs may not replead claims that were dismissed with prejudice. For all remaining claims, the Court considers them dismissed without prejudice.

*Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 59 (2d Cir. 2004). Further, Plaintiffs' discovering a massive a government investigation into Defendants' practices sheds new light on the magnitude of Defendants' operations. As described earlier, this discovery is sufficient to overcome the doctrine of *res judicata*, and it is similarly sufficient to permit Plaintiffs to replead any causes of action dismissed without prejudice. Accordingly, Defendants' motion to dismiss Plaintiffs' previously asserted claims is denied.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion to Dismiss is GRANTED in part and DENIED in part. The following claims have been dismissed: Plaintiffs' NY GBL § 380-b(b) claims (counts VII and VIII) against individual defendants Louis Cucinotta, Jennifer Contento, Jay Cohen, Sara Krieger, Joseph I. Sussman, and Joseph I. Sussman, P.C.

The Clerk of Court is respectfully requested to terminate the pending Motion. (ECF No. 54.) Defendants shall file an answer on or before May 24, 2019. The parties are directed to contact Magistrate Judge Lisa Smith within three days of receipt of this order.

Dated:   May 8, 2019                             SO ORDERED:
          White Plains, New York

                                                NELSON S. ROMÁN
                                        United States District Judge