UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

ELAINE AGHAEEPOUR, ANNE BARR, BRUCE
DRAGO, JULIE HIGGINS, SHANE MOORE,
MICHELE NORRIS, JESUS RIVERA, and HONG
ZHANG,

                Plaintiffs,


    -against-


NORTHERN LEASING SYSTEMS, INC., MBF
LEASING, LLC, LEAVE FINANCE GROUP,
LLC, LOUIS CUCINOTTA, JENNIFER
CENTENO a/k/a JENNIFER NUGENT, JAY
COHEN, SARA KRIEGER, JOSEPH I.
SUSSMAN, and JOSEPH I. SUSSMAN, P.C.,

                Defendants.
_____

14 Civ. 5449 (NSR)
OPINION & ORDER

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
DOC #: _____
DATE FILED: 05/24/2024

NELSON S. ROMÁN, United States District Judge:

Elaine Aghaeepour ("Aghaeepour") and Michele Norris ("Norris") (together "Plaintiffs")[1]

filed the Second Amended Complaint ("SAC"), the operative pleading, against Jay Cohen

("Cohen"); Sara Krieger ("Krieger"); Jennifer Centeno a/k/a Jennifer Nugent ("Centeno" or

"Nugent"); and Louis Cucinotta ("Cucinotta") (collectively, "Individual Defendants"); Joseph I.

Sussman ("Sussman"); and Joseph I. Sussman, P.C. ("Sussman, P.C.") (collectively, "Sussman

Defendants"); Lease Finance Group, LLC ("LFG"); MBF Leasing, LLC ("MBF"); and Northern

Leasing Systems, Inc. ("NLS") (collectively, "Corporate Defendants") (Corporate Defendants

---

[1] Plaintiffs Anne Barr, Bruce Drago, Julie Higgins, Shane Moore, Jesus Rivera, and Hong Zhang have been
dismissed from the action. Plaintiffs Higgins, Rivera, and Zhang were dismissed by the Court's Opinion & Order
dated June 15, 2023. (ECF No. 171.) Plaintiffs Drago and Barr voluntarily dismissed all claims against Defendants
with prejudice. (ECF Nos. 67, 94.) Plaintiff Moore dismissed her claims via stipulation upon reaching settlement
with Defendants. (ECF No. 69-1.)

with Individual Defendants and Sussman Defendants, collectively, "Defendants"), alleging claims under the Federal Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962, 1964; the Federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681b(f), 1681s-2(b)(A); New York's Anti-Deceptive Trade Practices Act ("NYFCRA"), N.Y. Gen. Bus. Law §§ 349, 380; and fraud. (SAC, ECF No. 48.) A jury trial is scheduled for June 17, 2024.

Presently before the Court are Defendants' Motions in Limine ("MIL," ECF Nos. 181, 183, 185, and 187). The motions are resolved as follows: (1) Defendants' First MIL (ECF No. 181) is GRANTED IN PART and DENIED IN PART; (2) Defendants' Second MIL (ECF No. 183) is DENIED; (3) Defendants' Third MIL (ECF No. 185) is GRANTED; and (4) Defendants' Fourth MIL (ECF No. 187) is GRANTED.

## BACKGROUND

The Court assumes familiarity with the facts and allegations in this case, as well as the procedural background of this case. *See, e.g.*, *Aghaeepour v. N. Leasing Sys., Inc.*, 378 F. Supp. 3d 254, Docket 62 (S.D.N.Y. 2019) (addressing Defendants' motion to dismiss Plaintiffs' Second Amended Complaint); *Aghaeepour v. N. Leasing Sys., Inc.*, No. 14 CV 5449 (NSR), 2023 WL 4014223, Docket 171 (S.D.N.Y. June 15, 2023) (addressing Defendants' motion for sanctions for the failure of Plaintiffs Higgins, Rivera, and Zhang to appear for court-ordered depositions). Additional factual information relevant to the instant motions *in limine* is addressed in the applicable section of the Court's discussion. For context, the Court briefly summarizes the relevant procedural history to date.

The Second Amended Complaint ("SAC"), dated January 17, 2017, is the operative complaint. (ECF No. 48.) On June 8, 2017, Defendants filed a motion to dismiss the SAC, which the Court granted in part and denied in part on May 8, 2019. (ECF No. 62.) On January 12, 2023,

while discovery was ongoing, Defendants filed a motion for sanctions against plaintiffs Higgins, Rivera, and Zhang for failure to appear for their depositions. (ECF No. 154.) On June 15, 2023, the Court granted Defendants' motion for sanctions and dismissed those plaintiffs from the case. (ECF No. 171.) Upon dismissal of those plaintiffs, Elaine Aghaeepour and Michele Norris became the two remaining Plaintiffs. On September 6, 2023, the parties represented to the Court that discovery was complete and that they would not file dispositive motions. (*See* Minute Entry 09/06/2023.) That same day, the Court set a control date for an eight-day jury trial. (*Id.*)

On March 28, 2024, Defendants filed the instant motions *in limine.* Trial is currently scheduled for June 17, 2024.

## LEGAL STANDARDS

"A district court's inherent authority to manage the course of its trials encompasses the right to rule on motions in limine." *Highland Cap. Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 176 (S.D.N.Y. 2008) (citing *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984)). "The purpose of a motion in limine is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996) (quotation omitted). Evidence challenged in a motion in limine "should only be precluded when it is clearly inadmissible on all possible grounds." *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013) (quotation omitted). Nonetheless, "a court's decision on the admissibility of evidence on a motion in limine may be subject to change when the case unfolds . . . because the actual evidence changes from that proffered by the movant." *Stoncor Grp., Inc. v. Peerless Ins. Co.*, 573 F. Supp. 3d 913, 917–18 (S.D.N.Y. 2021) (citing *Wilder v. World of Boxing LLC*, 220 F. Supp. 3d 473, 479 (S.D.N.Y. 2016)).

3

The Federal Rules of Evidence provide that only relevant evidence is admissible. Fed. R. Evid. 402. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence . . . and the fact is of consequence in determining the action." Fed. R. Evid. 401(a)–(b). Relevant evidence may still be excluded by the Court "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Though the "standard of relevance established by the Federal Rules of Evidence is not high," *United States v. Southland Corp.*, 760 F.2d 1366, 1375 (2d Cir. 1985), the Court has "broad discretion to balance probative value against possible prejudice" under Rule 403. *United States v. Bermudez*, 529 F.3d 158, 161 (2d Cir. 2008).

## DISCUSSION

### I.    Expert Testimony and Report of Dr. Stan V. Smith (ECF No. 181)

Plaintiff retained Dr. Stan V. Smith, an economics expert, to provide his expert opinion on damages for Aghaeepour.[2] Dr. Smith's expert report "calculate(s) the value of certain losses subsequent to the fraud suffered by [Aghaeepour]," including "(1) the loss of business income; (2) the lost of credit expectancy; (3) the loss of time spent; (4) reduction in value of life; and (5) the loss of payments to [NLS and MBF]." ("Smith Expt. Rpt.," ECF No. 181, Ex. A, at 1.) Defendants argue Dr. Smith is unqualified and his methodology is not credible and seek to exclude Dr. Smith's testimony pursuant to Federal Rule of Evidence ("Rule") 702. ("Defs. 1st MIL Mem.," ECF No. 182.) To the extent that the Court admits any of Dr. Smith's expert evidence, Defendants ask the Court to "issue a very precise and narrow ruling as to what Dr. Smith can and cannot opine on at

---

[2] Dr. Smith did not submit an expert report with respect to Norris.

4

trial." (*Id.* at 15-16.) For the following reasons, Defendants' First MIL is granted in part and denied in part.

### A.   Legal Standard

The testimony of an expert at trial must be reliable and relevant. The standards governing the admissibility of expert testimony are set forth in Rule 702, which provides that "[a] witness . . . qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if . . . the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.

The standards have been further clarified by the Supreme Court's decisions in *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 113 S. Ct. 2786 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167 (1999). In Daubert, the Supreme Court defined the role of the district court as that of a gatekeeper charged with the task of deciding whether an expert's scientific testimony satisfies Rule 702's general requirements of reliability and relevance. *Daubert*, 509 U.S. at 597. Originally intended to screen out "junk science," Daubert has been extended to both technical and other specialized expert evidence. *See Kumho*, 526 U.S. 137.

In addition to screening whether or not a proposed individual qualifies as an expert as contemplated by Rule 702, the court must assess whether the purported expert's testimony is relevant and reliable to be admissible at trial. In assessing the reliability of potential expert testimony, the court must, ". . . make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* Hence, the court must focus on the purported expert's principles and methodology, not on the expert's conclusions.

Ultimately, admissibility is a question of law that rests within the discretion of the district court. *United States v. Feliciano*, 223 F.3d 102, 120 (2d Cir. 2000).

Notably, in December 2000, Rule 702 was amended to reflect the court's gatekeeping task. With regards to assessing expert testimony for admissibility, Rule 702 now instructs district courts to ensure that: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. Further, the proponent of the evidence must establish its admissibility by a preponderance of the proof. *See Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987).

### B.   Application

Generally, Defendants challenge Dr. Smith's expert testimony and report as speculative and based on problematic assumptions. At the outset, Plaintiffs argue that Defendants' attempt to exclude Dr. Smith's testimony is "faulty at best" because Defendants chose not to depose him. ("Pl. 1st Opp." at 3, ECF No. 189.) Plaintiffs do not cite to a legal basis for this assertion, nor could they. There is no rule or principle that a party may not challenge an expert witness if it has chosen not to depose him.

"[E]xpert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." *Crawford v. Franklin Credit Mgmt. Corp.*, No. 08-CV-6293 (KMW), 2015 WL 13703301, at *2 (S.D.N.Y. Jan. 22, 2015) (citing *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)). However, "other contentions that the assumptions are unfounded go to the weight, not the admissibility of the testimony." *Id.* With these principles in mind, the Court addresses each category of evidence in turn.

1.  <u>Loss of Business Income</u>

Defendants seek to preclude Dr. Smith's expert opinion on Aghaeepour's loss of business income. (Smith Expt. Rpt. at 18.) Aghaeepour purchased a cash checking business in October 2007 for $150,000. (*Id.* at 3-4.) Aghaeepour eventually had to close down her business in December 2017 due to Defendants' allegedly fraudulent actions and the resulting damage to her credit. Dr. Smith calculated Aghaeepour's loss of business income under two different scenarios. Scenario 1 assumes Aghaeepour would have earned $100,000 per year starting in 2008 and Scenario 2 assumes Aghaeepour would have earned $350,000 per year starting in 2008. Both Scenarios accounted for inflation and wage growth each year. Based on these Scenarios and assumptions, Dr. Smith calculated that Aghaeepour suffered a loss of business income ranging from $4,558,954 to $15,956,351.

Dr. Smith bases his calculation on speculation rather than any real data. In Scenario 1, Dr. Smith largely bases this "conservative" number on Aghaeepour previously having worked a mortgage loan officer earning approximately $120,000 annually. However, Dr. Smith fails to explain why Aghaeepour could reasonably expect to earn a business income comparable to her employment income. This assumption seemingly rests on the fact that her previous employment and new business were both within the financial services industry, a weak comparison.

Scenario 2 is based on even more questionable assumptions. Dr. Smith reached the $350,000 estimate based on Aghaeepour's "feelings" on the projected profits of the business. Aghaeepour asserted she "felt she could build the business" to $350,000 per year in net profits, and seemingly based this belief entirely on the fact that the expenses "were minimal" and "it was a great location." (Smith Expt. Rpt. at 3.) Noting himself that the business had been established for 15 years, Dr. Smith could have based his calculation on the business's net profits prior to

Aghaeepour's purchase, or at least considered them in his analysis. Instead, Dr. Smith solely relies on Aghaeepour's speculation and wishful thinking.  Dr. Smith's expert opinion on this issue is thus speculative, conjectural, and based on insufficient facts or data. Accordingly, the Court precludes Dr. Smith's testimony on loss of business income.

       2.  <u>Loss of Credit Expectancy</u>

Dr. Smith also calculated the harm on Aghaeepour's credit rating from Defendants' allegedly fraudulent behavior. (Smith Expt. Rpt. at 5-6.) Aghaeepour asserts that her credit score dropped from the mid-to-high 700s to the 600s. Dr. Smith opines that Aghaeepour "lost the ability to borrow considerable sums beyond her current lines of credit." To calculate the loss of credit expectancy, Dr. Smith compared the cost of credit extended under normal circumstances to the cost of credit extended to individuals viewed as high credit risks—a difference he "conservatively" estimated at "12 percent per year as an estimate of the value of the expectancy loss." To reach this estimate, Dr. Smith considered the credit costs charged to normal accounts (approximately 1% to 1.5% per month) and those charged to high-risk accounts (as high as 3% per month). Defendants argue that Dr. Smith fails to provide "documentation" or "details," or a "single dollar figure reflecting any actual credit losses." (Defs. 1ˢᵗ MIL Mem. at 12.) However, Defendants misunderstand the analysis Dr. Smith is undertaking. He does not calculate the amount of credit loss, but rather estimates the value of a good credit rating over a period of years, which Aghaeepour allegedly lost due to Defendants' actions. Dr. Smith's calculation is clear, and his estimation is based on one contested fact and one assumption—Aghaeepour's credit score was harmed by Defendants' actions and the value of expectancy loss is 12 percent per year for the period of December 2007 through 2019. Defendants may challenge both Plaintiffs' factual allegations and Dr. Smith's assumptions on the issue during cross-examination at trial. As "contentions that [an

expert's] assumptions are unfounded go to the weight, not the admissibility, of the testimony," *Crawford*, 2015 WL 13703301, at *7 (citing *Boucher*, 73 F.3d at 21), the Court permits Dr. Smith to testify on Aghaeepour's loss of credit expectancy.

### 3. Loss of Time Spent

Dr. Smith's report also calculates the value of the time spent by Aghaeepour in resolving issues caused by the allegedly fraudulent leases. (Smith Expt. Rpt. at 6.) To make his calculations, Dr. Smith relied on an interview with Aghaeepour, who stated that she began working on the situation shortly after the first false lease on October 2007. (*Id.*) Dr. Smith illustrates Aghaeepour's time spent at 7.5 hours per month from November 1, 2007 through an assumed trial or resolution date of October 1, 2023.[3] Dr. Smith concludes that Aghaeepour's time spent should be valued at $23.33 per hour based on the "average of the mean hourly wages of $24.26 for bookkeeping, accounting, and auditing clerks and $22.40 for secretaries and administrative assistants" in the area where Aghaeepour lives. (*Id.*)

The Court precludes Dr. Smith's testimony on this issue and adopts the *Crawford* decision's reasoning for doing so. As in *Crawford*, Dr. Smith's report lacks any "data, testing methodology or empirical evidence . . . to support Smith's conclusions." *Crawford*, 2015 WL 13703301, at *7 (citing *Nook v. Long Island R.R. Co.*, 190 F. Supp. 2d 639, 642 (S.D.N.Y. 2002)). Smith provides no justification, explanation, or authority as to why Aghaeepour's time should be valued using the rates for secretaries, administrative assistants, and bookkeeping, accounting, and auditing clerks "as opposed to, for instance, paralegals, human resources officers, or customer services agents." *Id.* Furthermore, the Court agrees with Defendants that Dr. Smith provides no justification for "illustrat[ing]" Aghaeepour's time spent at 7.5 hours per month for the past 16

---

[3] Smith's report is dated January 9, 2023. At that time, trial had not yet been scheduled.

years and through the resolution of this action. The Court therefore precludes Smith's testimony on lost time spent at trial.

### 4. Hedonic Damages

"Hedonic damages value the loss of the enjoyment of life as affected by physical pain and suffering, physical disability, impairment and inconvenience affecting an individual's normal pursuits and pleasures of life." *Crawford*, 2015 WL 13703301, at *8 (citing *In re Korean Air Lines Disaster of Sept. 1, 1983*, 807 F. Supp. 1073, 1081 n.7 (S.D.N.Y. 1992)) (internal quotations omitted). Dr. Smith's value of life calculation is based on the "willingness-to-pay" methodology, which relies on "many economic studies on what we, as contemporary society, actually pay to preserve the ability to lead a normal life." (Smith Expt. Rpt. at 7.) Dr. Smith based his calculations of Aghaeepour's reduced value of life on the following factors: (1) a benchmark, based on an interview with Aghaeepour, of 40 percent to 60 percent reduction in the ability to lead a normal life which reflects "the impact on career, social and leisure activities, the activities of daily living, and the internal emotional state"; (2) "the central tendency" of the range of the economic studies cited in his report, "conservatively" estimated at $5.6 million in 2022 dollars; and (3) a life expectancy of 83.9 years. (*Id.* at 8.) Defendants argue that the Court should preclude Dr. Smith's hedonic damages methodology, which has been repeatedly rejected by the Courts, as "without proper foundation and support." (Defs. 1st MIL Mem. at 14.)

As *Crawford* notes, "the overwhelming majority of courts have concluded that Smith's willingness-to-pay methodology is either unreliable or not likely to assist the jury in valuing hedonic damages." 2015 WL 137603301, at *8 (citations and internal quotations omitted); *see also Ziegler v. Polaris Indus., Inc.*, No. 1:23-CV-00112-MR-WCM, 2024 WL 482212, at *5 (W.D.N.C. Feb. 7, 2024) ("Dr. Smith's methodology for calculating the value of an individual's 'loss of

enjoyment of life' has been routinely rejected as unhelpful and unreliable for three decades.")
(collecting cases). In rejecting Dr. Smith's testimony on hedonic damages, *Crawford* points to the
doubts that these courts have raised about the reliability and testability of Smith's methodology.
These concerns are shared by the Court.

First, courts doubt whether the studies underlying Dr. Smith's methodology reliably
measures the value of life. Dr. Smith represents that the "underlying, academic, peer-reviewed
studies" generally include analyses of "(1) consumer behavior and purchases of safety devices;
and (2) wage risk premiums to workers" as well as cost-benefit analyses of regulations. (Smith
Expt. Rpt. at 7-8.) Other courts have questioned whether consumer behavior and government
regulations "accurately reflect[] the value society places on the average human life." *Crawford v.
Franklin Credit Mgmt. Corp.*, 2015 WL 13703301, at *9 (citing *Saia v. Sears Roebuck & Co.*, 47
F. Supp. 2d 141, 148 (D. Mass. 1999)); *Smith v. Jenkins*, 732 F.3d 51, 67 (1st Cir. 2013) ("In short,
Dr. Smith's method for valuing life is based on assumptions that appear to convert logic and good
sense.") (citation omitted); *Mercado v. Ahmed*, 974 F.2d 863, 869 (7th Cir. 1992) (raising "serious
doubts about [Smith's] assertion that the studies he relie[d] upon actually measure how much
Americans value life.").

Another concern is whether Dr. Smith's methodology is sufficiently testable. *See
Crawford*, 2015 WL 13703301, at *9; *Kurncz v. Honda North America Inc.*, 166 F.R.D. 386, 389
(W.D. Mich. 1996) ("Some predictions or assumptions of economists can be validated at least in
retrospect; *e.g.*, life expectancy, inflation, etc. This is not true for valuation of hedonic damages.").
The "meta-analyses" Dr. Smith relies on for his calculations estimate the value of life as ranging
between $4.4 million and $7.5 million. (Smith Expt. Rpt. at 15.) As noted in *Lujan*, these wide-
ranging values that form the basis of the willingness-to-pay methodology "suggest[] very broad

and flexile parameters" and indicate that the theory may not be testable. *Lujan v. Cooper Tire &*
*Rubber Co.*, No. CIV. 06-173RHS/KBM, 2008 WL 7489095, at *3 (D.N.M. June 13, 2008).

Ultimately, Dr. Smith "conservatively" estimates the value of life at $4.6 million in 2008
dollars, or $5.6 million in 2022 dollars, which he asserts is the "central tendency" of the range of
economic studies he cites. (Smith Expt. Rpt. at 15.) To reach this estimate, Dr. Smith used the
value from a review published in the late 1980s that averaged the value of life results published by
that time and then adjusted that number for inflation. (*Id.* ("The actual value that I use, $4.1 million
in year 2008 dollars . . . is approximately 24 percent lower than a conservative average estimate
based on the credible meta-analyses.").) Dr. Smith, however, does not cite the 1980s study, its
methodology, the number that study reached, or the results of the underlying studies the 1980s
study averaged. Dr. Smith does not explain the meaning of "central tendency." Nor does Dr. Smith
explain why he used the $4.6 million number rather than the "credible net value of life" that the
meta-analyses estimated at $5.4 million in 2008 dollars. (*Id.*) The Court therefore agrees that Dr.
Smith's analysis "amounts to nothing more than eyeballing" and "lacks scientific reliability in the
sense of producing consistent results." *Ziegler v. Polaris Indus.*, Inc., No. 1:23-CV-00112-MR-
WCM, 2024 WL 482212, at *5 (W.D.N.C. Feb. 7, 2024) (citation omitted); *see also Stokes v. John
Deere Seeding Grp.*, No. 412CV04054SLDJAG, 2014 WL 675820, at *4 (C.D. Ill. Feb. 21, 2014)
("[T]he fact that an opinion is conservative does not make it scientific.").

Beyond these concerns, Dr. Smith again fails to sufficiently explain his conclusions. Dr.
Smith states that he estimates the "impairment rating benchmark" at 40 percent to 60 percent
without explaining how he arrived at those percentages, other than stating that he conducted "an
informational interview" with Aghaeepour. (Smith Expt. Rpt. at 8.) While Dr. Smith asserts that
it is "standard practice" to conduct an informational interview to estimate economic losses, he

provides no additional information on the interview itself. (*See id.*) Accordingly, the Court finds that Dr. Smith's hedonic damages calculation is not based on sufficient facts or data. The Court therefore grants Defendants' motion with respect to this category of damages.

5. Loss of Payments

Defendants argue that Dr. Smith's testimony about payments to Defendants should be excluded because "the jury is more than capable of adding two numbers together." (Defs. 1st MIL Mem. at 15.) Dr. Smith's report calculates that Aghaeepour "was wrongfully debited payments of $1,690.92 to [NLS] and $3,279.60 to [MBF], totalling $4,971." (Smith Expt. Rpt. at 9.) "[E]xpert testimony is not helpful if it simply addresses 'lay matters which the jury is capable of understanding and deciding without the expert's help.'" *Faulkner v. Arista Records LLC*, 46 F. Supp. 3d 365, 375 (S.D.N.Y. 2014) (quoting *United States v. Mulder*, 273 F.3d 91, 101 (2d Cir. 2001)). Dr. Smith does not rely on his expertise to determine the total amount Aghaeepour wrongfully paid to NLS and MBF. The jury is indeed "fully capable of performing the same mathematical calculation that Dr. Smith performs in his report." *Crawford*, 2015 WL 13703301 at *9. The Court thus precludes Dr. Smith's testimony on this category of damages.

**II. Evidence of Alleged Forgeries (ECF No. 183)**

The facts underlying Plaintiffs' claims involve contracts which they allege contain forgeries. Defendants seek to preclude evidence of the forgeries, which Defendants argue consistent solely of Plaintiffs' "impossibly biased," "inconsistent," and "self-contradictory" testimony. (Defs. 2nd MIL Mem. at 6, ECF No. 184.) For the following reasons, Defendants' Second MIL is denied.

As a threshold matter, Plaintiffs may attempt to prove their forgery claims without an expert witness. "Under the Federal Rules of Evidence, a layperson, with familiarity, can give his

or her opinion as to the identity and authenticity of a signature, as long as the testimony complies with Rule [] 901(b)(2) and 701." *Henry v. Westchester Foreign Autos, Inc.*, 522 F. Supp. 2d 610, 612 (S.D.N.Y. 2007). Rule 902(b)(2) provides that "the authenticity of a handwriting sample may be proven by nonexpert opinion . . . based upon familiarity not acquired for purposes of litigation." *Id.* at 613 (citing *United States v. Samet*, 466 F.3d 251, 254 (2d Cir. 2006), quoting Fed. R. Evid. 901(b)(2)) (cleaned up).  Rule 701 provides that:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 701.

Fed. R. Evid. 701. Plaintiffs satisfy all these requirements. Plaintiffs clearly offer their lay opinions regarding the signatures based on their lifelong familiarity with their own handwriting. Moreover, despite Defendants' assertion to the contrary, whether the leases contained fraudulent signatures is a contested fact central to the litigation, and therefore relevant under Rule 401.

Defendants further argue that Plaintiffs' "naked claims of 'forgery' are insufficient" to raise a triable issue of fact. (Defs. 2nd MIL Mem. at 8.) The Court has already resolved Defendants' motions to dismiss and they failed to move for summary judgment on any of the claims or the issues. Therefore, Defendants cannot now, on the eve of trial in a motion on the evidence, argue that Plaintiffs have failed to raise an issue of fact for the jury. *See Hamza v. Saks Fifth Ave., Inc.*, No. 07 CIV. 5974 FPS, 2011 WL 6187078, at *5 (S.D.N.Y. Dec. 5, 2011) (citing *Point Productions, A.H. v. Sony Music Entm't, Inc.,* 215 F.Supp.2d 336 (S.D.N.Y. 2002)) ("No motion for summary judgment was granted or even filed as to whether issues of material fact exist relating to this issue, and thus the law of this case should not be disturbed through the determination of an effectual motion for partial summary judgment filed as a motion in limine.").

Finally, Defendants argue that Plaintiffs' evidence of forgeries should be precluded as more prejudicial than probative under Rule 403. The Court disagrees. Plaintiffs allege that Defendants operated a complex racketeering scheme in which they intimidated, harassed, and extorted Plaintiffs for money that Defendants claimed was owed on equipment leases. Plaintiffs further allege that these leases were fraudulent. Therefore, the alleged forgeries and evidence thereof are at the core of Plaintiffs' claims. The Court also does not share Defendants' concern that the jury may side with Plaintiffs due to "sympathy or confusion." (Defs. 2nd Reply at 2, ECF No. 194.) Plaintiffs may testify regarding the signatures on the leases, and Defendants will then have the opportunity to cross-examine them. The Court may also provide the appropriate instructions to the jury that Plaintiffs are not experts and the jury should reach its own conclusions on their handwriting. Accordingly, the probative value of this evidence far exceeds its prejudicial value and the likelihood of confusing the jury. The Court therefore denies Defendants' motion to exclude evidence of forgeries.

### III.    Evidence of Other Legal Proceedings (ECF No. 185)

Plaintiffs' exhibit list includes three exhibits consisting of civil judgments in other cases: (1) *People of the State of New York v. SKS Associates*, N.Y. Supp. 400908/2012; Hon. Diana Mills (Judgment, Order and Opinion) [hereinafter, PX1]; (2) *People v. Northern Leasing Systems, Inc.*, No. 450460/2016 (N.Y. Supp., N.Y. Co.) (Judgment, Order and Opinion) [hereinafter, PX2]; and (3) *In re Neroni*, 2015 WL 9261287, at *3 (2d Cir. Dec. 18, 2015) (Judgment, Order and Opinion) [hereinafter, PX3]. Defendants seek to exclude these three exhibits as well as any evidence or argument relating to any other legal proceedings. Specifically, Defendants seek to preclude such evidence because "they are not relevant to the case before the Court, constitute hearsay, and the

introduction of such evidence or arguments would be unduly prejudicial to the Defendants." (Defs. 3rd MIL Mem. at 3, ECF No. 186.)

Plaintiffs assert that they intend to offer the prior court proceedings "to present to the jury that prior cases have been brought against the Defendants." (Pl. 3rd Opp. at 2, ECF No. 191.) Such evidence should be excluded under Rule 403. As a threshold matter, Plaintiffs do not explain the significance of this fact for their case. The mere fact that prior cases have been brought against the Defendants have no bearing on the merits of Plaintiffs' case. Likewise, evidence of prior cases will likely confuse the jury and prejudice Defendants. *See Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1351 ("The admission of a prior verdict creates the possibility that the jury will defer to the earlier result and thus will, effectively, decide a case on evidence not before it."). Finally, PX3 does not involve any Defendants in the current action. Therefore, the Court precludes these exhibits as more prejudicial than probative under Rule 403.

To the extent that Plaintiffs seek to adduce any evidence from the prior and pending litigation involving any of the Defendants, such evidence is also excluded under Rule 403. "Courts routinely exclude evidence relating to previous litigation involving one or both of the same parties where the merits of those prior litigations would become inextricably intertwined with the case at bar." *MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*, 232 F. Supp. 3d 558, 568 (S.D.N.Y. 2017) (citing *Arlio v. Lively*, 474 F.3d 46, 53 (2d Cir. 2007); *New Am. Mktg. FSI LLC v. MGA Entm't, Inc.*, 187 F.Supp.3d 476, 481 (S.D.N.Y. 2016)); *see also Thompson v. Spota*, No. 14CV02473NGGAYS, 2022 WL 17253464, at *9 (E.D.N.Y. Nov. 28, 2022) ("Courts in this circuit generally exclude evidence of related lawsuits, due to concerns of confusing the jury and unfairly prejudicing defendants.") (collecting cases). The jury could easily confuse the merits of the instant action with litigation arising from the same alleged scheme.

Finally, the Court declines to blanketly prohibit Plaintiffs from "making *any* reference to *any* other litigations or judicial decisions in the presence of the jury." (*See* Defs. 3rd Reply at 5, ECF No. 195 (emphasis in original).) Instead, the Court reserves its decision and will determine at the appropriate juncture the admissibility of any evidence of prior litigation that Plaintiffs seek to introduce. Accordingly, the Court excludes PX1, PX2, and PX3.

## IV.   March 6, 2008 Email Exchange (ECF No. 187)

Plaintiffs seek to introduce an email chain dated March 6, 2008 consisting of six emails between Richard Hahn and Adam Palminteri (the "Email Chain"). In the Email Chain, Hahn and Palminteri discuss a forwarded email using inflammatory language including "suckered," "works over," "stupidity" and "stupid people get burned." (*See* ECF No. 187, Ex. A.) Plaintiffs asked all the Individual Defendants and Joseph Sussman about the Email Chain during their respective depositions. (Defs. 4th MIL Mem. at 2, ECF No. 188.) Plaintiffs concede that the Email Chain is prejudicial but argues that its probative value outweighs its prejudicial nature. (Pl. 4th Opp. at 1-2, ECF No. 192.) Defendants seek to preclude the Email Chain as inadmissible hearsay and more prejudicial than probative. (Defs. 4th MIL Mem. at 4-8.)

1.   Federal Rule of Evidence 803

Hearsay is an out of court statement offered as evidence to prove the truth of the matter asserted and is typically inadmissible. Fed. R. Evid. 801(c), 802. However, this rule is subject to certain exceptions. Fed. R. Evid. 803, 804. One such exception is the business-records exception under Federal Rule of Evidence 803(6). Under the business-records exception, "a record of an act, event, condition, opinion, or diagnosis" will be admitted as hearsay if all of the following criteria are established: (1) "the record was made at or near the time by . . . someone with knowledge"; (2) "the record was kept in the course of a regularly conducted activity of a business"; (3) "making

the record was a regular practice of that activity"; and (4) "all these conditions are shown by the testimony of the custodian or another qualified witness." Fed. R. Evid. 803(6)(A)-(D). "The Second Circuit takes 'a generous view' of the business-records exception, construing it to favor admission over exclusion of evidence with 'any probative value at all,' and viewing the 'principal precondition' to admission of documents under Rule 803(6) to be that the records have 'sufficient indicia of trustworthiness to be considered reliable.'" *Mason Tenders Dist. Council v. Aurash Const. Corp.*, No. 04 Civ. 2427(RCC), 05 Civ. 1891(RCC), 2005 WL 2875333, at *2 (S.D.N.Y. Oct. 31, 2005) (quoting *United States v. Freidin*, 849 F.2d 716, 722 (2d Cir. 1988)).

Although not entirely clear, the Court interprets Plaintiffs' argument as: because the emails were drafted by NLS employees, they are business records. (Pl. 4th Opp. at 2.) However, "[a]n e-mail created within a business entity does not, for that reason alone, satisfy the business records exception of the hearsay rule." *Morisseau v. DLA Piper*, 532 F. Supp. 2d 595, 621 n.163 (S.D.N.Y. 2008), *aff'd*, 355 F. App'x 487 (2d Cir. 2009) (citing Fed. R. Evid. 803(6)). Rather, a party seeking to introduce an email as non-hearsay under the business records exception "must show that the employer imposed a business duty to make and maintain such a record." *Schaghticoke Tribal Nation v. Kempthorne*, 587 F. Supp. 2d 389, 397 (D. Conn. 2008), *aff'd*, 587 F.3d 132 (2d Cir. 2009) (citations omitted); *see also United States v. Figueroa*, No. 7:23-CR-161 (MAD), 2023 WL 8373566, at  *3 (S.D.N.Y. Dec. 4, 2023) ("A party seeking to introduce an email made by an employee about a business matter under the hearsay exception under Rule 803(6) must show that the employer imposed a business duty to make and maintain such a record."). Because Plaintiffs make no such showing, the Email Chain does not fall into the business records exception to the hearsay rule.

2.   Federal Rule of Evidence 807

Regardless, Plaintiffs argue that the Email Chain should be admitted under Rule 807. Rule 807 provides for a residual exception to the hearsay rule for those statements not admissible under the hearsay exceptions in Rules 803 or 804. The residual exception allows for statements to be admitted when "the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it is made and evidence, if any, corroborating the statement; and [ ] it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807(a). Evidence submitted under the residual exception must meet five requirements: (1) trustworthiness; (2) materiality; (3) probative importance; (4) the interests of justice, and (5) notice. *United States v. Griffin*, 811 Fed. App'x 683, 686 (2d Cir. 2020) (citing *Parson v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir. 1991)). Rule 807 is used "very rarely, and only in exceptional circumstances." *Parson*, 929 F.2d at 907.

In support of their argument, Plaintiffs cite to *Stimm v. New York City Transit Auth.*, 2013 U.S. Dist. LEXIS 8534 (E.D.N.Y. Jan. 18, 2023), in which the Eastern District Court for New York permitted an email under Rule 807. In that case, the district court determined that the email sender's attempt to be precise as well as his awareness that his co-workers would rely on his statements created "circumstantial guarantees of trustworthiness equivalent to those underlying the business records exceptions." *Stimm*, U.S. Dist. LEXIS 8534, at *28. There are no such circumstantial guarantees here. The Email Chain depicts two NSL employees engaged in an informal discussion of a forwarded email chain.

Plaintiffs argue that the Email Chain "shows the culpability of Defendants" and "is more probative on the material issue of Defendants intention and actions in defrauding small business

owners than any other evidence. (Pl. 4ᵗʰ Opp. at 2, 3.) The Court is unpersuaded. Plaintiffs fail to

demonstrate *how* or *why* this email chain is more probative on the material issue than any other

evidence. As Defendants noted, the Email Chain is between two non-parties, employees at NLS,

whom Plaintiffs have not indicated they intend to call as witnesses. Plaintiffs do not provide any

information about the employees—such as their role within NLS—or any additional context for

the emails. The Court further agrees that nothing within the standalone email thread indicates that

Hahn's or Palminteri's statements could be ascribed to any Defendants, even their employer NLS.

(Defs. 4ᵗʰ MIL Mem. at 7.) The Court therefore holds that it would not serve the interests of justice

to admit the Email Chain—devoid of context and concededly prejudicial—under Rule 807.[4] The

Email Chain therefore constitutes inadmissible hearsay. Accordingly, the Court grants Defendants'

motion to preclude the March 6, 2008 Email Chain.

---

[4] Plaintiffs assert two other arguments: (1) Defendants failed to object to the March 6, 2008 Email Chain and (2) the
Court should give "great weigh" to the fact that NLS itself produced the Email Chain in a prior litigation. (Pl. 4ᵗʰ
Opp. at 2, 3.) First, Defendants represent that the parties stipulated that all objections except to form would be
reserved until trial. Moreover, Plaintiffs fail to fully argue or cite to any supporting case law on this point. Plaintiffs
do not even argue that Defendants waived their right to object to the Email Chain, they merely note that Defendants
did not object during the depositions. Second, the Court disagrees that it should give any weight to the fact that NLS
produced the Email Chain in a prior litigation. Discoverable evidence is not necessarily admissible evidence. Also,
that NLS produced the Email Chain is irrelevant to whether it constitutes hearsay.

**CONCLUSION**

For the foregoing reasons, the Court resolves Defendants' motions as follows: (1) Defendants' first motion at ECF No. 181 is GRANTED IN PART, DENIED IN PART; (2) Defendants' second motion at ECF No. 183 is DENIED; (3) Defendants' third motion at ECF No. 185 is GRANTED; and (4) Defendants' fourth motion at ECF No. 187 is GRANTED.

The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 181, 183, 185, and 187.

Dated:   May 24, 2024                         SO ORDERED:
         White Plains, New York

                                          _____
                                              NELSON S. ROMÁN
                                          United States District Judge