USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/24/2025

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ELAINE AGHAEEPOUR, ANNE BARR, BRUCE DRAGO, JULIE HIGGINS, SHANE MOORE, MICHELE NORRIS, JESUS RIVERA, and HONG ZHANG,

                Plaintiffs,

-against-

NORTHERN LEASING SYSTEMS, INC., MBF LEASING, LLC, LEASE FINANCE GROUP, LLC, LOUIS CUCINOTTA, JENNIFER CENTENO a/k/a JENNIFER NUGENT, JAY COHEN, SARA KRIEGER, JOSEPH I. SUSSMAN, and JOSEPH I. SUSSMAN, P.C.,

                Defendants.

No. 14-CV-5449 (NSR)

**OPINION & ORDER**

---

NELSON S. ROMÁN, United States District Judge:

       From June 18, 2024, until July 3, 2024, the Court presided over a jury trial in which plaintiff Elaine Aghaeepour and Michele Norris (collectively, the "Plaintiffs") pursued civil claims alleging violations of the Racketeering Influenced and Corrupt Organizations Act of 1970 ("RICO"), the Federal Credit Reporting Act ("FCRA"), the New York Federal Credit Reporting Act ("NYFCRA"), and New York General Business Law § 349. On July 3, 2024, the jury returned a verdict in favor of Plaintiffs on all claims.

       This opinion addresses Defendants' motion for a directed verdict under Federal Rule of Civil Procedure 50(a) (ECF No. 211), Defendants' renewed motion for a directed verdict under Rule 50(b) (ECF No. 223), Defendants' motion for a new trial under Rule 59(a) (ECF No. 225), and Defendants' motions for contempt and sanctions. (ECF No. 225)

1

For the following reasons, the Court GRANTS Defendants' motion for a directed verdict under Rule 50(b) and DENIES Defendants' motion for a new trial under Rule 59(a) as well as Defendants' motion for contempt and sanctions.

**FACTUAL BACKGROUND**

Defendants operated a business where they would use Independent Service Organizations ("ISOs") to sell credit card processing terminals to business merchants. Merchants could buy the credit card processing terminal outright or lease it and make monthly payments. If the merchant opted to buy it outright, the ISO would receive a fee and the balance of the proceeds would go to Defendants. If the merchant instead opted to lease the terminal, the ISO would still receive a fee and Defendants would accept monthly payments from the merchants for the duration of the lease at a predetermined rate.

Plaintiffs were both small business owners who were visited by ISOs working with Defendants. According to Plaintiffs, the ISOs attempted to get them to sign leases for the credit card processing terminals, but they never ultimately signed one. Plaintiffs claim that being unable to secure a legitimate lease, the ISOs forged their signature on the lease and Defendants began debiting their accounts monthly. Once Plaintiffs became aware of the debits, they ceased making payments and attempted to dispute the charges and lease with Defendants. Plaintiffs claim that these discussions were not productive and that they were subjected to incessant collection calls from Defendants seeking to recoup payments for the remainder of the lease. Once those calls failed to secure the balance of the lease payments, Defendants then filed lawsuits against Plaintiffs. Ms. Norris was allegedly served by certified mail while Ms. Aghaeepour was served by process server. Neither of the Plaintiffs claim to have been properly served. As a result, they never appeared to

defend against Defendants' suit and Defendants obtained default judgments against Plaintiffs. After obtaining the default judgments, Defendants continued to debit Plaintiffs' accounts.

Plaintiffs allege that Defendants' operations amounted to an illegal RICO enterprise whose object was to obtain fraudulent leases to debit merchants' accounts. If those payments ceased, the scheme would proceed by Defendants filing lawsuits in civil court so that they could obtain default judgments against those merchants and continue siphoning money from their accounts. As articulated by Plaintiffs' counsel during oral argument, Plaintiffs' order of proof was the following:

- Merchants accused ISOs of forgery,
- Defendants failed to properly respond to those allegations,
- Defendants failed to properly supervise or train the ISOs,
- Defendants' business had a poor verification process before filing of the lawsuits,
- Defendants used poor methods of service to serve Plaintiffs,
- Defendants chose a venue in New York City Civil Court when many merchants were scattered throughout the United States,
- From 2010-2016 Defendants filed 30,000 lawsuits that resulted in 19,000 default judgments.

Tr. 1443:6-23.

The foundation of Plaintiffs' theory is that merchants' leases were being forged. Ms. Norris' testimony related to her allegedly forged signature was the following:

- Q. The only way that this got on this document was some kind of cut-and-paste job, right?
- A. Yes.
- Q. You don't know where -- well, first of all, you don't know who cut and pasted it, do you?
- A. No.
- Q. Do you have any suspects?

3

- A. No.
- Q. And you don't know where that person cut and pasted it from, right?
- A. To the best of my knowledge, the only thing I could think of was when I signed the DHL delivery.
- Q. Okay. Do you have that?
- A. No.

Tr. 1058:7-22. Ms. Aghaeepour's testimony related to her allegedly forged signature was the following:

- Q. And you signed the check?
- A. Yes. That's where they got my signature from.
- Q. That's where who got your signature from?
- A. MBF Leasing and Northern Leasing.
- Q. They took it from this check?
- A. Absolutely.
- Q. So you believe that the cut and paste which we'll talk about came from this check?
- A. Possibly.
- Q. Possibly or yes or no?
- A. Yes.
- Q. Yes?
- A. Well, I wasn't there when it happened, so to the best of my knowledge.
- Q. Let's try it this way. Exhibit P, Exhibit P, which we don't have to bring up, is the first lease, the Northern Leasing lease, right? Yes?
- A. Yes.
- Q. Is it your testimony that they got your signature off of this check for that lease?
- A. Possibly.

Tr. 1514:14-25, 1515:1-12.

## PROCEDURAL HISTORY

On July 1, 2024, Defendants filed a motion for a directed verdict under Rule 50(a). (ECF No. 211) Plaintiff filed an opposition the following day. (ECF No. 212) On July 3, 2024, the jury returned a verdict in favor of Plaintiffs. On August 19, 2024, Defendants filed a renewed motion for a directed verdict under Rule 50(b) (ECF No. 223) and, in the alternative, a motion for a new trial under Rule 59(a). (ECF No. 225) As part of this same motion, Defendants moved for sanctions against Plaintiffs' counsel. (ECF No. 225) On September 18, 2024, Plaintiffs filed an opposition

to Defendants' motion for a directed verdict (ECF No. 230) and an opposition to Defendants' motion for a new trial. (ECF No. 229)

**LEGAL STANDARD**

Rule 50(a) allows a party to move for judgment as a matter of law ("JMOL") after trial has begun but before the case has been submitted to the jury. *See Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 286 (2d Cir. 1998). Rule 50(a) does not define the level of specificity needed for the motion but the purpose of the motion is to articulate the ground on which JMOL is sought "to give the other party an opportunity to cure the defects in proof that might otherwise preclude him from taking the case to the jury." *Baskin v. Hawley*, 807 F.2d 1120, 1134 (2d Cir.1986) (internal quotation marks omitted). After an unfavorable verdict, Rule 50(b) allows a party to renew its motion for JMOL. *See Galdieri-Ambrosini*, 136 F.3d at 286. But the post-trial Rule 50(b) motion is limited to those grounds that were raised in the prior Rule 50(a) motion. *Id*.

"Under Rule 50, a court should render judgment as a matter of law when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000). The standard mirrors that for summary judgment—i.e., that the court must draw all reasonable inference in favor of the nonmoving party without making credibility determinations or weighing the evidence. *Id* at 150. It is for the jury to determine the facts and for the judge to determine the law. *Id*. Moreover, the court is to disregard all evidence favorable to the moving party that the jury is not required to believe. *Id* at 151. A Rule 50(b) motion may only be granted "if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture." *Kinneary v. City of N.Y.*, 601

5

F.3d 151, 155 (2d Cir. 2010) (quoting *Brady v. Wal–Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008)).

The Second Circuit has explained that, though all inferences are to be drawn in the non-movant's favor, "an inference is not a suspicion or a guess." *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019) (citing *Siewe v. Gonzales*, 480 F.3d 160, 168 (2d Cir. 2007) (internal quotations omitted). Rather, it is "a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999) (quoting 1 Leonard B. Sand et al., Modern Federal Jury Instructions ¶ 6.01, instr. 6–1 (1997). On the other hand, "impermissible speculation" is when there is "a complete absence of probative facts to support the conclusion reached." *Pauling*, 924 F.3d at 656 (quoting *Lavender v. Kurn*, 327 U.S. 645, 653 (1946). A court is to defer to a jury's reasonable inferences but can give no deference to impermissible speculation. *See United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994). Even "reasonable speculation"—where a factfinder concludes that a disputed fact is possible, but that conclusion is premised on a fact that is not known—is not to be given deference. *See Pauling*, 924 F.3d at 656.

## DISCUSSION

Plaintiffs allege that Defendants' business operations violated 18 U.S.C. §§ 1962(c),(d), FCRA §1681b(f), NYFCRA § 380-b, NYFCRA § 380-o, and New York General Business Law § 349. The Court will analyze each in turn.

## Civil RICO

### Enterprise

In *Sedima, S.P.R.L. v. Imrex Company, Inc.*, 473 U.S. 479 (1985) the Supreme Court set forth the requirements for a violation of 18 U.S.C. § 1962(c), which are (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity, and (5) injury to the plaintiff in his

business or property by the conduct constituting the violation. "The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages." *United States v. Turkette*, 452 U.S. 576, 583 (1981). "The existence of an enterprise at all times remains a separate element which must be proved." *Id*. The enterprise must also have a common purpose that is shared amongst its members. *See Boyle v. United States*, 556 U.S. 938, 946 (2009). In this Circuit, an enterprise must be comprised of "individuals [that] share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir. 2004).

    Here, Plaintiffs failed to prove a common fraudulent purpose. As the Court understands Plaintiffs' theory, Plaintiffs were not alleging that Defendants' entire business model was issuing fraudulent leases to obtain default judgments sometime thereafter. Rather, the theory is that when ISOs could not secure a legitimate lease, they would forge one and obtain monthly payments from unwitting merchants. Once merchants became wise to the scheme, Defendants would then obtain default judgments to continue debiting the merchant's account. Any other theory would make little sense. First, there would be no need for ISOs to legitimately attempt to secure leases and Defendants could have instead forged leases using the phone book to identify unsuspecting victims. Second, if the entire objective was to obtain default judgments to secure payments, the litigation process would have been too delayed and expensive to keep the business afloat or worth operating without some other income stream. The only plausible theory is that Defendants would supplement their legitimate business by obtaining fraudulent leases from ISOs and using default judgments to continue debiting merchants' account to recoup the balance of the lease payments owed.

7

If true, it would have been essential for Plaintiffs to prove that their leases were forged, and that Defendants knew that they were forged. Without proof of forgery, there is no way to distinguish between: (1) a lease that was legitimately signed and entered into by the merchant that the merchant then attempted to break; and (2) a lease that was fraudulently signed by someone other than the merchant that Defendant was trying to improperly collect from. The former would not be fraud but a Defendants' valid use of the legal system, while the latter would be Defendants engaging in a plainly fraudulent scheme. Without proof of forgery, and thereby a fraudulent scheme, Plaintiffs cannot prove a common fraudulent purpose that establishes a RICO enterprise. As mentioned, in the absence of fraud, the use of the court system would have been a legitimate attempt to vindicate Defendants' right to enforce a duly executed contract. The default judgment would have also been a legitimate outcome of a legitimate proceeding. Plaintiffs' entire case is predicated on the original sin of fraudulently signed leases. Unfortunately, Plaintiffs never proved that.

At trial, both Plaintiffs took the stand and testified that they did not know who signed the leases but that they did not sign them. Ms. Norris speculated that "the only thing I could think of was when I signed the DHL delivery." Tr. 1058:17-18. Ms. Aghaeepour also guessed, after admitting that she wasn't there when it happened, so she didn't know, that Defendants could have "possibly" cut and paste her signature from one of her previously issued checks. Tr. 1514:20-22. When Plaintiffs' counsel was questioned on this gap in evidence, Plaintiffs' counsel failed to adequately address it. Instead, Plaintiffs' counsel attempted to burden shift:

- THE COURT: If you're going to rely on the forgeries you're going to have a problem because you never demonstrated who, who committed the alleged information.
- MR. ALTMAN: Why do I -- why is that my burden?

Tr. 1581:9-13. It is a basic principle in our system of law that the person who brings a claim in a dispute bears the burden of proof. It was not for Defendants to prove that they did not forge the documents or that Plaintiffs did, in fact, sign them. It was for Plaintiffs to do so. They did not.

Plaintiffs tried to rely on testimony that others had made allegations that ISOs forged their signature to bolster their claims here. But just because there may have been other allegations of misconduct on the part of ISOs in other cases does not prove that there was forgery in this case. This is made more difficult for Plaintiffs because Defendants do have a legitimate business where there are valid leases, and it would be impossible to determine legitimate from illegitimate leases without more evidence.[1] Plaintiffs' counsel even conceded during oral argument that Defendants did not know how the ISOs were obtaining signatures. Tr. 1444:1-2. Plaintiffs' counsel seemed to be using this as an argument that the Defendants were reckless in their handling of the ISOs. Maybe so. But that in no way supports Plaintiffs allegations that the signatures were forged, and that Defendants knew they were forged such that they were engaged in an enterprise with a common fraudulent purpose. The only testimony proffered at trial did not amount to evidence of forgery but the sort of conjecture and surmise that allows for a Rule 50 motion to be granted. At best, the jury engaged in "reasonable speculation" by crediting Plaintiffs testimony that they did not sign the lease and crediting Plaintiffs' guesses that the ISOs must have done so by cutting and pasting from Ms. Norris' delivery slip and one of Ms. Aghaeepour's previously issued checks. Though possible, this conclusion is not based on known facts but Plaintiffs' speculation. Plaintiffs' counsel also conceded this point during oral argument:

- THE COURT: It would be speculative for anyone to say, based on the evidence presented, that it was the ISOs who cut and paste the signatures as it relates to either Ms. Norris or Ms. Aghaeepour. Is that fair?
- MR. ALTMAN: That's fair.

---

[1] The Court also notes that Ms. Norris was sent a forgery affidavit by Defendants so that she could contest the validity of the lease, but she ultimately never submitted it to Defendants for their review.

9

- THE COURT: Would it be also speculative to say based on the evidence presented that it was someone at either Northern Leasing or MBF who cut and paste the signature.
- MR. ALTMAN: That would, that would be fair.

Tr. 1583:6-15. As such, the universe of testimony on forgery amounts to impermissible speculation that the Court is not required to give deference.

What's worse, even if Plaintiffs were able to prove that the leases were fraudulent, Plaintiffs failed to prove any sort of agency relationship between the ISOs and Defendants. Again, Plaintiffs' counsel conceded as much at oral argument:

- THE COURT: All right, so let me be clear. You have demonstrated -- you have proffered no evidence regarding the relationship between, between the ISOs and MF -- MBF and Northern Leasing.
- MR. ALTMAN: Other than the --
- THE COURT: Such...
- MR. ALTMAN: Sorry.
- THE COURT: Such that they were operating under some type of agency.
- MR. ALTMAN: I'm not talk --
- THE COURT: So you have failed to demonstrate that.
- MR. ALTMAN: Your Honor, I agree, and I haven't even tried.
- THE COURT: All right, and you've conceded, okay.
- MR. ALTMAN: I have agreed that they -- that the ISOs are acting independently…

Tr. 1602:5-20. Without an agency theory, there is no link between any misconduct by the ISOs that can be imputed to Defendants. Plaintiffs' counsel seemed to misunderstand this. On this line of argument, Plaintiffs' counsel stated that "Northern Leasing is here because of their own actions, and the knowledge of the actions of the ISOs when they become aware of what's going on with ISOs, there's a problem. They are not here because the ISO defrauded or, or misrepresented to Ms. Aghaeepour or Ms. Norris. That's not why Northern Leasing is here…but when they became aware of it, it's what they did in [response]." Tr. 1602:20-24, 1603:1-4. Plaintiffs' counsel's argument sounds like he is accusing Defendants of recklessness—that Defendants were aware of misconduct by Defendants that they disregarded and that they failed to respond to it or implement

10

proper controls to prevent it. "[An] actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent." Restatement (Second) of Torts § 500 (Am. L. Inst. 1965). Again, maybe so but these allegations are not consistent with the charges brought in this case. RICO does not contemplate recklessness and requires a common *purpose* to sustain a claim. Accordingly, Plaintiffs failed to prove that Defendants' business operation amounted to an illegal RICO enterprise.

### **Predicate Acts**

To be liable for a RICO violation, a defendant must commit "at least two acts of racketeering activity." *See DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001) (citing 18 U.S.C. § 1961(5)). "Racketeering activity" is satisfied by several qualifying acts, which includes mail and wire fraud. *See* 18 U.S.C. § 1961(1). Plaintiffs allege that Defendants engaged in several acts in furtherance of the RICO enterprise that constituted mail and wire fraud. The Court instructed the jury that they must find at least two of the following types of predicate acts occurred:

- One: Defendants in New York wrongfully caused the mailing via interstate mails of the summons and complaint and the New York Civil Court judgment to Ms. Aghaeepour in California and Ms. Norris in Texas;
- Two: The defendants in New York wrongfully made telephone calls via interstate wires to Ms. Aghaeepour in California and Ms. Norris in Texas;
- Three: The defendants Northern Leasing Systems, Inc. and MBF Leasing, LLC wrongfully debited Ms. Aghaeepour's bank account in California and Ms. Norris' bank account in Texas;
- Four: The defendants Northern Leasing, Inc. and MBF Leasing, through the use of interstate wires, wrongfully accessed Ms. Norris' and Ms. Aghaeepour's consumer credit report.

The predicate acts suffer several deficiencies. Most damning is that all four predicate acts are based on the leases being fraudulent. Without evidence of that, the mailing of the summons and complaint were not wrongful, but a legitimate exercise of Defendants' rights to enforce a contract.[2] Absent fraud, the collection calls were also not wrongful but legitimate attempts to recoup money that was duly owed to Defendants. The debiting of Plaintiffs' accounts would also not have been wire fraud but the lawful collection of money owed for a good or service. And finally, accessing Plaintiffs consumer credit report would not have been wrongful but part of Defendants' legitimate process for underwriting leases. These acts are only wrongful if the leases were not signed by Plaintiffs. As discussed above, there is an insufficient evidentiary basis for the jury to have concluded that Plaintiffs' leases were forged. Accordingly, Defendants mailings, telephone calls, debiting of accounts, and accessing of consumer credit reports would not qualify as sufficient predicate acts to sustain a RICO claim.

The Court also notes, though it need not rely on this for purposes of resolving this motion, that Plaintiffs failed to prove harm from the collection calls and from accessing the credit reports. RICO's provision for civil actions reads that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue." *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 265 (1992) (citing 18 U.S.C. § 1964(c)). As a result, "the compensable injury necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497 (1985). Here, the only harm alleged by Ms.

---

[2] The Court also notes that normal litigation activities absent fraud, or a more concerted abuse of the legal system, typically cannot constitute a viable RICO predicate act. *See Black v. Ganieva*, 619 F. Supp. 3d 309, 342 (S.D.N.Y. 2022) (collecting cases). Here, absent the fraudulent signatures, the lawsuits would have been legitimate. Again, the Court does not rely on this for purposes of resolving this motion but notes the problematic nature of this predicate act absent more.

12

Norris from the collection calls was that they were "annoying." Tr. 1115:23. Ms. Aghaeepour also similarly characterized them as "annoying" and "harassment." Tr. 1394:21-25. There was no mention of harm to business or property anywhere in the record from this act and mere personal annoyance does not qualify when it does not implicate business or property interests. *See Horn v. Med. Marijuana, Inc.*, 80 F.4th 130 (2d Cir. 2023). Moreover, there doesn't seem to be any harm from the credit report being obtained by Northern Leasing. The harm that Aghaeepour testified to was from restraints, levies, and duplications. Tr. 1399:12-15. But these are harms that resulted separately from obtaining her credit report. Ms. Norris also testified that she learned about the default judgment through her credit report, but the record does not include any mention of harm caused by Defendants obtaining her credit report. The closest instances come from Plaintiffs' counsel asking Ms. Norris if Northern Leasing made adverse entries on her credit report. To which Ms. Norris responded, "I don't remember." Tr. 1007:1-4. Again, the Court does not rely on this for purposes of resolving this motion but notes it to underscore that Plaintiffs' case was rife with legal and evidentiary holes.

Accordingly, there is no legally sufficient evidentiary basis for a reasonable jury to conclude that Defendants violated RICO.

**Civil RICO Conspiracy**

"To establish a conspiracy to violate the civil RICO statute pursuant to 18 U.S.C. § 1962(d) ... plaintiff must prove (1) that there existed a conspiracy to commit acts that, if successful, would constitute a substantive civil RICO violation; (2) that defendant agreed to join in, and knowingly participated in, that conspiracy; and (3) that defendant acted in furtherance of the conspiracy in some manner (although not necessarily by the commission of any RICO predicate acts himself)." *City of New York v. Chavez*, 944 F. Supp. 2d 260, 268-69 (S.D.N.Y. 2013) (citing *United States v.*

*Pizzonia*, 577 F.3d 455, 463-64 (2d Cir. 2009). Plaintiffs must prove that "[t]he partners in the criminal plan … agreed to pursue the same criminal objective." *Salinas v. United States*, 522 U.S. 52, 63 (1997). Not only that the defendants "intended for the broad goals of the racketeering scheme be realized," but also "that some (or any) members of the conspiracy intended that specific criminal acts be accomplished." *United States v. Zemlyansky*, 908 F.3d 1, 11–12 (2d Cir. 2018). If the plaintiff can prove that the defendants "share a common purpose, [then] conspirators are liable for the acts of their co-conspirators." *Id* at 64.

Here, the theory is that Defendants conspired to obtain fraudulent leases to then obtain defaults judgments. But much like the substantive count, Plaintiffs failed to provide proof of an agreement to bring lawsuits against business merchants who reneged on their fraudulent leases. There was no evidence of internal meetings or internal documents where the alleged coconspirators met to speak about the architecture of this scheme, who was to take what role, how the scheme would work, discussions of its progress, or some other indicia of nefarious conduct. *See United States v. Maldonado-Rivera*, 922 F.2d 934, 979 (2d Cir. 1990) (concluding that evidence of meetings amongst coconspirators as well as one coconspirators possession of documents that related to the innerworkings of the conspiracy presented sufficient evidence to establish conspiracy). There was no testimony from insiders at Northern Leasing who said that there was an illegal scheme to secure fraudulent leases and to pursue lawsuits or that they all had agreed to do so. *See United States v. Diaz*, 176 F.3d 52, 94 (2d Cir. 1999) (determining that testimony of coconspirators was sufficient to show that defendant had knowingly and intentionally joined the conspiracy). There was no evidence of text messages between ISOs and representatives at Northern Leasing that they had secured fraudulent leases. *See United States v. Smothers*, No. 20-CR-213 (KAM), 2023 WL 6796295 at *5 (E.D.N.Y. Oct. 13, 2023) (finding that evidence of text

messages, meetings related to the conspiracy, and witness testimony established a RICO conspiracy). There was no evidence in the record of emails between employees of Northern Leasing discussing that they would, or how they would, bring lawsuits against merchants once the merchants became aware of the fraudulent leases. *See Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) (noting that an e-mail or phone call can provide direct evidence of conspiracy). The record was bereft of any evidence of a conspiracy to violate RICO. The only evidence that Plaintiff could marshal was that Mr. Cohen, the owner of Northern Leasing, had "conversations" with the other Defendants about lawsuits. Tr. 1442:20-25. As the Court pointed out then, and as it will point out now, mere conversations do not go to proof of a conspiracy. Business owners sometimes sue or get sued, but mere conversations about litigation related to the business does not mean that the lawsuits were part of a wrongful conspiracy to commit RICO. Even if Mr. Cohen himself was guilty of some nefarious conduct with respect to the lawsuits filed against Plaintiffs, mere association with Mr. Cohen would not be sufficient to establish a conspiracy between him and his employees. *See United States v. Torres*, 901 F.2d 205 (2d Cir. 1990) (explaining that mere association with a conspirator, without more, is insufficient to establish membership in a conspiracy).

When pressed on Plaintiffs' conspiracy theory, Plaintiffs' counsel responded that he was not satisfied with the robustness of Northern Leasing's verification process, that there were more effective means to serve the lawsuits on individuals, that the ISOs were not properly supervised, and that Northern Leasing's venue selection was New York. Tr. 1443-45. According to Plaintiffs' counsel, this was all proof of conspiracy. But none of this proves the existence an agreement between the Defendants to obtain fraudulent leases and to then obtain default judgments. Plaintiffs' counsel may have been trying to argue that these circumstances were proof of a tacit agreement

15

through commonality of conduct. This would have been an odd fit given the charges, but in any event, to do so would require more. "Proof of consciously parallel business behavior is circumstantial evidence from which an agreement, tacit or express, can be inferred but that such evidence, without more, is insufficient unless the circumstances under which it occurred make the inference of a rational, independent choice less attractive than that of concerted action." *Ambook Enterprises v. Time Inc.*, 612 F.2d 604, 615 (2d Cir. 1979) (quoting *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 446 (3 Cir. 1977)). Plaintiff adduced no such evidence at trial. Accordingly, there is no legally sufficient evidentiary basis for a reasonable jury to conclude that Defendants engaged in a conspiracy to commit RICO.

**Fair Credit Reporting Act Claims**

Plaintiffs also allege several state and federal consumer protection violations. Plaintiffs allege that Defendants violated FCRA §1681b(f) for accessing Plaintiffs' consumer report without a permissible purpose, NYFCRA § 380-b for requesting Plaintiffs' consumer report without a legitimate purpose or with false pretenses or without providing advanced notice, and NYFCRA § 380-o for knowingly and willfully introducing false information on Plaintiffs' consumer report for the purpose of damaging their credit information.

Defendants argue in their Rule 50(b) motion that Plaintiffs failed to provide reliable evidence that the credit reports were pulled. Defendants point the Court to Ms. Aghaeepour's testimony that only indicated that she never gave Defendants permission to pull her credit report and not that they had, in fact, done so. Tr. 1046:23-25, 1407:1-2. Defendants also argue that Ms. Norris' testimony was too vague to constitute reliable evidence that her credit report was pulled and that it was not backed by documents or other corroborative evidence. Tr. 1006:4-9. Ms. Krieger, however, did testify that there was a practice of pulling credit reports of merchants who

had signed leases. Tr. 829:20-23. Crediting this evidence as true, as the court must assume the jury did, evidence that Defendants had a practice of pulling the credit reports of every lessor, along with one Defendant who personally testified that her credit report was pulled several times, could be enough for a reasonable jury to conclude that Plaintiffs' credit reports were pulled.

Normally, a court is limited to the arguments made on a Rule 50(a) motion and renewed on a Rule 50(b) motion. *See Galdieri-Ambrosini*, 136 F.3d at 286. The only exception to this general rule is when a court must address additional arguments to prevent "manifest injustice" or to correct a "purely legal error." *Malmsteen v. Berdon, LLP*, 369 Fed.Appx. 248, 249 (2d Cir. 2010). "Manifest injustice exists where a jury's verdict is wholly without legal support." *ING Glob. v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 97 (2d Cir. 2014) (collecting case). In *Russo v. State of N.Y.*, the Second Circuit concluded that a jury verdict was "wholly without legal support" where the plaintiff "failed to prove one of the four essential elements of a malicious prosecution action." 672 F.2d 1014, 1022 (2d Cir. 1982). The Circuit has also indicated that it "cannot find manifest injustice ... where, had Defendants properly raised [an] issue at trial, 'it may be that Plaintiffs would have been able to present additional evidence'" on that issue. *Rivera v. City of N.Y.*, 594 Fed.Appx. 2, 6 (2d Cir. 2014) (quoting *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 164 (2d Cir. 1998)).

With respect to the credit accessing violations, all these counts are predicated on the wrongful accessing of a consumer report for various reasons: without an authorized purpose, without a legitimate purpose, under false pretenses, or without providing advanced notice. But as with the RICO claims, these claims are based on the theory that the original leases were fraudulently signed. Without evidence of that, Plaintiffs cannot establish that the accessing of the consumer reports were wrongful. As Ms. Krieger testified, once a lessor signed a lease, it was

common practice for them to ascertain their credit information and that they did so as a matter of legitimate business. These acts only become wrongful if the leases were forged. So too with the reporting of false information in violation of NYFCRA § 380-o. This count is predicated on Defendants reporting that Plaintiffs had reneged on their lease and failed to make payments pursuant to the lease agreement. This only becomes a violation if the reporting was false. But if the lease was duly signed (which there is no evidence that it was not, and it was Plaintiffs' burden to prove otherwise) the information that was reported was not false. Instead, it was a legitimate report of a consumer who had failed to pay their debts.

This argument was not made by Defendants in their Rule 50(a) motion. But Defendants did raise several issues related to the lack of proof of Plaintiffs' theory of fraudulent leases—specifically with Plaintiffs' method of attempting to prove that the signatures were forged and with the "empty chair problem" of the ISOs missing from the Defendants' table. Tr. 1452:16-24, 1566:18-25, 1567:1-7. The Court also pressed Plaintiffs about this specific gap in Plaintiffs' proof of forgery. Tr. 1581:9-13. From these exchanges, Plaintiffs' counsel was put on notice that there were substantial gaps in his case and particularly so with respect to his forgery allegations. But instead of attempting to re-open his clients' case to better establish the forgery proof, Plaintiffs' counsel responded, "… why is it my burden?" Tr. 1581:12. It was always Plaintiffs' burden to establish all the necessary elements of his clients' claims. He failed to do so. Being that this is an essential element at the heart of these counts, and that Plaintiffs' counsel was effectively put on notice that there were deficiencies in his order of proof, the Court is forced to address it to prevent manifest injustice. As a result, the Court concludes that there is no legally sufficient evidentiary basis for a reasonable jury to conclude that Defendants violated FCRA §1681b(f), NYFCRA § 380-b, and NYFCRA § 380-o.

**New York General Business Law § 349**

Plaintiffs also allege violations of New York General Business Law § 349 for engaging in an act or practice that is deceptive or misleading.[3] For the same reasons as the Fair Credit Reporting claims, these counts must also be dismissed. There is no proof of fraudulent leases and as such there was no basis for the jury to conclude that the Defendants engaged in deceptive or misleading practices through their use of the court system. As mentioned, absent fraud, Defendants use of the court system would have been a legitimate exercise of Defendants' right to enforce a duly executed contract. Accordingly, there is no legally sufficient evidentiary basis for a reasonable jury to conclude that Defendants violated New York General Business Law § 349.

**Sanctions**

District courts are vested with certain inherent power. The inherent power to sanction derives from the fact that courts are "vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991). "An award of sanctions under the court's inherent power must be based on clear evidence and must be accompanied by a high degree of specificity in the factual findings." *Mickle v. Morin*, 297 F.3d 114, 125–26 (2d Cir. 2002) (citation and internal quotation marks omitted). Contempt requires a finding that "(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir.1995).

Defendants move for sanctions and contempt against Plaintiffs' counsel for violation of the Court's order with respect to Defendants' third motion *in limine*, violation of the Court's order

---

[3] Defendants also failed to make this argument in their Rule 50(a) motion, but for the same reasons, the Court must address it.

19

with respect to Defendants' fourth motion *in limine*, and for repeated instances of arguing to the jury that an unincorporated entity has any existence beyond its sole proprietor despite the Court's several warnings that such arguments were improper and misleading to the jury. It is soundly within the Court's discretion to issue sanctions. The Court declines to do so here. Though Plaintiffs' counsel did violate the Court's orders and did mislead the jury, there is not enough indicia of bad faith for the Court to impose sanctions. Moreover, any potential harm from Plaintiff's improper actions would have been corrected by the Court's instructions to the jury. Accordingly, the Court must dismiss Defendants' motion for contempt and sanctions.

## CONCLUSION

For the above reasons, Defendants' motion for judgment as a matter of law is GRANTED. Defendants' motions for a new trial under Rule 59(a) and for sanctions are DENIED.

The Court directs Defendants to submit a proposed judgment on or before January 31, 2025.

Dated: January 24, 2025　　　　　　　　　　　　　SO ORDERED:
White Plains, New York

　　　　　　　　　　　　　　　　　　　　　　　　　　NELSON S. ROMÁN
　　　　　　　　　　　　　　　　　　　　　　　　　　United States District Judge

20